

April 26, 2024

**Via ECF**

The Honorable Araceli Martínez-Olguín
United States District Court for the Northern District of California
San Francisco Courthouse Courtroom 10 — 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re:    *In re OpenAI ChatGPT Litigation*, Master File No. 23-cv-3223-AMO

Dear Judge Martínez-Olguín:

Pursuant to the Court's standing order, the Parties hereby submit this joint discovery letter brief concerning Plaintiffs' Interrogatory Nos. 12 and 14. Lead counsel for the parties met and conferred regarding the issues discussed herein on March 28, 2024. The Parties are at impasse.

**A.  Interrogatory No. 12**

  **1.  Plaintiffs' Statement**

**Interrogatory No. 12** seeks basic information with respect to the identity of social-media usernames of certain current and former employees of Defendants who used personal social-media accounts to communicate on the subjects of the litigation. Consistent with principles of cooperation underlying electronic discovery, Plaintiffs have narrowed the scope of Interrogatory No. 12. *See In re Facebook PPC Advert. Litig.*, 2011 WL 1324516, at *1, n.1 (Apr. 6, 2011) (citing The Sedona Conference and other authority that "counsel are generally directed to meet and confer to work in a cooperative, rather than an adversarial manner, to resolve discovery issues."). Defendants nonetheless refuse to respond. The Court should order Defendants to respond to Interrogatory No. 12, narrowed as follows:

- For *current* employees or board members listed in response to any interrogatory, Defendants will investigate whether any such employee or board member has used any of their personal social media accounts to discuss anything relevant to this litigation. If so, Defendants will produce those individuals' social media usernames.

- For *past* employees or board members, Defendants will produce the social media usernames of those individuals to the extent they are known to Defendants.

Plaintiffs have limited this interrogatory to only require identification of social-media *usernames* of responsive individuals who utilize their social media accounts to discuss anything relevant to the litigation. Courts allow discovery of information sufficient to identify non-party employee social media accounts. *See Roblox Corp. v. WowWowee Grp. Ltd.*, 2023 WL 8374741, at *2 (N.D. Cal. Dec. 4, 2023). And, Plaintiffs' request is indistinguishable from asking a deponent if she uses her personal cell phone for work, and requesting her personal cell-phone number if she does. Courts in this district consider this discoverable if tied to the claims at issue. *See, e.g., Robinson v. Chefs' Warehouse*, No. 3:15-cv-05421-RS(KAW), 2017 WL 4509142, at *3 (N.D. Cal. Oct. 10, 2017) (ordering defendant to disclose witness's personal cell-phone number where cell phone was used to call and manage class members).

Several of the individuals listed in response to Plaintiffs' interrogatories routinely utilize their personal social-media accounts to publicly discuss ChatGPT and the GPT language models, the relevant technology products at the center of this action.[1] *See* The Sedona Conference, *Primer on Social Media*, 20 Sedona Conf. J. 1, 23 (2019) ("Social media evidence may be relevant in several ways . . . , even in a situation where social media evidence does not seem to impact issues of liability, it may be relevant to issues such as standing, damages, or good-faith participation in the judicial process."). Moreover, responsive individuals have used other forms of media to discuss sources of training data, which is directly relevant to the allegations at issue here.[2]

Furthermore, Defendants' employees may operate some of their personal social-media accounts pseudonymously. Plaintiffs have zero ability to uncover these except through discovery. For instance— Elon Musk, co-founder and early investor in OpenAI,[3] admitted in a recent deposition in a separate action that he operates two separate pseudonymous Twitter accounts.[4]

Defendants argue that the examples cited in footnote 1 do not directly support the allegations at issue. But Plaintiffs' narrowed request asks a threshold question of whether responsive individuals have utilized their personal social-media accounts to discuss anything relevant to this action.

Contrary to Defendants' claims, they are in a far better position than Plaintiffs to investigate whether their employees use social media to discuss relevant topics and then request their social-media usernames. *Kellman v. Spokeo, Inc.*, No. 3:21-cv-08976-WHO, 2023 WL 411353, at *1 (N.D. Cal. Jan. 25, 2023) citing *Hinostroza v. Denny's Inc.*, 2018 WL 3212014, at *6 (D. Nev. June 29, 2018) (collecting district-court decisions within the Ninth Circuit permitting discovery of social-media posts and information). The burden of doing so is minimal, and Rule 26's proportionality concerns clearly tip in favor of discovery given that this is a case of broad public concern. Any privacy interests in matters publicly communicated in social media can be addressed by the protective order entered in this case.

