# EXHIBIT B

Corporate Ownership Reports
Ownership Multiple, Factor in Applications
Reports, Required to be Filed

> *Report & Order* adopted revising standards for attributing interests in broadcast, cable television, and newspaper properties and to the manner these interests are reported. Proceeding terminated.
> —*Attribution of Ownership Interests*
> Docket No. 20521

FCC 84–115
34396

## BEFORE THE
## FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554

| | |
|---|---|
| In the Matter of | |
| Corporate Ownership Reporting and Disclosure by Broadcast Licensees. | Docket No. 20521 |
| Amendment of Sections 73.35, 73.240 and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations. | Docket No. 20548 |
| Amendment of Sections 73.35, 73.240, 73.636 and 76.501 of the Commission's Rules relating to Multiple Ownership of AM, FM, and Television Stations and CATV Systems. | BC Docket No. 78–239 |
| Reexamination of the Commission's Rules and Policies Regarding the Attribution of Ownership Interests in Broadcast, Cable Television and Newspaper Entities. | MM Docket No. 83–46<br>RM–3653<br>RM–3695<br>RM–4045 |

*REPORT AND ORDER*
(Proceedings Terminated)

Adopted: March 29, 1984; Released: April 30, 1984

BY THE COMMISSION: COMMISSIONER RIVERA ABSTAINING AND ISSUING A STATEMENT.

97 F.C.C. 2d

II. *Historical Background*

2. As pointed out in *Notice 83-46*, the attribution rules constitute "the mechanism by which the multiple ownership rules are given practical effect. That is, [they] define what constitutes a 'cognizable interest' for the purpose of applying the multiple ownership rules to specific situations." *Notice 83-46, supra* at para. 1. In that role, they represent the Commission's judgment regarding what ownership interest in or relation to a licensee will confer on its holder that degree of influence or control over the licensee and its facilities as should subject it to limitation by the multiple ownership rules.

3. The Commission's first efforts at limiting the multiple ownership of broadcast facilities consisted of local and national restrictions adopted in the early 1940's.[3] The current rule restricting ownership of broadcast entities on a national basis, the so-called "seven station" rule, was adopted in 1953. *Amendment of Multiple Ownership Rules* (Docket No. 8967), 18 FCC 288 (1953). In adopting this rule, the Commission stated that its fundamental purpose was "to promote diversification of ownership in order to maximize diversification of program and service viewpoints as well as to prevent undue concentration of economic power contrary to the public interest." *Id.* at 291-92. In this initial effort to achieve diversification of ownership, the Commission stated that it would make no distinction between a controlling interest and a non-controlling, minority interest for purposes of applying the rule, reasoning that minority shareholders can have considerable voice in the control and management of a corporate licensee. *Id.* at 292-93. It consequently determined that for a "widely-held" corporation (fifty or more stockholders), an interest constituting 1% or more of the outstanding voting stock would be cognizable, whereas for a "closely-held" corporation (less than fifty stockholders), any voting interest would be cognizable. *Id.* at 294.[4] It also

---

[3] Duopoly and national multiple ownership restrictions were adopted for FM and television in 1940 [5 Fed. Reg. 2384 (June 26, 1940)] and 1941 [6 Fed. Reg. 2284 (May 6, 1941)], respectively. The first one-to-a-market rule was adopted in 1941 as part of the *Report on Chain Broadcasting*. After the Supreme Court upheld these rules of general applicability in *National Broadcasting Co., Inc. v. U.S.*, 319 U.S. 190 (1943), the Commission adopted a duopoly rule for AM. 8 Fed. Reg. 16065 (November 27, 1943). A national multiple ownership restriction for AM was first applied in *Sherwood R. Brunton et al. (KQW)*, 11 FCC 407 (1946), where the Commission denied an application for the transfer of an AM station to Columbia Broadcasting System, Inc., because Columbia already owned several other AM stations. The Commission thereafter proposed the adoption of formal rules limiting overall AM station ownership in 1948. *Notice of Proposed Rule Making* in Docket No. 8967, 13 Fed. Reg. 5060 (August 31, 1948).

[4] The "owns, operates or controls" language of the duopoly and one-to-a-market rules has been construed by the Commission to render these provisions applicable only where a stockholder holds a majority voting interest in the licensee or otherwise exercises actual control over the licensee. As to stock ownership, therefore, the percentage attribution

market and in the media marketplace since the existing standard was established. They concluded that raising the benchmark will advance the public interest by increasing the availability of resources to broadcasters which, in turn, should result in improved service.

10. Parties supporting 5%, 10%, and 20% each contend that the particular ownership level they support best identifies the level of stock ownership at which a shareholder will be able to affect the affairs of a licensee. Several parties also cite those rules and regulations of other federal agencies which use the same benchmark they advance as evidence of the appropriateness of their selection.

11. In establishing appropriate attribution levels for stock interests in corporate licensees, the Commission has historically taken a cautious approach. The underlying multiple ownership rules are premised on the principle that "a democratic society cannot function without the clash of divergent views." *Second Report and Order* in Docket 18110, 50 FCC 2d 1046, 1079 (1974), *recon. denied*, 53 FCC 2d 589 (1975), *remanded on other grounds, National Citizens Committee for Broadcasting v. F.C.C.*, 555 F.2d 938 (D.C. Cir. 1977), *aff'd*, 439 U.S. 775 (1978). *See also Associated Press v. U.S.*, 326 U.S. 1, 20 (1945). Indeed, this "idea of diversity of viewpoints from antagonistic sources is at the heart of the Commission's licensing responsibility." *Second Report and Order* in Docket 18110, *supra*. In this respect, "[t]he significance of ownership ... lies in the fact that ownership carries with it the power to select, to edit, and to choose the methods, manner and emphasis of presentation, all of which are a critical aspect of the Commission's concern with the public interest." *Id.* at 1051. In light of the weight to be given these considerations, and in the absence of any empirical evidence to guide its deliberations, the Commission exercised its best judgment in attempting to attribute any stockholding interest which might impart even slight influence in a licensee. We now believe, however, that this approach may have been unnecessarily restrictive in frequently attributing ownership to inconsequential interests.

