UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPENAI CHATGPT LITIGATION<br><br>This document relates to:<br>23-cv-03223-AMO<br>23-cv-03416-AMO<br>23-cv-04625-AMO | Master File No. 23-cv-3223-AMO |

**DECLARATION OF TARA S. EMORY IN SUPPORT OF PLAINTIFFS' PROPOSED
ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**

I, Tara S. Emory, declare as follows:

1.     I am the Senior Vice President of Legal A.I. Strategy for Redgrave Strategic Data Solutions LLC d/b/a Redgrave Data, a legal technology services company that assists lawyers and their clients with complex technology and data issues in legal matters. I am an attorney licensed to practice law in the District of Columbia and New York. I am over 18, have personal knowledge of the facts set forth herein, and am otherwise competent to testify.

2.     I regularly provide consulting, speak and write in the areas of identification of relevant data, data preservation practices, litigation holds, data collection strategies, and search and review methodologies for electronically stored information ("ESI"), as well as negotiation of protocols regarding those issues. I have also served as a court-appointed expert to assist courts to resolve case disputes related to eDiscovery.

3.     I am a nationally recognized expert in the field of electronic discovery. I am one of four Band 1 (Top Tier) Ranked Litigation Support eDiscovery Ranked Individuals in the United States by Chambers and Partners, a rank I have held for the last three years. I am active in eDiscovery thought leadership groups, including The Sedona Conference Working Group One

(WG1), for which I am an appointed member of the Steering Committee, and EDRM,[1] for which

I am an appointed member of the Global Advisory Council. I hold certifications from the

Association of Certified E-Discovery Specialists and the Project Management Institute. My

Curriculum Vitae is attached as Appendix A.

4.      I have been engaged by Joseph Saveri Law Firm, LLP, on behalf of Plaintiffs, to

offer this declaration in support of Plaintiffs' Proposed Order re: Discovery of Electronically

Stored Information, addressing the issues of number of custodians and process for use of search

terms.

5.      In preparing this Declaration, I have reviewed the operative complaint and the

Parties' competing Proposed Orders re: Discovery of Electronically Stored Information

("Plaintiffs' Proposed Order" and "Defendants' Proposed Order").

6.      My opinion also considers a party's ordinary duties to conduct a reasonable

inquiry to find relevant ESI, subject to proportionality factors, as set forth in the Federal Rules of

Civil Procedure 26(b)(1), 26(g), and 34, as well as standard eDiscovery industry practices.

## I.      The Competing Orders

7.      The Plaintiffs' Proposed Order provides for production from 28 initial custodians,

while the Defendant's Proposed Order provides for production from 14 initial custodians. In each

proposed order, parties may request additional custodians, but in Defendants' Proposed Order,

that is limited to five custodians. The Defendants' contemplated discovery plan regarding

custodians may represent a deficient process, unless Defendant has ascertained that it has no

---

[1] EDRM refers to the Electronic Discovery Reference Model, and is also the name of the organization that created and owns the model.

other custodial sources of relevant data to produce in this matter. A deficient custodian identification process is likely to result in a deficient production.

8.      The proposed orders also differ in their processes of measuring and curing deficiencies in effectiveness of search terms. In summary, the Plaintiffs' Proposed Order requires a Producing Party to: a) disclose its intended search terms and consider input from the Requesting Party early in the search and review process; b) show that its responsive document recall rate (percentage of responsive documents found out of all responsive documents in the searched document set) is likely at least 80%; and c) to measure overall search term performance, sample the "Null Set" (documents that do not contain search terms) to a confidence level of 98% with a margin of error of 2% (98% +/- 2%), which would require sampling no more than 3,383 documents of documents without search term hits. The Defendants' Proposed Order requires a Producing Party to: a) in the most likely scenario, disclose its search terms after it has already finalized them, and only consider Requesting Party suggestions in the unlikely event that the Null Set Sample is over 10% responsive, b) establish only that the Null Set Sample has a responsiveness rate ("Elusion Rate") of 10% or less (a likely outcome even if the search terms are ineffective); and c) sample the Null Set to a confidence level of 95% with a margin of error of 5% (95% +/- 5%), which would require sampling of no more than 385 Null Set documents.

9.      The Defendants' Proposed Order could remove its duty to produce relevant data through a reasonable inquiry, by potentially omitting custodians with relevant data without stating a specific basis for doing so, and by requiring an inadequate process for evaluating effectiveness of its searches. Therefore, the Defendants' contemplated discovery plan regarding search terms includes a deficient process that is likely to result in a deficient production.

II.     <u>**Custodian Search**</u>

10.     The Defendants' Proposed Order restricts the number of initial custodians to only fourteen, and potentially could go up to a maximum of nineteen, without being subject to ordinary producing party requirements of making reasonable efforts to identify and produce all relevant data from all relevant sources, subject to proportionality considerations. In cases with high value and large amounts of responsive data, it is not uncommon for producing parties to produce data for many more than fourteen to nineteen custodians.

11.     Typically, when parties who are knowledgeable in eDiscovery practice have negotiated and agreed to limit custodians for production, it is because the producing party has provided information about data sources for all potentially responsive data. Such disclosures by companies often include an organizational chart that includes departments with employees whom the company has determined may have responsive data., based on custodial and IT interviews and other diligence. Based on such disclosures and additional context on proportionality factors and nature of the potentially responsive data these employees may have, the parties may agree as to what may be deprioritized or eliminated based on low content value in context of the other sources. In addition, a producing party may also justify custodian limits with specific information on data volumes and associated costs of aggregated data sources, which can then be considered under proportionality considerations of Federal Rule of Civil Procedure 26(b)(1), including **1) the importance of the case, 2) amount in controversy, 3) parties' relative access to information, 4) parties' resources, 5) likely importance of the evidence, and 6) associated costs and burdens.** The fifth and sixth factors generally must be provided by the producing party when it raises proportionality issues that it believes should limit the responsive evidence it must produce. Proportionality factors can be complex and may be best considered with input

from both parties on the potential incremental value of ESI that may be produced from different

data sources and discovery processes, when considered against the associated burdens.[2]

Therefore, cooperation between the parties, and transparency of the producing party, can be

highly effective in achieving just and proportional results in discovery.

12.     To my understanding, Defendants have not made disclosures about the nature of

their data sources and all custodians with potentially relevant information, including refusing to

respond to Plaintiffs' request even for an organizational chart of employees. Defendant's letter

statement appears to admit additional relevant data exists.[3] Yet, to my understanding, they have

continuously declined to disclose what other employees may have responsive information and

why those employees' data would not be unique or important under the fifth factor of the

proportionality analysis (likely importance of the evidence). It is also my understanding that

Defendants also have not represented the specific nature or cost of burdens associated with

producing responsive data from any custodians. Notably, duplicative, non-unique documents

across custodians are deduplicated in standard discovery processes; they therefore add little cost

because only a single copy of each undergoes review and production.

13.     Therefore, without disclosures by Defendants about the nature and burdens

related to their responsive data, any limitation on the number of custodians to be produced may

exclude significant relevant data from Defendants' production.

---

[2] See The Sedona Conference, Commentary on Proportionality in Electronic Discovery, 18
SEDONA CONF. J. 141, 164 (2017) ("Extrinsic information [about proportionality] can take
many forms and may include affidavits, estimates of the expenses to be incurred based upon
experiences from prior litigation, industry experiences, or another basis supported by research or
analysis performed").
[3] Defs.' Stmt. Re ESI. Defendants "have identified 14 custodians most likely to have unique
discoverable information."