2. **OpenAI's Statement**

Plaintiffs are not seeking information about *OpenAI's* social media accounts. They want employees' and Board members' *personal* accounts. Plaintiffs portray their request as narrow because it is limited to individuals identified in OpenAI's interrogatory responses. It isn't a narrow request. OpenAI has *already* identified 24 individuals in its interrogatory responses. OpenAI does not collect from its employees and Board Members information about personal social media accounts, or monitor those

---

[1] *See, e.g.,* Sam Altman (@sama), X, https://t.ly/I6Vwj (April 11, 2024) "gpt-4 now significantly smarter and more pleasant to use"); Mira Murati (@MiraMurati), X, https://t.ly/1RCHo (March. 16, 2024) ("One year since GPT-4 deployment: From GPT-1 and 2 establishing the language model paradigm, through GPT-3's scaling predictions, to GPT-4 showing how complex systems emerge, mimicking nature's unpredictable patterns from simple elements."); Ilya Sutskever (@ilyasut), X, https://t.ly/2H75N (Nov. 20, 2023) ("I deeply regret my participation in the board's actions. I never intended to harm OpenAI."); Greg Brockman (@gdb), X, https://t.ly/iR9VZ (Apr. 10, 2024) ("Example of new GPT-4 Turbo compared to old . . .").
[2] *See* Wall Street Journal, YouTube, OpenAI's Sora Made Me Crazy AI Videos—Then the CTO Answered (Most of) My Questions (Mar. 13. 2024) https://www.youtube.com/watch?v=mAUpxN-EIgU/.
[3] OpenAI, OpenAI and Elon Musk, https://openai.com/blog/openai-elon-musk (Mar. 5, 2024).
[4] Rolling Stone, Musk Admits He Doesn't Fact-Check Himself and Has Two Burner Accounts on Twitter, https://t.ly/ATC_X/ (Apr. 8, 2024).

accounts in the ordinary course of business. Plaintiffs' request goes far beyond what OpenAI has, and none of the requested accounts are relevant in any event. Plaintiffs' request should be denied in its entirety.

First, Plaintiffs point to several examples of OpenAI-affiliated individuals who have discussed OpenAI's business in general on social media, but not one of the posts they have identified has any bearing on the claims in this case. That Plaintiffs found a handful of examples of generic commentary about OpenAI is not enough to show relevance. *See Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (requesting party bears the burden of showing relevance). This case is about the alleged use of copyrighted works as training data for the models underlying ChatGPT. None of the examples in Footnote 1 have anything to do with that issue. And the *only* example Plaintiffs cite that does implicate the issue has nothing to do with OpenAI employees' personal social media accounts—it's an interview with OpenAI's Chief Technology Officer posted by the Wall Street Journal. The fact that Plaintiffs scoured at least four of the social media accounts they request and came up empty affirmatively demonstrates their *irrelevance*. The Court should deny Plaintiffs' motion on this basis alone. *Twitter, Inc., v. Skootle, Corp.*, No. C 12-1721 SI, Order, ECF No. 71 (N.D. Cal Nov. 7, 2012) (denying motion to compel employees' personal social media accounts where Plaintiffs failed to show they "used 'personal' accounts in furtherance of the allegations made in the complaint") (Ex. A).

Second, OpenAI does not have all of the requested information in its possession or custody. *See* Fed. R. Civ. P. 34(a)(1). While OpenAI knows of the X/Twitter handles of some of its employees, the company does not systematically collect from its employees and Board members information about personal social media accounts, or monitor those accounts in the ordinary course of business. (Baker-Whitcomb Decl.) Absent a showing of relevance, it is unreasonable for Plaintiffs to demand that OpenAI contact its employees and Board members to collect information it does not have.