12. *Widely-Held Companies*. Two factors convince us that, under current market and industry conditions, a 1% stockholder is unlikely to be able to exert control or programming influence on the basis of that stockholding in virtually any widely-held broadcast corporation. First, in comprehensively reviewing our ownership report files, we find that among all broadcast corporations studied a 1% shareholder is one of more than twelve individual shareholders, on average, reported as holding 1% or greater interests. Moreover, in some corporations, there are actually tens of 1% or greater shareholders. In many corporations, there are also several institutional shareholders with larger holdings. The 1% shareholder is, obviously, the least of these shareholders, and his shareholding is

only marginally greater than that of the host of lesser shareholders in the corporation. Consequently, a shareholder with 1% of a corporation's stock is not in a preeminent position among stockholders and is unlikely to have much influence among them on the basis of his stockholding, or to measurably affect the outcome of elective or discretionary corporate decisions. Second, with the increasing dispersion of stock into smaller holdings, the growing sophistication of company management methods and needs, and the rising participation in the stockmarket of individuals without management sophistication, stockholders have increasingly ignored or failed to independently exercise their voting rights. In this environment, corporate management has emerged as an increasingly independent source of control in corporations. This heightened independence of management means that a significant amount of stock must reside in one place to influence the activities of the management of most large corporations.[15] These factors taken together suggest that the 1% benchmark is unnecessarily low for accomplishing the stated objectives of the multiple ownership rules under current or anticipated conditions.

13. Having concluded that the existing attribution benchmark can be safely raised, we must now determine what new standard should be selected in its place. Our objective in this undertaking is to establish a benchmark which avoids unnecessary and possibly costly regulatory intervention by minimizing the attribution of noninfluential interests, yet which also identifies with reliable accuracy those interests that convey to their holders a realistic potential to affect the programming decisions of licensees. Based upon our analysis of the record, we have concluded that a 5% benchmark represents the best choice in this regard.

14. Our stockholding survey reveals that, under current attribution, aggregation, and reporting methods, a 5% shareholder appears to be one of the largest two or three shareholders, on average, in a widely-held corporate licensee.[16] In only a few cases are there more than three such shareholders, and in several cases there is only one such shareholder. Furthermore, a 5% or greater holding is substantially larger than the holdings of the host of lesser stockholders. Such a position makes the great majority of 5% or greater shareholders the preeminent shareholders

---

[15] Over the years, numerous scholarly treatises have chronicled the increasing occurrence of management control in large corporations as sizable family holdings dissipate and stock becomes more widely dispersed. *See, e.g.,* A.A. Berle, Jr., and G.C. Means, *The Modern Corporation and Private Property* (New York: MacMillan Co. 1932), revised ed., 1968; R.A. Gordon, *Business Leadership in the Large Corporation* (Berkeley: University of California Press, 1961); M.L. Mace, *Directors: Myth and Reality* (Boston: Harvard Business School Division of Research, 1971).

[16] Although NBC's ownership survey lacks the necessary information regarding the methods and parameters it used to permit our reliance on it, we note that it basically confirms our own findings. *See* Appendix A, n. 7.

in their respective companies, with enough votes to potentially affect the outcome of elective or discretionary decisions and to command the attention of management. In view of these facts, it appears that a 5% benchmark is likely to identify nearly all shareholders possessed of a realistic potential for influencing or controlling the licensee, with a minimum of surplus attribution. In a corporation with no holders of 5% or more of its stock (approximately one fifth of widely-held licensees), it is probable that a holding of less than 5%, even though the largest holding in the corporation, is neither sufficiently greater than other holdings to accord it a distinct position nor significant enough to overcome the entrenched position of corporate management, particularly with respect to the day-to-day business judgments of the licensee, such as programming decisions.

15. In contrast, the adoption of a benchmark higher than 5% may result in many substantial and influential interests being overlooked. For example, the average occurrence of 10% or greater shareholders, under current attribution methods, is less than one for each corporation, and approximately half of the Commission's widely-held licensees have no stockholder with that large an interest. For over half of these corporations, however, there are one or two stockholders with an individual holding between 5% and 9.9%, a holding much larger than that of any other single stockholder, whose interest would not be attributed.

16. Beyond the statistical data from our ownership survey, we have examined ownership benchmarks utilized in other regulatory frameworks with a view to their applicability to our attribution determination. Our review reveals strong support for a 5% standard. Specifically, we note that none of the guidelines studied more closely parallels in purpose our own concerns than the stockholding disclosure requirements of the Securities and Exchange Commission (S.E.C.).[17] These requirements provide for the collection and public availability of information on all entities holding 5% of the stock of large publicly-traded corporations. 15 U.S.C. § 78m(d). In considering the significance of these requirements, we are mindful that our multiple ownership rules protect unique First Amendment concerns not within the S.E.C.'s jurisdiction. However, despite the different missions of the agencies and their respective regulations, to the extent that specific aspects of their rules are directed to the same purpose, they can be productively compared. In this regard, while the S.E.C.'s requirements are expressly intended for the protection of the shareholders in each company and of participants in the stockmark-

---

[17] For a discussion of other benchmarks considered and our reasons for finding them less relevant than the S.E.C. reporting requirements, see *infra* at paras. 22-23.