DECLARATION OF TARA S. EMORY IN SUPPORT OF PLAINTIFFS' PROPOSED ORDER RE: DISCOVERY
OF ELECTRONICALLY STORED INFORMATION

III.     **Search Term Development Process**

14.     Search terms can be an effective way of identifying relevant data when they are developed through an iterative process of testing the terms' effectiveness, refining them, and then, after they appear to be performing well, conducting a robust validation test to confirm the searches are reasonably effective.

15.     Without appropriate iteration and testing, attorney-developed search terms are notoriously ineffective. For this reason, for many years, initial search terms have been referred to in caselaw and the eDiscovery industry as "Go Fish" searches, referring to the child's game in which a player asks for a card, hoping they will be lucky – often unsuccessfully, resulting in being told to "go fish" for another card).[4] In a well-known study of keywords, attorneys and paralegals developed keywords they believed would capture 75% of the responsive documents in a data set, but on average they actually found only 20% of all responsive documents.[5]

16.     In my experience, the initial iterations of search terms are expected to and do perform poorly. However, the search terms can usually be honed through the iterative process of sampling and reviewing from sets of documents with and without search term hits, using those sampled results to estimate "recall" (the percentage of responsive documents that are hit by search terms) and precision (percentage of documents containing search terms, that are also

---

[4] See *Da Silva Moore v. Publicis Groupe & MSL Group*, No. 11 Civ. 1279 (ALC) (AJP) (S.D.N.Y. Feb. 24, 2012) ("In too many cases, however, the way lawyers choose keywords is the equivalent of the child's game of 'Go Fish'"), *citing* Ralph C. Losey, "Child's Game of 'Go Fish' is a Poor Model for e-Discovery Search," Adventures in Electronic Discovery 209-10 (2011) and *citing William  A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.,* 256  F.R.D. 134, 136 (S.D.N.Y. 2009) ("This Opinion should serve as a wake-up call to the Bar in this District about the need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce emails or other electronically stored information").
[5] *See id., citing* David L. Blair & M. E. Maron, *An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval System*, 28 Comm. ACM 289 (1985).

actually responsive), and refining the search terms by learning from samples' false positives (search term hits that are not responsive) and false negatives (responsive documents in the samples that do not have search terms). This process often requires multiple iterations for the search terms to achieve satisfactory results.

17.     It can be helpful for the requesting party to suggest search terms for consideration by the producing party. However, because the producing party has access to, and usually better knowledge of, the entire document set, producing parties must put significant work into improving the effectiveness of their searches.

18.     Given the potential inconveniences and difficulties of manually developing effective search terms through this iterative process, many parties planning a search and review of large volumes of documents instead use Technology Assisted Review ("TAR").[6] TAR systems incorporate machine learning and automatic iterative training[7] to improve responsiveness predictions, in lieu of humans needing to manually iterate for search terms. Given TAR's popularity and acceptance, every major technology review platform and every major eDiscovery service provider offers TAR technology and consulting services. In fact, Relativity One offers a TAR product, aiR, which uses OpenAI's GPT technology to review documents for responsiveness.[8]

---

[6] While certain data may be excepted from TAR for various reasons, generally, the large majority of a producing party's data can be effectively searched with TAR.

[7] For example, in the reviewer document review queue in the review platform Relativity One, samples of documents currently ranked as not responsive can be automatically included throughout the review. In doing so, relevant topics that were previously missed may be found, and then incorporated into the ranking model, so that similar responsive documents may then be ranked as more likely responsive and promoted for review.

[8] *See* Relativity, aiR for Review (workflow includes iterative testing and tweaking of a prompt followed by more testing). *available at* https://help.relativity.com/RelativityOne/Content/Relativity/aiR_for_Review/aiR_for_Review.htm.

DECLARATION OF TARA S. EMORY IN SUPPORT OF PLAINTIFFS' PROPOSED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION

19.     While TAR has become a common tool to reduce discovery burdens of searching for responsive documents, some parties prefer to use search terms instead. Generally, they understand and accept the costs of manual, iterative search term development, and do not raise burden issues to resist that process. This is because while the burdens of sampling and developing keywords manually are often significant, proportionality analysis would include the potential to use technology (such as TAR) to reduce burdens for the producing party.[9]

### A.   Measuring Search Effectiveness: Recall vs. Elusion

20.     Recall is the standard metric by which to measure search effectiveness, regardless of whether the search involved using Boolean terms and/or machine learning. In a search for responsive documents, recall is the percentage of responsive documents found by a search out of all of the responsive documents in a document set.[10]

21.     When searching for responsive documents, it is calculated as:

$$\frac{\textit{Number of responsive docs in the positive set}}{\textit{Number of responsive docs in the positive set} + \textit{Number of responsive docs in the negative set}}$$

22.     When using search terms to find responsive documents, "Number of responsive docs in the positive set" refers to the documents with search term hits that are actually responsive. This number can be determined either by determining how many responsive documents are included in a production after the producing party has completed review,[11] or by

---

[9] *Id.*, 18 SEDONA CONF. J. at 173, Proportionality Principle 6 ("Technologies to reduce cost and burden should be considered in the proportionality analysis").

[10] *See The Sedona Conference Glossary: eDiscovery & Digital Information Management, Fifth Edition,* 21 SEDONA CONF. J. 263, 360–61 (2020) ("The Sedona Conference Glossary").

[11] Not every produced document is responsive, due to family member inclusions. Therefore, the number of produced documents that are actually responsive is required as part of the recall calculation.

sampling the positive set of documents (with search term hits) to estimate the number of responsive documents.

23.     The documents without search term hits are the negative set, sometimes called the "Null Set" in eDiscovery. In the recall calculation, "Number of responsive docs in the negative set" refers to responsive documents without search term hits.

24.     Because the Null Set is generally not reviewed in eDiscovery, the exact number of "Number of responsive docs in the negative set" is not known, so instead they must be estimated. This is done with a Null Set Sample, which is a random sample generated from the Null Set.

25.      The percent of responsive documents in the Null Set Sample is often referred to as the Elusion Rate in eDiscovery practice. The term "Elusion Rate" is a misnomer; it does not refer to the percent of documents that have eluded the search; it is simply the percent of the Null Set that is responsive, regardless of what percentage of responsive documents were found or missed by the search. The Elusion Rate is a percentage that is calculated as: Number of responsive documents in the Null Set Sample / Number of documents in the Null Set Sample.

26.     The Elusion Rate is then multiplied by the number of documents in the Null Set, to estimate the "Number of responsive docs in the negative set" for the recall calculation. That result is used in the recall formula above, along with the actual or estimated number of responsive documents in the positive set.

27.     While Elusion Rate is an important component the recall calculation, it is virtually meaningless on its own. Elusion Rate only measures the concentration of responsive documents in the often-enormous sea of documents that was not returned by the search.

28.     By analogy, if an oil tanker spills oil into the ocean, the effectiveness of clean-up efforts would best be estimated as the percentage of total spilled oil that was removed from the

ocean, which would be its recall. It would be illogical to measure the clean-up effort's effectiveness based on only the percentage of the entire ocean that is oil, which would be the Elusion Rate.

29.     While recall rates should be subject to proportionality considerations, in my experience, parties that stipulate to search provisions generally agree on a 75-80% recall requirement.

30.     Elusion Rates are meaningless on their own, because they do not provide necessary context required to determine recall.

31.     Compared to produced document sets of responsive documents, non-produced sets are usually comparatively large. Therefore, if the large set were 10% responsive (Elusion Rate), that large set would often contain more actual responsive documents than the produced smaller, produced set, yielding an inadequate production.