Nor are employees' and Board members' personal accounts within OpenAI's *control*—defined in the Ninth Circuit as "the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-CV-01967 CW NC, 2012 WL 161240, at *5 (N.D. Cal. Jan. 17, 2012) (denying motion to compel when defendant lacked a legal right to obtain information from a non-party); *Smart v. Nat'l Collegiate Athletic Ass'n*, No. 1:23-CV-425-WBS-KJN, 2023 WL 7407525, at *4 (E.D. Cal. Nov. 9, 2023) (same). Plaintiffs have identified no legal basis for OpenAI to demand its employees and Board members turn over information about their personal accounts. *See Smart*, 2023 WL 7407525 at 4. While courts have found information "readily obtainable" from a third-party discoverable under limited circumstances, those cases are limited to situations of formal control (e.g., parent-subsidiary corporations). *Id.* at *3 (collecting cases). Plaintiffs' insistence that OpenAI is "in a better position" to ask for non-party employees' personal accounts does not put that information within the company's control. *Id.*

Third, Plaintiffs' cited cases are of no help. In *Roblox Corp. v. WowWowee Grp. Ltd.*, the court ordered the identification of personal accounts only after the defendant admitted at least one such account was relevant. 2023 WL 8374741, at *2 (N.D. Cal. Dec. 4, 2023) (RFP 108). Here, OpenAI disputes relevance as to *all* the personal accounts. Nor does *Kellman v. Spokeo, Inc.* support Plaintiffs. No. 3:21-cv-08976-WHO, 2023 WL 411353, at *1 (N.D. Cal. Jan. 25, 2023). Further, not only did that case *deny* the production of social media posts on relevance grounds, but it concerned the "discovery of a *party's* social-media posts and information." *Id.* at *1 (emphasis added). Plaintiffs do not seek *OpenAI's* social media accounts. They seek the personal accounts of *non-party* Board members and employees.

Finally, social media accounts are generally public. If Plaintiffs believe that social media posts are

likely to help their case, they are welcome to search for them.[5]  *Benedict v. State Farm Mut. Auto. Ins. Co.*, No. 221CV00245RFBNJK, 2022 WL 60775, at *2 (D. Nev. Jan. 5, 2022) (citing *Hunter v. Ogbuehi*, 2018 WL 1243421, at *17 (E.D. Cal. Mar. 9, 2018) ("courts are disinclined to compel discovery when the responsive information is equally available to the propounding party from public sources").  This motion itself demonstrates Plaintiffs' ability to do so, given that they apparently identified several social media accounts already (as well as demonstrating the lack of relevance of such accounts, as noted above).  There is no reason to require OpenAI to ask people for their personal information when Plaintiffs can find that information for themselves.

OpenAI is willing to produce relevant information about *its own* social media accounts, subject to a valid discovery request.  But Plaintiffs' request for *personal* accounts should be denied.

**Interrogatory No. 14**

1. **Plaintiffs' Statement**

**Interrogatory No. 14** seeks basic and clearly relevant information about individuals and entities "who possess or have possessed stock or ownership interests in You greater than five percent."[6] This information is relevant and proportional to the needs of this case and to determining who at OpenAI exercises power or control over OpenAI's management and direction, including decision making relevant to this case. The 5% percent ownership interest threshold is used by every branch of government as a standard for determining ownership interests and control.

For example, sections 13(d) and 13(g) of the Securities Exchange Act generally require any person(s) who acquire 5% or more of an issuer's Section 13(d) securities to report such ownership to the SEC. That requirement is intended "to alert investors to potential changes in control[.]" *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 132 (2d Cir. 2016).  In addition, the F.C.C. ("Commission") determined 5% is an appropriate ownership benchmark for the purposes of the Commission's efforts to limit the multiple ownership of broadcast facilities. The F.C.C. conducted a survey showing that, in widely held corporations, an owner of 5% or more "appears be one of the two or three largest shareholders," large enough "to command the attention of management." *Attribution of Ownership Interests,* 97 FCC 2d 997, 1005-06 (1984). This reasoning was upheld in a subsequent Court of Appeals decision. *Time Warner Ent. Co., L.P. v. F.C.C.*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("Presumably **an owner of 5% or more typically has enough of an interest to justify the burden of informing himself about the company's activities and trying to influence** (or supplant) **management, a fact that management would bear in mind in deciding to whose exhortations it should pay attention**.") (emphasis added).

Interrogatory No. 14 simply asks Defendants to *identify* the names of individuals or entities that own an interest of 5% or more. This is a routine first-wave discovery request. Such individuals or entities may have discoverable documents or information relevant to the claims in this action. For example, such

---

[5] Plaintiffs' suggestion that OpenAI employees "may post . . . under pseudonymous accounts" and that such accounts contain relevant information is speculative.  The existence of a single pseudonymous account, registered in March 2023, by a public figure who has not been associated with OpenAI since 2018, is unavailing.  *Compare* Rolling Stone, *supra* note 3 *with* @BabySmurf9000, TWITTER, https://twitter.com/babysmurf9000 ("Joined March 2023).