DECLARATION OF TARA S. EMORY IN SUPPORT OF PLAINTIFFS' PROPOSED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION

32.     To demonstrate this, assume a 1,000,000 document set, with search terms that hit on 50,000 documents, of which 25,000 documents are actually responsive. This leaves 950,000 documents in the Null Set. Also assume an Elusion Rate of 10%, which would satisfy the search requirements of Defendants' Proposed Protocol. 95,000 responsive documents have been missed by the search terms, compared to 25,000 found by them. Recall would be:

$$\frac{25,000 \text{ } responsive \text{ } with \text{ } search \text{ } hits}{25,000 \text{ } responsive \text{ } with \text{ } search \text{ } hits + 95,000 \text{ } responsive \text{ } in \text{ } Null \text{ } Set} = \frac{25,000}{120,000} = 20.8\% \text{ Recall}$$



33.     As illustrated here, the vast majority of responsive documents were not found by the search, but the search would nevertheless satisfy the Elusion Rate test in Defendants' Proposed Order.

34.     In addition, after an effective search, an Elusion Rate should be significantly lower than the overall responsiveness of a set of documents. For example, if a collection is 8% responsive as a whole, then any random sample, even before searches are applied, would be expected to be about 8% responsive. When a search is applied, the positive set (hit by the search) would be expected to be greater than 8% responsive, and the negative set would be expected to be lower than 8% responsive. Therefore, in a collection that is approximately or less than 10%

responsive as a whole, the Elusion Rate test in Defendants' Proposed Protocol would be satisfied, even if the search terms do not hit on a single responsive document.

35.     Disclosure of the identity of responsive documents from a Null Set Sample taken to support evaluation of search effectiveness can increase transparency for, and facilitate qualitative assessment of, the nature of responsive documents missed by the search. Therefore, when producing those responsive documents among others, it is common for cooperating producing parties to identify which documents were in the Null Set Sample.

### B. Confidence Level and Margin of Error

36.     As discussed above, the Elusion Rate is determined through a statistical sample, randomly selected from the Null Set. The size of the sample should be determined by the desired confidence level and margin of error for the resulting estimate.[12] A larger sample size increases the confidence level and decreases the margin of error. Larger samples are more burdensome to review, but they provide higher confidence and a lower margin of error for the resulting metrics.

37.     Review platforms permit a party to enter a number of documents to draw a random sample from a document population. The required number of documents can be determined from online statistical sample size calculators.[13]

38.     For any given confidence level with margin of error, there is a maximum statistical sample size even for a very large, or even infinite, population. For a confidence level of 98% with a margin of error of 2%, as proposed by Plaintiffs, the sample size will always be

---

[12] The confidence level refers to what percentage of times a test would contain the true answer within the margin of error, if the test were repeated many times. *See id.* Therefore, when analyzing the result of a statistical sample, the sample result should also be viewed as a range based on the margin of error, and true answer is likely (though not certain) to lie within that range.

[13] For example, Raosoft is commonly used, available at http://www.raosoft.com/samplesize.html.

3,383 or fewer documents. For a confidence level of 95% with a margin of error of 5%, as proposed by Defendants, the sample size will always be 385 or fewer documents.

39.     A confidence level of 95% +/- 5% is the least burdensome statistical standard generally applied in discovery iterative search testing.[14] In general, however, to establish the reasonability of a completed search process, parties review a final validation sample that is more robust.

40.     Even on a very large Null Set, the sample for 95% confidence, with 5% margin of error, would not exceed 385 documents. In comparison, the sample for 98% confidence, with 2% margin of error, would not exceed 3,383 documents, making a difference of 2,998 documents reviewed for the sample.[15]

41.     A larger Null Set Sample, with a higher confidence rate and lower margin of error, provides a resulting range of values that is more likely to reflect the true value within the range. The lower margin of error also means there will be a tighter range of values for the results.

42.     In addition, when evaluating a search, a larger sample will provide more examples of documents missed by the search. For example, a Null Set Sample that is 2% responsive may yield 68 example responsive documents without the test search terms if the sample size was 3,383; in comparison, a Null Set Sample that is 2% responsive will yield only 8 example responsive documents if the sample size was 385. Therefore, the responsive documents from the

---

[14] In my experience, Null Set samples at sizes with 95% +/- 5% are highly useful for iterating search terms, to find missed responsive documents and improve the search, and as a rough check on search progress. They may also be appropriate for final testing of Null Sets to determine recall in matters where the review of additional test documents (though under 3,000 in all cases) would be highly burdensome under proportionality factors.

[15] Review platforms permit a party to enter a number of documents for a random sample. The correct number of documents can be determined from online statistical sample size calculators. For example, Raosoft is commonly used, available at http://www.raosoft.com/samplesize.html.

larger sample create more opportunity for insights into the nature of any important documents the search terms may be missing, and what additional terms could be necessary to find them.

**C.  Plaintiffs' Proposed Order Search Approach**

43.     Plaintiffs' Proposed Order requires the producing party to disclose search terms early in the search term development process. The requesting party may then suggest additional terms for the producing party to consider when developing and testing its search terms.

44.     Beyond that, the Plaintiffs' Proposed Order does not set forth any requirements on the details or extent of the producing party's subsequent process of iteration and testing (other than that the producing party may need to update the disclosed search terms). While it is expected that the producing party *would* do enough iteration and testing to reasonably ensure that the final validation test would demonstrate that it would meet the recall requirement, **the producing party only needs to demonstrate the efficacy of the search process after it has completed its review** and identified for production all responsive documents found by search terms, plus families.[16]

45.     The producing party must then take Null Set Sample, based on a confidence level of 98% confidence with a 2% margin of error, which would have a maximum size of 3,383 documents. The Null Set Sample may be reviewed before, during or after the responsiveness review, as long as the search terms have been finalized. The producing party must disclose the number of documents in the Null Set, number of documents in the Null Set Sample, and number

---

[16] While the Plaintiffs' Proposed Order only requires testing after the review is complete, an alternative approach for the producing party to validate its final search terms could be done sooner. Such an approach would still include sampling the Null Set, but instead of using actual counts of responsive documents from the review itself, could instead sample (instead of fully review) the responsive documents with search terms, to estimate the number of actually responsive documents (true positives) are in that set. However, it is my understanding that Defendants rejected a process that involved sampling the set with search term hits.

of responsive documents in the Null Set sample. With those numbers, the "Number of responsive docs in the negative set" can be determined for the recall calculation.

46.     In addition, the producing party must produce the responsive documents from the Null Set Sample and identify them as such. In this way, the receiving party can assess the importance of documents that may have been missed by the search terms and favor supplementing them.

47.     Then, when the producing party has completed its responsiveness review based on the search terms, it must disclose the number of documents it has found and tagged responsive. This is the "Number of responsive docs in the positive set," and together with the "Number of responsive docs in the negative set," recall can be calculated. Factoring in the margin of error from sampling, Plaintiff's Proposed Protocol requires a lower bound of 80% recall.

48.     In the event the producing party has not attained adequate recall, the Plaintiffs' Proposed Protocol provides for a collaborative, iterative process between the parties to refine the search terms and meet the recall requirement of 80%.

### D. Defendant's Proposed Order Search Approach

49.     The Defendants' Proposed Order requires the producing party to disclose its selected search terms only after it completes the Null Set Sample. If its Elusion Rate is 10% or less, then the search terms would be final, so it does not provide any opportunity for input from the requesting party.

50.     Like the Plaintiffs' Proposed Protocol, the Defendant's Proposed Protocol involves testing the Null Set with a Null Set Sample. However, the Defendant's Proposed Protocol process stops with finding and disclosing the Elusion Rate. It also does not require Defendants to disclose the number of documents in of the Null Set, which would be required to

determine the "Number of responsive docs in the negative set," or the number of documents in the Null Set Sample, or number of responsive documents in the sample.