[6] Plaintiffs agreed that if Defendants provide a sufficient response to this Interrogatory, Plaintiffs would withdraw Request for Production No. 20, which requests documents sufficient to identify the same owners *and* vendors involved in the purchase or sale of such ownership interest.

individuals may have sought to exert influence and/or voice concerns vis-à-vis decisions by Defendants, including the key decision of whether to train the GPT models at issue using copyrighted works without permission. *See Time Warner*, 240 F.3d at 1140. Separately, information on Defendants' ownership structure will allow Plaintiffs to understand the Defendants' corporate relationship and structure of relationship. In addition, it will address the financial condition of the Defendants, which is relevant to the ability of Defendants to respond to a judgment. Defendants have the details of ownership of the company in their corporate documents, *e.g.*, in their capitalization table. There is no burden of producing it. To the extent Defendants have privacy concerns, the Protective Order can adequately address them.

### 2. OpenAI's Statement

Plaintiffs seek information about *every* individual or entity who has ever possessed a stock or ownership interest in every OpenAI defendant of greater than 5%. Plaintiffs claim—without citation—that this is a routine request. It isn't. Indeed, at least one court in the Ninth Circuit has rejected an RFP seeking similar information. Specifically, in *Blast Motion, Inc. v. Zepp Labs, Inc.*, the court rejected a motion to compel production in response to an RFP seeking "documents sufficient to identify any investor with an ownership interest of at least 5%" in the defendant company. 2015 WL 12564315, at *3 (S.D. Cal. Dec. 2, 2015). There, as here, the plaintiff argued that the RFP could help it "identify potential witnesses with knowledge of relevant information." *Id.* The court, however, held that "to the extent [the plaintiff] seeks to discover potential witnesses it has other more appropriate ways of doing so." *Id.*

The same is true here. For example, Plaintiffs speculate that individuals or entities "may have sought to exert influence and/or voice concerns vis-à-vis decisions by Defendants, including the key decision to whether to train the GPT models at issue using copyrighted works." But if Plaintiffs seek to understand who had input into the training data for the models used for ChatGPT, it should serve discovery directed at *that* question—not seek a list of *everyone* who has ever possessed a 5% or more stake in OpenAI.

Plaintiffs also claim that they need to understand "Defendants' corporate relationship and structure of relationship," but they explain neither why "Defendants' corporate relationship" has any bearing to any issue relevant to their claims and defenses, nor why the documents OpenAI has already agreed to produce are insufficient. *See Blast Motion*, 2015 WL 12564315 at *3 (rejecting argument that the plaintiff needed the investor list to understand who had a financial interest in the case because the "desire to understand who has a financial interest in the litigation is not relevant to the case").

Plaintiffs' reliance on the Securities Exchange Act and an FCC rule on ownership of broadcast facilities is of no help (and hardly shows that "every branch of government" uses a 5% threshold). Plaintiffs have not shown why the SEC's or FCC's views on holding a five percent interest in a company has any bearing on discovery in this case. The FCC rule, for example, was developed for newspaper, broadcast, and cable companies "to maximize diversification of program and service viewpoints." *Attribution of Ownership Interests,* 97 FCC 2d 997, 999 (1984) (Ex. B). There is no reason to transpose such a rule to the discovery context in a case on unrelated issues. In any event, Plaintiffs have not explained why *all* individuals or entities with a 5% interest in OpenAI are relevant to their copyright claims. What matters is who had input into the particular actions that OpenAI took that Plaintiffs challenge. *Cf. Trofimchuk v. BitClave PTE, Ltd.,* No. 21-CV-07003-CRB, 2022 WL 377976, at *5 (N.D. Cal. Feb. 8, 2022) ("Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions . . . ."). OpenAI has already answered several interrogatories addressing those types of questions.

Because Plaintiffs have not met their burden to establish the relevance of the information sought by its request, the Court should deny Plaintiffs' motion.

Sincerely,

  /s/ *Joseph R. Saveri*
Joseph R. Saveri

*Counsel for Plaintiffs*

  /s/ *Allyson Bennett*
Allyson Bennett

*Counsel for Defendants*


cc:   Counsel of record