51.     Further, the Defendants' Proposed Protocol does not require the producing party to check or disclose the "Number of responsive docs in the positive set" (either through full review or sampling the search term hits), which is necessary to calculate recall.

52.     The Null Set Sample would only need to show an Elusion Rate of 10% or less. As described above, Elusion Rate by itself is meaningless. In addition, because the Defendants' Proposed Protocol does not even require disclosure of the number of documents in the Null Set, an Elusion Rate of 10% would only mean 10% of an unknown Null Set size.

53.     In my experience, an Elusion Rate of 10% would be extraordinarily high, and it would be unlikely that the accompanying recall rate would be reasonable.

54.     The Null Set Sample would only need to be of a size required for 95% confidence with a 5% margin of error. Compared to the Plaintiffs' Proposed Order, this sample of 385 or fewer documents will have a lower confidence level with a higher margin of error, and yield fewer examples of responsive documents missed by the search terms.

55.     If the producing party's Null Set Sample has an Elusion Rate of 10% or less, which is very likely even if the search terms are not reasonably effective, then the responsive documents found in the Null Set Sample may be produced with other responsive documents (it is unclear in the Defendant's Proposed Protocol). But in any event, the documents do not need to be identified and disclosed as having been in the Null Set Sample. Therefore, the requesting party would be unable to assess the nature of and potential importance of the responsive documents in the Null Set Sample.

56.     If the Null Set Sample's Elusion Rate is higher than 10%, which is very unlikely even if the search terms are not reasonably effective, the Defendant's Proposed Protocol places the onus on the requesting party to figure out how to refine those search terms. It requires the requesting party to first propose additional terms, and the producing party would then be permitted to narrow, while not proposing any additional terms of its own. In addition, the requesting party is afforded only two rounds to improve those searches. Moreover, because the responsive documents from the Null Set Sample will not necessarily be shared and identified as such to the requesting party, it does not have an opportunity to refine the search terms in a usual way by qualitatively assessing those responsive documents.[17]

57.     Defendant's Elusion Rate test would also be passed automatically if the richness (responsiveness) of the overall document set is 10% or less before search terms are applied, which is common in many discovery collections.[18]

58.     In my experience, a 10% elusion result would be very high. If 10% of the documents not found by a search are responsive, it would be highly likely the search can be readily improved to find more responsive documents. At 10% responsiveness of a Null Set, it would also be relatively easy to use sampling to find examples of responsive documents that can help attorneys iteratively improve their search terms.

---

[17] The Defendant's Proposed protocol does not provide for production and identification of the Null Set responsive documents after the initial Elusion Test failure. It would provide the examples after each of the subsequent two iterations, but only the first iteration would be useful as no further refinement is permitted after the second.

[18] Many corporate employees work on a variety of different workflows, topics, and miscellaneous items throughout their day, and also receive and send messages that are not directly relevant to their own work. Therefore, it is common that data on a relevant topic will comprise less than 10% of any employee's custodial data, even for employees who work closely on that topic.

59.     I declare under penalty of perjury that the foregoing is true and correct.

_Tara S Emory_
Tara Emory

# Appendix A

DECLARATION OF TARA S. EMORY IN SUPPORT OF PLAINTIFFS' PROPOSED ORDER RE: DISCOVERY
OF ELECTRONICALLY STORED INFORMATION

# Tara Shaun Emory

tara.emory@redgravedata.com                                          linkedin.com/in/tarasemory

## *DEGREES AND CERTIFICATIONS*

**Duke University School of Law**:  J.D., 2003
**Duke University School of Law**:  LL.M. in International and Comparative Law, 2003
**Pennsylvania State University**: B.A., Psychology with Spanish Minor, 1999
**Project Management Professional Institute Certification (PMP),** 2015-present


## *EXPERIENCE*

**Senior Vice President of Legal AI Strategy & General Counsel, Redgrave Data,** Remote: May 2022 to present

Guide legal teams to use artificial intelligence and other technology effectively, efficiently, and compliantly. Provide expert consulting on legal, policy, and operational aspects of AI, Information Governance (InfoGov), and eDiscovery. Monitor AI and technology trends and legal developments to guide client services and internal operations. In eDiscovery matters, serve as an expert witness and court-appointed expert, and consult on data search, technology-assisted review (TAR/machine learning), keyword searching, data preservation, discovery protocols, and strategy. InfoGov expert services optimize organizational data management, compliance, privacy measures, Generative AI programs, and data policies, while leveraging associated technologies. Collaborate with the Redgrave Data team to develop new legal operations software solutions, including visualizations, analytics, and AI strategies, workflows, and validation procedures. As General Counsel, oversee legal compliance and provide legal advice.

**Executive Vice President of Strategy and Product Development, Redgrave Education & Training, Inc.,** Remote: November 2022 to present

Design software programs and products for legal education and corporate compliance programs on Artificial Intelligence, eDiscovery and Information Governance topics. Support law firm practice groups on training programs for their clients' employees on data policies and procedures.

Built and released "Generative AI at Work" and "Generative AI for Legal Practice" interactive compliance training programs for corporate employees and legal providers.

**Innovative Driven,** 2013 to April 2022

**Vice President, PRESA (PRemiere Expert Solutions Advisory) Group & Associate General Counsel,** Arlington, VA, November 2021 to April 2022

Executive in legal technology SaaS and supporting services company providing electronic discovery and Information Governance services. Led nationally recognized team of consultant experts on legal and technology issues; served as experts for clients and internal processes on tools, processes, machine learning applications, data search, industry trends, eDiscovery and Information Governance workflows, marketing strategies and content, thought leadership, and sales through relationships with industry experts. Client services included serving as judge-appointed court neutrals for eDiscovery disputes, as well as providing expert testimony for parties on eDiscovery issues.

**Director of Consulting and General Counsel, Driven Inc.,** Falls Church, VA, 2013 to November 2021

Built and led an expert legal technology consulting department that was nationally recognized in eDiscovery and Information Governance industry rankings and in prominent industry groups. Led the company's addition of Information Governance services to the existing electronic discovery services. Managed consulting product and solutions design, working with software development team to imagine and create unique solutions, including machine learning software programs for internal department use and new products for clients. Vetted and deployed third party software solutions for clients. Edited Driven blog on IG and discovery legal issues.

**eDiscovery Lead, U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol** (Contractor), Washington, DC: September 2021 to April 2022.

Led eDiscovery workflows and consulted on eDiscovery strategies, including designing and integrating workflows for investigative teams, developed search strategies for electronic evidence, assisted in negotiation of production formats from government agencies and other producing parties, supported evidence analysis and visualizations including network analysis and timelines.

**Associate Attorney; Skadden, Arps, Slate, Meagher & Flom LLP,** Washington, DC, Antitrust: 2007-2013

Antitrust experience includes mergers and acquisitions, regulatory compliance, class action litigation, civil and white-collar criminal investigations, and privacy law compliance for multinational companies. Argued successfully before Federal Circuit Court of Appeals in a pro bono case.

**Associate Attorney; Cadwalader, Wickersham & Taft LLP:** Washington, DC, Antitrust: 2006-2007

**Associate Attorney; Clifford Chance US LLP:** Washington, DC and New York; NY Banking, Bankruptcy, Litigation, Antitrust: 2003- 2006; Intern, Summer 2002

## *Other Roles*

**Advisory Board Member, Leyla,** April 2024 to present, remote.

Advise startup tech platform that provides a marketplace for freelance attorneys. Plan to develop training programs for freelance attorneys.

**Advisor, Expoune,** November 2022 to present, remote.

Advise Artificial Intelligence Customer Service platform startup on product development and strategy.

**Board Member, Advocates for Justice in Education,** Washington, D.C., 2013 to December 2021

Served on Board of Directors for non-profit organization devoted to promoting education rights of students and their families, with a focus on serving disabled children.

## *Professional Memberships and Achievements*

**BAR ADMISSIONS:** New York (active), 2004; District of Columbia (active), 2005; Virginia

(active, corporate counsel), 2021.

Chambers Litigation Support Rankings: eDiscovery in the USA (2019-present) (6 years ranked)
- 2022-24 Band 1 (Top Tier) ranking (3 years ranked Band 1)

Co-Chair of The Sedona Conference on AI and the Law: AI and Civil Litigation, April 4-5, 2024 (Reston, VA)

The Sedona Conference Working Group 1 on Information Governance and Electronic Discovery
- WG1 Steering Committee: January 2022 through December 2024 term
- Steering Committee Membership Committee Co-Chair, 2024
- Steering Committee Liaison to: Brainstorming Group on Artificial Intelligence and Machine Learning; Drafting Team for Commentary on Conducting eDiscovery of Modern Communication and Collaboration Platforms; Databases Drafting Team; Internet of Things (IoT) Drafting Team; Brainstorming Group on Defining a Document for ESI in Modern Collaboration Platforms; The Sedona Conference Primer on Managing Electronic Discovery in Small Cases
- Co-lead of TAR (Technology Assisted Review/machine learning) Primer 2nd ed. Drafting Team
- Co-lead of Defensible Disposition Drafting Team
- Member of: Drafting Team for Privacy and Information Security for Legal Technology Providers; Mobile Device Brainstorming Team; ESI Protocols Brainstorming Team; The Sedona Conference 2.0 Planning Team

The Sedona Conference Technology Review Panel (2013- present): Advises The Sedona Conference working groups on technical issues

Relativity Innovation Awards: Stellar Women category: 2024 Nominee

ARMA International (Information Management & Governance)
- Conference Education Committee (appointed, November 2023-April 2024)

EDRM (eDiscovery)
- Project Trustee of EDRM (Electronic Discovery Reference Model) Revision Team, revising Guidelines for all phases of EDRM (2019-2022)
- EDRM Global Advisory Council member (2021-present)
- Member of drafting teams for: Information Governance Reference Model (IGRM) Records & Information Management (RIM) team and IGRM Business team; AI in eDiscovery; GenAI Judicial Orders Repository (April 2024); Technology Assisted Review (TAR)/Machine Learning Validation; TAR/Analytics Ethics; Ethics and Bias AI team; Generative AI team

American Bar Association
- SciTech Robotics and AI Committee (October 2023-present)

Women's Bar Association of the District of Columbia, Antitrust (2022-present)
- Co-chair of In-House Counsel Subcommittee (September 2023-present)

American Bar Association Judicial Division Technology Committee/Subcommittee: Community-Based Access to Virtual Proceedings (September 2021-September 2022)

Legal Technology Professionals Institute (2015-2018)
- Project Manager and Contributor to ESI Stipulations Guidance Paper

Toastmasters
- 2014 District Champion for International Speech Competition

**Patent** (pending, filed Feb. 23, 2024): D. Lewis, L. Gray, J. Pickens, T. Emory, M. Noel, A. Kuchibhatla, Systems and Methods for Estimating the Effectiveness of a Cumulative Coding of Records, U.S. PTO Application 18/586,359.

### *Designated eDiscovery Expert Engagements in Litigation*

Court-Appointed Discovery Facilitator, *In re Northwest Biotherapeutics, Inc. Stockholder Litigation*, C.A. No. 2022-0192-JTL (Del.Ch. 2024).

Court-Appointed Technology Assisted Review (TAR/machine learning-based document review) Facilitator, *McKee v. Specialty Benefits*, LLC, C.A. No. 2019-0646-JTL (Del.Ch. 2020).

Court-Appointed eDiscovery Expert, *Integrated Communications & Technologies, Inc. v. Hewlett-Packard Financial Services Company*, 1:16-cv-10386 (D. Mass. 2019); Dkt. #241 (Report & Recommendation with Adopting Order).

Testifying Expert, *ADI Construction of Virginia, LLC v. 1345 K Street SE, LLC,* 2018 CA 006293 (D.C. Super. Ct. September 30, 2020; August 23, 2021 (under seal); September 24, 2021 (under seal)).

Testifying Expert, *Wirth v. Appriver, LLC*, 2019 CA 000118 (Fla. Santa Rosa County Ct. 2020).

Testifying Expert, *Boothe Farms v. The Dow Chemical Co.*, No.: 3:19-cv-00264-DPM (E.D.Ark. 2020).


### *Publications*

Kearney, M., Emory, T. Assessing EU Artificial Intelligence (AI) Act Risks, Bloomberg Law Practical Guidance, Tech & Telecom Checklist (April 2024).

Emory, T., Pickens, J., Louis, W., TAR 1 Reference Model: An Established Framework Unifying Traditional and GenAI Approaches to Technology- Assisted Review, 25 SEDONA CONF. J. 109 (March 2024).

Omrani, R., Yang, *et al* (including Emory, T.). "Beyond the Bar: Generative AI as a Transformative Component in Legal Document Review," Relativity and Redgrave Data (February 2024).

Emory, T., Louis, W., Poeppelmeier, A., Burns, K., "Automation in Legal Departments," Legal Operations in the Age of AI and Data, edited by O. Mack, H. Noorestani, and M. Onwudiwe, Globe Law and Business, Chapter 1 (January 2024).

Shonka, D., Emory, T.,. Snavely, N., "Federal Trade Commission Investigations," The General Counsel's Guide to Government Investigations, 4th ed., edited by P. Oot, A. Prasad, A. Hayes, The Government Investigations & Civil Litigation Institute, pp. 259-288 (2024).

Kearney, M., Emory, T., Lozano, S. Mealey's Litigation Report: Artificial Intelligence. "Considerations for Governance of Generative AI" (October 2023).

EDRM (contributing author). "Professional Responsibility Considerations in AI for eDiscovery: Competence, Confidentiality, Privacy and Ownership" (June 14, 2023).

The Sedona Conference WG1 (Co-lead of Drafting Team). "The Sedona Conference TAR [Technology Assisted Review/Machine Learning] Case Law Primer," 2nd edition (May 10, 2023).

The Sedona Conference WG1 (Steering Committee Liaison). "Primer on Managing Electronic Discovery in Small Cases" (May 10, 2023).

Emory, T., Kearney, M., Snavely, N. Law360, "Prepare For Federal Agency Scrutiny On AI Discrimination" (May 8, 2023).

Emory, T. Redgrave Education & Training, Inc. "BYOD Policies are Failing: The Need for Effective Training" (April 26, 2023).

Emory, T. Redgrave Education & Training, Inc. "Master GDPR Compliance: The Top 5 Things Your Employee Training Program Needs" (April 5, 2023).

Emory, T. Redgrave Education & Training, Inc. "Interactive Training Emerging as a New Gold Standard for Legal Hold Notices" (March 29, 2023).

Emory, T. Redgrave Education & Training, Inc. "Why Early Employee Training is Key to Building Effective InfoGov Programs" (March 21, 2023).

Fasching, D. *et al* (including Emory, T). "Act Now or Pay Later: The Case for Defensible Disposition of Data," Thomson Reuters Practical Law (December 12, 2022)

Emory, T., Lewis, D., Davis, E., Tully, M. Redgrave LLP. "White House Adds its Voice to Growing Consensus on AI Ethical Requirements," (October 18, 2022).

Emory, T., Davis, E., Surugeon, A. "Techno wars and inadvertent productions: an ethics guide to the Alex Jones phone debacle," Westlaw Today, 2022 PRINDBRF 0440 (September 29, 2022).

Emory, T., Kearney, M. "Minimize Regulatory Exposure from Consumer Data Privacy Legislation with Technology and Best Practices," Complex Discovery (September 4, 2022).

Emory, T., Snavely, N., Tully, M. "How to Lose a Privilege In 10 Steps (Or Fewer): Recent Case Clarifies Scope of FRE 502(d) and Marital Privilege," ALM LegalTech News (July 28, 2022)

Atherton, K., Emory, T., Favro, P. "Guide to Choosing a TAR [Technology Assisted Review/machine learning] Workflow," Bloomberg Law (February 23, 2021).

EDRM (contributing author), "The Use of Artificial Intelligence in eDiscovery," EDRM (February 3, 2021).

The Sedona Conference Technology Review Panel (contributing author and editor). "The Sedona Conference Glossary," The Sedona Conference (February 2020).

The Sedona Conference WG1 (co-lead of drafting team), "Principles and Commentary on Defensible Disposition," The Sedona Conference (April 16, 2019).

Duke EDRM (contributing author). "Technology Assisted Review (TAR) Guidelines," (January 2019).

Brady, K., Emory, T. "Information Governance Programs Should Include Defensible Disposition," Bloomberg Law (September 7, 2018).

Emory, T. ILTA. "The New Path to eDiscovery Success: Business Intelligence," Litigation and Practice Support Digital White Paper  (April 2018).

The Sedona Conference Technology Review Panel  (contributing author), "The Sedona Conference Guidance for the Selection of Electronic Discovery Providers" (2017).

The Sedona Conference WG1 (contributing author). "Commentary on Privacy and Information Security: Principles and Guidelines for Lawyers, Law Firms, and Other Legal Service Providers" (November 11, 2015).

Emory, T. "5 Steps to Litigation Readiness," Driven White Paper (December 19, 2014).

Emory, T. "Risk Assessment and Compliance Programs for Information Governance," Compliance and Ethics Spotlight, ABA Antitrust Section Compliance and Ethics Committee (September 2014).

Emory, T., Lindsey, A. "Legal Holds: A Guide to Defensible Preservation," Driven White Paper (2014).

Emory, T. "Experts Debate Pros and Cons of Internal Corporate Leniency Programs." Compliance and Ethics Spotlight, ABA Antitrust Section Compliance and Ethics Committee (March 2014).

Editor of all *Driven Copilot* blog articles (2014-2022)

Emory, T. blog articles:

Emory, T., Pish, A. Attorneys Embracing Remote Review with Virtual Supervision (2020)

Information Governance is Key in New DOJ Antitrust Guidance on Corporate
Compliance Programs (2019)

Court Holds that Math Matters for eDiscovery Keyword Search, Urges Lawyers to
Abandon their Fear of Technology (2018)

Instead of Asking, "How Long Should We Retain Email?", Ask This Question (2016)

How to Achieve Cooperation in eDiscovery, at Long Last (2016)

What the Judges Said: Top 10 Takeaways from 2015 Legal Tech Judges Panel (2015)

Custodial Interviews: You're Doing it Wrong (2015)

3 Reasons You're Afraid of Technology Assisted Review…and Shouldn't Be (2014)

HIPAA Violations May Result in Private Right of Action under State Law – and why
every company should care (2014)

The End of the Privilege Log as We Know It? (2015)

Judge Creates the Ultimate Discovery Sanction: Humiliation (2014)

The Newest Predictive Coding Case Teaches Us Little About Predictive Coding and
Everything About Stipulated ESI Protocols (2014)

Top 5 eDiscovery Habits You Should Break (5 part series) (2014)

What the Judges Said: Top 10 Takeaways from Legal Tech Judges Panel (2014)

Lipstick on a Pig: 5 Reasons to Love eDiscovery (2014)

Who picks up the tab for eDiscovery? A roadmap for cost shifting under Rule 26(c)
(2014)

Protecting Privilege: Let's (not) Be Reasonable (2014)

The Price of Being an Innocent Bystander: Managing Discovery Obligations for Non-
parties (2014)


## *Presentations*

**Non-public presentations for corporations and law firms are not included below.**

Antitrust and AI: Competition Issues From AI Use and AI Markets, June 2024, The Sedona
Conference, webinar.

Responsible AI: Shaping the Future of Ethical AI and Defensibility, June 2024, AI
Bootcamp, Relativity, Washington, DC.

A Roundtable Discussion on Artificial Intelligence and Litigation, May 2024, ACEDS NY
Metro Chapter, webinar.

Reality Check: Generative AI and eDiscovery, May 2024, Putting Insights into Practice
(PIIP) Forum, Complete Discovery Source, webinar.

eDiscovery Insights from the January 6 Investigation with Special Guest Candyce Phoenix,
April 2024, The Sedona Conference WG1, Arlington, VA.

Dark Side of AI, April 2024, Privacy and Emerging Technology Institute and Spring
Meeting, American Bar Association (ABA) SciTech, Bethesda, MD.

Negotiating ESI Protocols for the Use of Generative AI in e-Discovery, April 2024, The
Masters Conference, Washington, DC.

Artificial Intelligence in the Practice of Law, April 2024, The Sedona Conference on AI and
the Law: AI and Civil Litigation, Reston, VA.

Assessing the Validity, Reliability, and Bias of Artificial Intelligence, April 2024, The
Sedona Conference on AI and the Law: AI and Civil Litigation, Reston, VA.

Transforming Legal Workflows with AI, March 13, 2024, Emerging Litigation Podcast
(guest).

*Keynote Speaker*: Horseless Carriages and the Future of Legal Technology, February 2024, Federal eDiscovery Working Group (FEDWG/government regulators) Annual Conference, Arlington, VA.

Ask the Experts: Q&A on eDiscovery Best Practices, February 2024, Federal eDiscovery Working Group (FEDWG) Annual Conference, Arlington, VA.

Generative AI & Its Impact on eDiscovery and Document Review, February 2024, The Masters Conference, webinar.

The AI Advantage: Building Responsible and Defensible Generative AI Solutions, January 2024, Relativity, webinar.

Ahead of the Curve: Mastering Next-Gen Managed Review with TAR and Generative AI (2 parts), January 2024, Legalweek Redgrave Data & Purpose Legal, New York NY.

Managed Services Reimagined: Metrics That Matter & Innovative Offerings, January 2024, Legalweek Redgrave Data & Purpose Legal, New York NY.

Generative AI and Document Review, January 2023, Washington D.C. Bar Litigation Community eDiscovery and Information Governance Subcommittee meeting, Washington, D.C.

AI Tools in Litigation: Transform Your Practice, Minimize your Risks, December 2023, American Law Institute (ALI), webinar.

Generative AI and eDiscovery: What May the Future (or Present) Hold, December 2023, The Sedona Conference WG1 Town Hall (organizer and breakout group leader), webinar.

Ethics and AI: What's Old is New Again!, November 2023, Georgetown Law Advanced eDiscovery Institute (AEDI), Washington, DC.

The Path from GenAI to Next Gen Discovery, October 2023,, The Sedona Conference WG1 Annual Meeting, Indianapolis, IN.

Recent Developments in Privacy and Data Security, E-Discovery and AI, October 2023, Delaware State Bar Association CLE, Wilmington, DE.

Privacy as a Factor for Rule 26 Proportionality, September 2023, The Sedona Conference WG1 Breakout Group Discussion Leder, webinar.

Emerging Tech: Why Predicting Tech Innovation is Like Forecasting the Weather, July 2023, American Bar Association Cross Border Institute, Paris, France.

AI Revolution & Risk: Generative AI, Algorithm Assessments, and Agency Regulation, June 2023, Marcus Evans CLO Roundtable, Boston, MA.

AI On the Edge: Navigating the Perilous Terrain of Generative AI (2 parts), May 2023, MER Conference, Chicago, IL.

Cybernetic Eyes May Be the Mirror of Our Soul: What Artificial Intelligence Can Teach Us about Human Biases, April 2023, The Sedona Conference WG1, Semi-Annual Conference, Portland, OR.

Webinar on The Sedona Conference TAR Case Law Primer, Second Edition, Public Comment Version, March 2023, The Sedona Conference, webinar.

Virtual Data Collection for Discovery in a Virtual World, December 2022, Federal Bar Association and MyLawCLE, webinar.

Teams, Slack and More: Tracking Today's Collaboration Tools through the eDiscovery Workflow, November 2022, Georgetown Law Advanced eDiscovery Institute (AEDI), Washington, DC.

What You Don't See Can (And Probably Will) Hurt You: Avoiding Inadvertent Disclosures Of Hidden Data, November 2022, Association of Legal Administrators (ALA) Annual Virtual Conference.

AI & Privacy Data Ethics: The Good, Bad & The Ugly, October 2022, Women, Influence & Power in Law (WIPL) Conference, Washington, DC.

Defining a "Document" For ESI in Modern Collaboration Platforms, October 2022, The Sedona Conference WG1, Annual Conference, Philadelphia, PA.

eDiscovery in Small Cases, October 2022, The Sedona Conference WG1, Annual Conference, Philadelphia, PA.

Ethical Issues Concerning Metadata and Client Communications, October 2022, American Bar Association, webinar.

Using Technology to Tackle eDiscovery, Georgetown Law Advanced eDiscovery Institute (AEDI), September 2022, webinar.

Computer Usage Policies, Records Management, and Corporate IT Infrastructure (Guest Lecturer), August 2022, St. Mary's School of Law: Electronic Discovery course LW7320.

Cacophonies of Collaborative Chaos: Managing Non-Traditional Records and Data from Video Conferencing and Third-Party Collaboration Platforms, May 2022, MER Conference, Indianapolis, IN.

Ethics in eDiscovery: Changing Standards in Competence, Confidentiality, and Cooperation, March 2022, Women's Bar Association of the State of New York.

Town Hall on Search and Retrieval Methods, January 2022, The Sedona Conference WG1, webinar.

Cacophonies of Collaborative Chaos: Managing Non-Traditional Records and Data from Video Conferencing and Third-Party Collaboration Platforms, January 2022, ARMA, Arizona chapter.

Doubting the Data: Litigation and Information Governance (Guest Lecturer), December 2021, Tufts School of Medicine, 2021-0907 HIA 221 Data Trust- Information Governance in Health.

EDRM Projects Present, November 2021, EDRM eDiscovery Day 2021 Conference, webinar.

Women Who Lead Roadshow: Technology Trends, November 2021, ILTA, webinar.

The EDRM: Why Has It Held Up So Long?, September 2021, InfoGov World, webinar.

Computer Usage Policies, Records Management, and Corporate IT Infrastructure (Guest Lecturer), August 2021, St. Mary's School of Law: Electronic Discovery course LW7320.

How Does AI Work and What Is/n't It Telling Me? How to Be Tech Competent in 2021, June 2021, American Bar Association National Conference on Professional Responsibility.

The Law on ESI Sanctions, March 2021, Women in eDiscovery San Francisco chapter, Webinar.

Town Hall on ESI Protocols (Discussion Leader), December 2020, The Sedona Conference WG1, Webinar.

Recent Developments in Data Security and eDiscovery, November 2020, Delaware State Bar Association, Webinar.

Future of IG and eDiscovery (Guest Lecturer), Data Trust- Information Governance in Health (Guest Lecturer), Tufts School of Medicine, 2021-0907 HIA 221 (two classes recorded September 2020).

Deploying Legal Technology for More Than eDiscovery, March 2020, The Sedona Conference Institute (TSCI): eDiscovery, Data Privacy, and Security (Saint Louis, MO).

eDiscovery Technology in the Trenches: Are we Using the eDiscovery Tools We Have Effectively?, March 2020, The Sedona Conference Institute (TSCI): eDiscovery, Data Privacy, and Security, Saint Louis, MO.

Ethical Considerations for Social Media Discovery, December 2019, ACEDS DC Chapter, e-Discovery Day Education Symposium, Washington, DC.

Recent Developments in Data Security and eDiscovery, October 2019, Delaware State Bar Association, Wilmington, DE.

eDiscovery Lessons Learned from the Mueller Report, August 2019, Women in eDiscovery, Richmond, VA.

Artificial Intelligence in the Courts and the Profession, May 2019. Law and Technology for Judges, Federal Judicial Center, Bolch Judicial Institute, Duke Law, Durham, NC.

Explore the Fear and Rising Prominence of Artificial Intelligence and Its Use in Litigation, May 2019, The Sedona Conference WG1 Midyear Meeting, Charlotte, NC.

Addressing the Duty to Dispose in a Post-GDPR World. April 10, 2019, Managing Risk Records: Evolving Privacy Best Practices, ARMA Seminar, Washington, DC.

Annual Judges Panel on eDiscovery, with District Judge Rodriguez (WD TX), and Magistrate Judges Laporte (ND CA), Aaron (SD NY), Wettre (D NJ), and Peck (SD NY, ret). February, 2019, New York, NY.

Recent Developments in Cybersecurity and eDiscovery. Delaware State Bar Association, November 2018, Dover, DE.

Expert Analysis and Dialogue re: The Sedona Working Group's Draft Paper on Defensible Disposition. October 2018, ActiveNav, Webinar.

Sedona Conference Webinar on Information Governance and Defensible Disposition. October 2018, The Sedona Conference, Webinar.

Auditing Your Litigation Support Providers. September 2018, ILTA, Webinar.

Evaluate Your Organization's Data Risk. September 2018, Master Class, Marcus Evans CLO Summit.

Hot Topics in eDiscovery. July 2018, Women in eDiscovery, Philadelphia, PA.

The e-Workplace: Privacy Issues and Cyber Security for Employers. July 2018, American Bar Association, Webinar.

Defensible Disposition & Information Governance. May 2018, The Sedona Conference WG1 Midyear Meeting.

Reducing Litigation Risk by Changing the Culture of Discovery. March 2018, AIIM and ARMA, Richmond, VA.

Mobile Madness: Discovery Challenges with Mobile Messaging Applications. January 2018, Legal Tech Super Session, New York, NY.

Data Security: What all Lawyers Need to Know. December 2017, National Bar Association, Webinar.

Effectively Using Data Analytics for Litigation: ECA, TAR and Beyond. October 2017, ARMA Live!, Orlando, FL.

Computer Analytics for Data Management and Legal Department Management. September 2017, Master Class, Marcus Evans CLO Summit, Hollywood, FL.

Defensible Disposition of Information: An Integral Component of an Information Governance Program. May 2017, The Sedona Conference WG1 Midyear Meeting, Minneapolis, MN.

The Internet of Things: Privacy, Information Governance and eDiscovery Issues. May 2017, ARMA, Richmond, VA.

What Should a CLO Know about Computer Analytics (and what are they, anyway)? March 2017, Master Class, Marcus Evans CLO Summit, Las Vegas, NV.

Discovery and the New Federal Rules of Civil Procedure. February 2017, Women in
    eDiscovery, Raleigh, NC.

Judges Panel: Roadmap for a Successful ESI Protocol, with Judges Peck (SDNY), Laporte
    (ND Ca), and Francis (SDNY). February 2017, Legal Tech, New York, NY.

The Next Frontier in TAR: Choose Your Own Algorithm. February 2017, Legal Tech, New
    York, NY.

Roadmap for a Successful ESI Protocol. February 2017. Women in eDiscovery, Richmond,
    VA.

How Well is Your Information Governance Program Working? A Guide to Auditing
    Compliance and Maintaining IG Programs. November 2016, Marcus Evans, Webinar.

Moving from Models to Standards: Next Steps in Maturing the Industry. October 2016,
    Masters Conference, Washington, DC.

Release of Information, eDiscovery and Data Risk Management: A Single Strategy for All
    to Achieve Information Governance. October 2016, AHIMA Convention, New Orleans,

The State of Information Governance and Sedona's Commentary. October 2016. The
    Sedona Conference Annual Meeting, Atlanta, GA.

The Staggering Costs of Hoarding Stale Data: Cyber Breaches, eDiscovery, and Data
    Compliance. September 2016, Master Class, Marcus Evans CLO Summit, Las Vegas,
    NV.

Use of Technology and Innovations in Wage and Hour Class and Collective Action
    Litigation. September 2016, HNBA Annual Convention, Chicago, IL.

Release of Information (ROI) and eDiscovery - How and Why the FRCP Amendments are
    Impacting IG, Privacy, Security and Litigation Risk. July 2016, CIOX Healthcare
    Educational Summit, Palm Beach, FL.

Counsel's Guide to Defensible Deletion of Corporate Data. November 2015, Driven
    Webinar.

Information Governance for Healthcare. October 2015, Driven Webinar.

Learning to Swim in a Legal Tsunami – Meeting Discovery Obligations While Responding
    to Data Breaches. October 2015, The Sedona Conference WG1 Annual Meeting,
    Orlando, FL.

Achieving the "Right Fit" Alternative Fee Arrangement. September 2015, Master Class,
    Marcus Evans CLO Summit, Miami, FL.

Commentary on Privacy and Information Security: Principles and Guidelines for Lawyers,
    Law Firms, and Other Legal Service Providers. July 2015, The Sedona Conference
    WG1, Webinar.

"Any and All Documents Meets ESI," with Judge Ron Buch, Judge Paul Grimm, et al. May
    2015, Tax Court Judicial Conference, Durham, NC.

Best Practices for In-House Management of Data Privacy and Security Matters. May 2015,
    Marcus Evans Webinar.

The Two Types of Data Risk for CLOs and the Three Solutions. March 2015, Master Class,
    Marcus Evans CLO Summit, Las Vegas, NV.

Judges Panel: What's Wrong with Discovery?, with Judge Facciola, Judge Peck, Judge
    Laporte and Judge Maas. March 2015, Legal Tech, New York, NY.

Government Contractors' Guide to Preventing Security Leaks. January 2015. Driven
    Webinar.

eDiscovery Caselaw Update: What's new in eDiscovery? December 2014, Driven Webinar.

Privacy and Data Security Issues in eDiscovery - Law Firms and Best Practices.  November
    2014, The Sedona Conference All Voices Meeting, New Orleans, LA.

Litigation Ready, Set, Go! October 2014, Driven Webinar.

Managing Cybersecurity Threats. September 2014, Women in eDiscovery, Washington, DC.

What is Litigation Readiness? September 2014, Master Class, Marcus Evans CLO Summit, Las Vegas, NV.

Data Security and Privacy for Lawyers. June 2014, Driven Webinar.

Privacy and Data Security Issues in eDiscovery—Law Firms and Best Practices. May 2014, The Sedona Conference WG1 Midyear Meeting, Miami, FL.

Achieving Standards for TAR Success Amid Black Boxes, Secret Algorithms and Competing Products, Association of Certified eDiscovery Specialists (ACEDS) Conference, Miami, FL.

The Flavors of Data Analytics, Served up for Attorneys. April 2014, ACEDS Webinar.

The Internet of Things: Privacy, IG and eDiscovery Issues. April 2014, ACEDS Webinar.

Judges Panel: Changing Rules and Best Practices in eDiscovery, with Judge Peck, Judge Maas and Judge Laporte. February 2014, Legal Tech, New York, NY.

Cyber Paleontology: Computer Forensics. October 2013, ACEDS Webinar.

eDiscovery for In-House Counsel. September 2013, Master Class, Marcus Evans CLO Summit, Las Vegas, NV.

Ethics in eDiscovery: Evolving Standards for Competence, Confidentiality and Cooperation. June 2013, ACEDS Webinar.

**Driven Speaker Series Presentations:**

Negotiating TAR Protocols, February 2022, Webinar.

New Trends for Second Requests in the Biden Administration, July 2021, Webinar.

Guidelines for Using Technology Assisted Review, November 2020, Webinar.

Hot Topics in InfoGov and eDiscovery, June 2020, Webinar.

The Law on ESI Sanctions, May 2020, Webinar.

Practical and Ethical Considerations for Social Media Discovery, February 2020, Washington, DC.

Roadmap to a Successful ESI Protocol, July 2019, Charlotte, NC.

eDiscovery Lessons Learned from the Mueller Report, July 2019, Richmond, VA.

Beware of Letting the Government Look Under the Hood: Mitigating the Risk of Follow-On Investigations in Merger Review, April 2019, Washington, DC.

Hot Topics in eDiscovery. March 2019, Richmond, VA.

Roadmap for a Successful ESI Protocol. February 2019, Raleigh, NC.

Guidelines for Using Technology Assisted Review. January 2019, Houston, TX.

Roadmap for a Successful ESI Protocol. September 2018, Atlanta, GA.

The Law on ESI Spoliation Sanctions. September 2018, Charlotte, NC.

Negotiating TAR Protocols. May 2018, Denver, CO.

Discovery and Mobile Messaging. March 2018, Charlotte, NC.

Guidelines for Using Technology Assisted Review. December 2017, Houston, TX.

Data Security and Privacy for Lawyers. September 2017, Austin, TX.

eDiscovery and Ethical Considerations for Social Media. June 2017, Philadelphia, PA.

Protecting Work Product in the Age of Electronic Discovery. May 2017, Charlotte, NC.

Art of the Litigation Hold. April 2017, Chicago, IL.

Art of the Litigation Hold. April 2017. Philadelphia, PA.

Art of the Litigation Hold. April 2017. McLean, VA.

Art of the Litigation Hold. February 2017, Charlotte, NC.

Ethics in eDiscovery: Evolving Standards for Competence, Confidentiality and Cooperation. November 2016, Miami, FL.

Information Governance Corporate Roundtable. November 2016. McLean, VA.

Discovery and the New Federal Rules of Civil Procedure. October 2016, Atlanta, GA.

Protecting Work Product in the Age of Electronic Discovery. September 2016, New York, NY.

Protecting Work Product in the Age of Electronic Discovery. August 2016, Richmond, VA.

The Law of Data – Information Governance 101. June 2016, Richmond, VA.

Working Together: eDiscovery Management Strategies for Inside & Outside Counsel, November 2015, Washington, DC.

What's Your Plan? Responding to Government Investigations. October 2014, Washington, DC.

Data Protection and Privacy in the U.S. and Abroad. September 2014, Houston, TX.

Data Protection and Privacy in the U.S. and Abroad. July 2014, New York, NY.

Data Protection and Privacy in the U.S. and Abroad. July 2014, Washington, DC.

What's New? eDiscovery and the Proposed FRCP Amendments. April 2014, New York, NY.

Second Requests without All the Pain. March 2014, Washington, DC.