1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Robert M. Illman, Magistrate Judge

4

5   TREMBLAY, et al.,                )
                                     )
6            Plaintiffs,             )
                                     )
7   vs.                             )   No. C 23-03223-AMO
                                     )
8   OPENAI, INC., et al.,            )
                                     )
9            Defendants.             )
    _____)

10

                                San Francisco, California
11                              Tuesday, December 17, 2024

12

13   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
              <u>RECORDING 11:36 - 1:09 = 93 MINUTES</u>

14   <u>APPEARANCES</u>:

15   For Plaintiffs:
                                Joseph Saveri Law Firm, LLP
16                              601 California Street
                                Suite 1000
17                              San Francisco, California
                                  94108
18                         BY:  CHRISTOPHER K.L. YOUNG, ESQ.
                                HOLDEN J. BENON, ESQ.
19
                                Cafferty Clobes Meriwether &
20                                Sprengel, LLP
                                135 South LaSalle Street
21                              Suite 3200
                                Chicago, Illinois 60603
22                         BY:  ALEXANDER SWEATMAN, ESQ.

23

24
                    (APPEARANCES CONTINUED ON NEXT PAGE)
25

2

```
 1  For Defendants:
 2                              Keker Van Nest & Peters, LLP
                                633 Battery Street
                                San Francisco, California
 3                                94111
                            BY:  CHRISTOPHER S. SUN, ESQ.
 4                               R. JAMES SLAUGHTER, ESQ.
                                 PAVEN MALHOTRA, ESQ.
 5
                                Latham & Watkins, LLP
 6                              555 Eleventh Street, NW
                                Suite 1000
 7                              Washington, DC 20004
                            BY:  ELANA N. DAWSON, ESQ.
 8
    Transcribed by:            Echo Reporting, Inc.
 9                             Contracted Court Reporter/
                               Transcriber
10                             echoreporting@yahoo.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1  <u>Tuesday, December 17, 2024</u>                    <u>11:36 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Court calls Civil Case Number 3:23-CV-

5  3223-AMO-RMI, Tremblay, et al. versus OpenAI, Incorporated,

6  et al.

7      Parties, please state their appearances for the record,

8  beginning with Plaintiff.

9      (Pause.)

10          THE COURT:  All right.  Nobody here for the

11  Plaintiff?

12          MR. SLAUGHTER (via Zoom):  Your Honor, I do

13  believe their -- Plaintiffs' counsel is on.  Mr. Benon and

14  Mr. Sweatman I believe are -- represent Plaintiffs.

15          MR. SWEATMAN (via Zoom):  Good morning, your

16  Honor.  Alex Sweatman on behalf of the Plaintiffs.

17          THE COURT:  Okay.  And that's it?  Mr. Sweatman,

18  you're the -- you're appearing by yourself?

19          MR. SWEATMAN:  No.  My understanding is Holden

20  Benon is on for the Plaintiffs from this very firm, and

21  Chris Young was on earlier, and he was going to be handling

22  the -- the argument.  There he is.

23          MR. YOUNG (via Zoom):  I apologize, your Honor.

24  It appears that Mr. Benon and I got booted immediately as

25  the panel shifted from the prior case.  Christopher Young on

4

1   behalf of Plaintiffs.

2         THE COURT:  It looks like Holden Benon is on my

3   screen, but now he is no longer on my screen.  He might have

4   to reboot or something like that.

5         MR. SWEATMAN:  Yeah.  And I've got a message from

6   him that he also got booted as the matters were switching.

7         THE COURT:  Okay.  All right.  Well, that's

8   unfortunate.  If you guys hadn't appeared, I just would have

9   granted the other side's -- all their requests.  So, now I'm

10  going to go through it.

11        THE CLERK:  Your Honor, I apologize.

12        THE COURT:  Yes.

13        THE CLERK:  If I could interrupt, I missed -- if

14  they could identify themselves again as to whom they

15  represent so I could get that for the record --

16        THE COURT:  Yeah, yeah.

17        THE CLERK:  -- the record.  Thank you.

18        THE COURT:  Yeah.  Well, let's let Holden Benon in

19  because it looks like he wants to get in according to My

20  Zoom thing.  And then once he comes in, we'll have them give

21  us their names, who they represent, and all that fun stuff.

22     (Pause.)

23        MR. BENON (via Zoom):  Good morning, your Honor.

24  Sorry about that.

25        THE COURT:  No problem.  No problem.

1       Okay.  So, Mr. Sweatman, you represent who?

2              MR. SWEATMAN:  Plaintiffs Coates, Diaz, Greer,

3  Hwang, Litman, Snyder and Woodson.

4              THE COURT:  And then hold up till -- till Ms.

5  Knudsen has that all down.

6       (Pause.)

7              THE CLERK:  Coates, Snyder, Diaz -- please repeat

8  the rest.

9              MR. SWEATMAN:  Sure.  Coates, Diaz, Greer, Hwang,

10 Klam, Snyder and Woodson.

11             THE CLERK:  Thank you.

12             THE COURT:  All right.  And Mr. Young?

13             MR. YOUNG:  Yes, your Honor.

14             THE COURT:  Who do you appear on behalf of?

15             MR. YOUNG:  Yes, your Honor.  I represent

16 Plaintiffs Silverman, Tremblay, Kadry, and Golden, but I'll

17 also be arguing on behalf of Mr. Sweatman's clients as well

18 today.

19             THE COURT:  Okay.

20             MR. BENON:  Good morning, your Honor.  Holden

21 Benon representing Plaintiffs Kadry, Silverman, Tremblay,

22 and Golden.

23             THE COURT:  Okay.

24       (Pause.)

25             THE COURT:  And then is there anybody for

1 Defendants?

2          MS. DAWSON (via Zoom):  Yes, your Honor.

3          THE COURT:  Okay.  So, who wants to start with

4 Defendants?

5          MR. SUN (via Zoom):  Why don't I go first, your

6 Honor.  Christopher Sun from Keker, Van Nest, and Peters, on

7 behalf of OpenAI, and with me are my colleagues James

8 Slaughter and Paven Malhotra.

9          THE COURT:  Okay.

10          MS. DAWSON (via Zoom):  And Elana Nightingale

11 Dawson of Latham and Watkins, also on behalf of OpenAI.

12          THE COURT:  Okay.  All right.  We have -- we set

13 this for -- with two discovery letter briefs in mind and

14 then a -- a third one was filed shortly thereafter.  So, we

15 -- we really have three discovery letter briefs.  There's

16 also unopposed letter briefs with regard to attaching

17 exhibits which I will take if I need at the end of this

18 hearing if I need those.  I can just hear what you guys have

19 to say with regard to them, and then if I want to see them,

20 I'll just -- I assume they all remain unopposed and I can

21 just grant them and have you guys attach them because I

22 don't think they are attached separately somewhere else,

23 correct?

24          MS. DAWSON:  That is correct, your Honor.

25          THE COURT:  All right.  And then just -- just to

7

1  double check real quick before we get into it and spend a

2  bunch of time here, you guys aren't being moved to the MDL

3  or -- and consolidated somewhere else, are you, so that I

4  don't have to deal with you anymore or -- that hasn't

5  happened yet?

6       MR. YOUNG:  Your Honor, last night, OpenAI filed a

7  brief in JPML seeking an expedited hearing date of January

8  30th.  So, more to come, your Honor, but they --

9       THE COURT:  Okay.

10       MR. YOUNG:  From the briefing, it does appear that

11  OpenAI has requested the Northern District of California as

12  the desired jurisdiction.  Plaintiffs haven't yet -- haven't

13  yet responded.  So --

14       THE COURT:  Oh, okay.  So, we'll -- we'll stick

15  with you anyway.  Okay.

16       MR. YOUNG:  Perhaps.  Who knows.

17       THE COURT:  All right.  All right.  Then let's get

18  started.  I mean, I've got -- I've got the paperwork in

19  front of me.  I could -- I could probably do this on the

20  paper.  Part of the reason why I get you guys together on

21  the Zoom call is kind of what we saw in the last hearing.

22  Sometimes some of these things get updated with new

23  information that makes some of the rulings unnecessary.

24       Is there anything like that that we could kick off with

25  with regard to 204 or anything on any of these?

8

1          MR. SUN:  Yes, your Honor.  I can give you one

2  update and start things off right hopefully.

3      So, the parties do have an update with respect to the

4  custodian dispute.  Following Plaintiffs' request to

5  designate Mr. Boloji (phonetic) as a custodian, the parties

6  have resolved that dispute.

7          THE COURT:  Okay.

8          MR. SUN:  So, with respect to Mr. Boloji, there is

9  no more dispute between the parties.

10         THE COURT:  Okay.  All right.  So, then I don't --

11  you know, again, I don't necessarily need anybody to -- to

12  just, you know, read out everything that's in their stuff,

13  and we can just start  with the -- the first letter brief

14  and -- and go through it.

15         MR. BENON:  Actually, your Honor, with respect to

16  the first letter brief, Plaintiffs have three separate

17  updates they'd like to point the Court's attention to.

18         THE COURT:  Okay.  Let's -- let's do that then.

19         MR. BENON:  Okay.  So, the first two of these

20  updates relate to what's happening in the analogous <u>Authors</u>

21  <u>Guild</u> case.

22         THE COURT:  Okay.

23         MR. BENON:  On December 6th, the <u>Authors Guild</u>

24  court ordered OpenAI to cross-produce documents from Ilya

25  Sutskever custodial file.

9

```
1          THE COURT:  Yeah.

2          MR. BENON:  And, so, Ilya Sutskever we understand

3   is a custodian in the New York Times versus OpenAI copyright

4   action, and the magistrate judge in -- in Authors Guild

5   said, OpenAI, you must cross-produce the documents from Mr.

6   Sutskever's custodial file in the Authors Guild action.

7       So, we think that -- so, this shows that the Authors

8   Guild court already deemed this custodial file to be

9   relevant to these claims, and this also goes to burden.

10  OpenAI can simply cross-produce the documents from that

11  custodial file in this case as well.

12         THE COURT:  Okay.

13         MR. BENON:  Second, your Honor --

14         THE COURT:  What is OpenAI's position on that?

15         MR. SUN:  Your Honor, I -- I've got a couple of

16  things to clarify.  First is that the order that came down

17  in Authors Guild is relevant not just because of what it say

18  with respect to Doctor Sutskever.  I believe six of the

19  custodians that are requested in this current motion were

20  also requested in the Authors Guild motion.  I'll note that

21  all six of them -- the motion was denied as to all six of

22  them.  The Court did order cross-production of Doctor

23  Sutskever's files from the New York Times to -- to the

24  Authors Guild action, but it wasn't -- it wasn't fully

25  designated as a custodian, and I note that because it
```

10

1  supports the position that OpenAI has taken in its briefing.

2      I'll answer the question I think you ultimately are

3  going to ask me, which is whether or not OpenAI would be

4  willing to produce Doctor -- cross-produce Doctor

5  Sutskever's files.  I think ultimately we would, but I do

6  want to respond to the burden argument that Plaintiffs has

7  raised.

8      I think -- there are -- there are two concerns, your

9  Honor.  I don't want to let it go unsaid that simply cross-

10 producing documents means that there is no burden because I

11 think there is one, even if the technical burden of

12 production is lesser than it would be if we were designating

13 a custodian in full, most obviously because the scope of

14 documents that are produced in a case dictate things like

15 the scope of deposition testimony that has to be covered.

16 It expands the scope of the case.

17     And, so, it's not without cost, even if the cost is

18 relatively less than it is in the context of a full

19 designation of a custodian.

20     The second concern I have and I want to raise is one

21 with regards to the equities.  I think OpenAI is concerned

22 that the Plaintiffs in all of these actions are kind of

23 leveraging the orders in each case against each other in a

24 way that's favorable where they maximize the benefits to

25 themselves while minimizing the down side, which I don't

11

1  blame them for but I do want to flag.

2      For example, the thing to note here is that Mr. Benon

3  highlights that we should have to cross-produce files from

4  Doctor Sutskever, and he leverages the Authors Guild order

5  to benefit him in that respect, but he neglects to mention

6  that the remaining -- that the custodians were denied in

7  that case, and I think it's fair to say if you live by the

8  sword, you should die by the sword.  So, if he believes that

9  Authors Guild -- it's appropriate to leverage the order in

10 that case here, then he should leverage the case in full,

11 the -- the order in that -- that case in full, which would

12 requiring denying the designation of custodians across the

13 other six.

14     The other final thing I want to note, your Honor, is

15 that the cases -- cross-production, it's -- it's a thorny

16 proposition.  It causes a lot of difficulties.  I'll give

17 you two examples.  The first is in Authors Guild, something

18 else that Mr. Benon does not -- neglected to inform the

19 Court is that there is a -- there's a cap on the number of

20 search term hits.  So, the number of custodians that are

21 designated in Authors Guild is not necessarily equivalent in

22 burden to the number of custodians that would be designated

23 here, because no matter the number of custodians, there's a

24 search term hit cap.

25     And the second thing that I want to flag is that cross-

12

1  production is also a way to get to an end run around the

2  orders in this case.  So, the last time we -- we briefed the

3  custodians, your Honor, back in October, Plaintiffs denied

4  OpenAI's offers to add two custodians, Mohammed (phonetic)

5  and Brunenshetti (phonetic), but they are produced in

6  Authors Guild.  So, I'd be concerned that Plaintiffs are

7  going to say, Well, their files are already being produced

8  in Authors Guild, so you might as well cross-produce them

9  here as well.

10      So, they -- I -- I flagged those issues just to

11  highlight that it's not and it shouldn't be as simple as

12  saying, Well, you produced the documents in that case.  You

13  should have to produce them here.  I think there are a lot

14  of considerations to -- to consider, but if your question is

15  whether or not OpenAI would produce Doctor Sutskever's filed

16  if you ordered it, of course, we would.

17          THE COURT:  Let me just flag one thing real quick,

18  and I sort of probably forgot to do that.  You know, some of

19  the material contained within the joint letter brief has

20  been redacted, and the request to have it remain sealed is

21  -- is before the Court.  And I haven't issued an order on

22  that yet.  I will do that as -- as I issue the order related

23  to the -- to the -- the letter brief.

24      But we are not in a closed session here.  This is a

25  public session.  So, any of the information contained in

13

there that people want to discuss, you need to keep that in

mind.  If we need to go into a -- a sealed session, we can

do so.  I prefer not to.  I think we can discuss it without

that.  But just -- I just want to flag that for the parties,

just keep that in mind as we -- as we move forward.

You know, Mr. Sun, to your point, though, I mean -- I

mean, do you want this Court to -- to take into effect the

-- the decision in the Southern District of -- of New York

with regard to that because then, you know, and like you

said, it's -- it's one way or the other.  Do I just ignore

that ruling and make it -- the determination based on the

needs of this case?  You know what I'm saying?  So --

MR. SUN:  Yeah.  I -- yes, your Honor, I -- I

understand what you're asking.  If the Court would order --

if the Court is going to adopt the order in the Authors

Guild case, I think that we would accept that order, but

I'll note that it's obviously complicated and subject to the

caveats that I noted, which we should consider that there

was a search term hit count in -- in Authors Guild, and, of

course, there are custodians that Plaintiffs are requesting

here that aren't the -- that weren't requested in Authors

Guild, which we would obviously need to consider, but I

think the arguments that led to Judge Wang concluding that

it was burdensome and unnecessary to add additional

custodians in Authors Guild applies equally if not more here

14

1  given that I believe in that case, the number of custodians

2  have been limited.  Full designated custodians is only at

3  24.  And given the compromise that I -- I updated you about

4  earlier, we're currently at 25 in this case.

5          THE COURT:  Right.  Okay.

6      Mr. Young, did you have anything in addition that you

7  wanted to add to the discussion of 204?

8          MR. YOUNG:  I do, your Honor, but Mr. Benon is

9  handling this portion of --

10          THE COURT:  Oh, I'm sorry.

11          MR. YOUNG:  -- the argument here.

12          MR. BENON:  Thanks.  Thanks, your Honor.  I'll

13  just note that Mr. Sun mentioned one thing that struck me as

14  a little odd earlier.  He said that the Plaintiffs are

15  making -- taking positions with respect to the Authors Guild

16  case when it benefits them, and they're taking opposite

17  positions with respect to that analogous case when it also

18  benefits them.

19      But OpenAI is doing the exact same thing here, your

20  Honor.  When -- when it comes to depositions, OpenAI insists

21  on coordination.  But when it comes to producing documents,

22  they say, No, you will not get the same custodians in that

23  case.  You will -- you are stuck with the custodians that

24  were entered here, and if you want additional custodians

25  here, you have to go back to the Court.

1      We think that's inefficient, your Honor.  We think that

2  the -- the Court -- that OpenAI should take a consistent

3  approach with respect to whether -- whether it's producing

4  document discovery, whether it's producing it's witnesses.

5  Is it going to take the same approach or not?  And we keep

6  coming back to the Court about discovery disputes that,

7  frankly, can be resolved if OpenAI will just agree to take a

8  consistent approach across how it's conducting -- how it

9  wants depo coordination to proceed versus how it wants

10  discovery -- document discovery to proceed.

11              THE COURT:  Okay.

12              MR. SUN:  Can I respond, your Honor?

13              THE COURT:  Yeah.

14              MR. SUN:  I -- I don't think that that's fully

15  correct.  I want to clarify that Mr. Benon's talking about

16  an offer that I've never heard, which is that the Plaintiffs

17  in the Northern District of California would follow the

18  Plaintiff -- the custodians that were ordered in the other

19  cases.

20      In fact, they can't do that because we had offered them

21  two of the custodians that were designated in the Authors

22  Guild case, and they affirmatively said they did not want

23  those two custodians.  They wanted to swap them out.  So, we

24  couldn't follow what was happening in Authors Guild anyway.

25      And, regardless, the offer that Plaintiffs made was not

16

1  to follow Authors Guild but, rather, a demand that we

2  designate everyone that was designated in Authors Guild as a

3  custodian in this case and then permit them to demand an

4  unlimited and unfettered number of additional custodians on

5  top of that, and we contend that that would be unduly

6  burdensome and disproportionate to the needs of the case.

7       MR. BENON:  Your Honor, may I respond to those

8  points?

9       THE COURT:  Well, I don't -- you know, I don't

10  want us to argue about, you know -- I'd rather us just sort

11  of figure out how we're going to move forward with the

12  proper custodians and -- and not worry about who's saying

13  what to whom and all that and who's being more difficult.  I

14  mean, obviously, I mean, I do agree that this is something

15  you guys have both said is that -- is that really you guys

16  should be working this stuff out without me being involved.

17  I mean, designating custodians and -- and all that, that's

18  just -- it's a little silly for me to have to be here for

19  that and -- and have to go through and, you know, make those

20  determinations when you guys should be the ones -- and, you

21  know, both you guys are going to complain the other side is

22  -- is, I don't know, stalling or throwing up roadblocks and

23  all that kind of stuff, but I don't want to -- I don't want

24  to spend our time today doing -- doing that.

25       So, who has an idea as to what's going to streamline

1   and get this going so that you guys can be done with this?

2           MR. SUN:  Your Honor, I -- I have some thoughts

3   that I'm happy to share that will be helpful.  I'm mindful

4   of your admonition that you kind of don't want to hear a

5   rehash of what was in the briefs.

6       We've already -- we've currently designated 25

7   custodians, assuming your Honor thinks it's appropriate to

8   cross-produce from Doctor Sutskever that would, you know,

9   bring us to 26 maybe, depending on how you count the last

10  one.  I think that's a good place to start, and the parties

11  can look at the documents that are being produced and use

12  those documents to hone in on the additional information

13  that is missing or that Plaintiffs think they might need and

14  will crystalize the discussion.

15      If I'm being candid with you, your Honor, I think they

16  have what they need.  I think the 25 to 26 custodians is

17  appropriate.  That's according to the other cases that they

18  cited in their briefs.  So, they cite -- they point to two

19  cases.  Authors Guild, as we discussed, that's 24

20  custodians.  Then they point to the Kadry case, which is

21  another case about machine learning and copyright issues.

22  And in that case I believe the number of custodians that

23  were designated was 15.  So, that's less than half of the

24  number of custodians that they're demanding -- that

25  Plaintiffs are demanding in this case.  And Facebook I

1 believe has something like 20 times more employees than

2 OpenAI does.

3     So, I think if we're discussing at least -- at the very

4 least in the interim do we have enough custodians, I think

5 the answer must be yes.

6     I'll note that -- and the reason I think it makes sense

7 to focus -- to look at the documents first and then to use

8 -- to figure out what's missing before asking for more

9 custodians is that my suspicion is that's not happening

10 right now.  I think it would be helpful to look at two

11 examples.  I can think of two examples that kind of clarify

12 the issue.

13     So, the first is Plaintiffs, according to their brief,

14 have identified at least six of the 11 custodians that

15 they're demanding concerning training data because they

16 don't know about training data.

17     But, as we noted in our brief, OpenAI has already

18 identified nine people that can speak to that precise

19 question, including people like the head of the -- head of

20 pretraining, the former head of post-training, the head of

21 data acquisition, among many other engineers who worked on

22 the -- specifically on training the relevant models.  And,

23 so, it's not clear to me why they would need additional

24 people.

25     And one of the people they demand, for example, is Chi

19

1  Ming Yin (phonetic), who is a person that reports to Alex

2  Paino (phonetic), already a custodian, who also reports to

3  Nick Rider (phonetic), also a custodian.

4       Another example is that they identify Jakub Pachoki

5  (phonetic) as being relevant because he worked on GPT-4.

6  But 19 of the current 24 custodians that we've identified

7  worked on GPT-4.  And, so, it's unclear what additional

8  information they would need from him.  And the only thing --

9  other thing the brief identifies is his work on OpenAI Five,

10 which is a neural network that plays competitive video games

11 like Dota.  So, it's not clear why those are relevant.

12      I highlight those examples, your Honor, to -- to

13 emphasize the merit of taking a more structured approach to

14 identifying additional custodians.  I -- I fear that

15 Plaintiffs are animated by an understandable but I think

16 ultimately misguided desire to figure out -- try to get

17 every document no matter how relevant, when I think the more

18 efficient approach here would be let's figure out what

19 information you need.

20      You don't need 10 different documents that all describe

21 -- describe the same training process in different words.

22 What they need is information, and if there is information

23 that is missing, if there are categories of information that

24 are missing and unavailable from our existing custodians,

25 we're happy to meet and confer and talk about whether adding

20

1   more custodians makes sense.  That's why we compromised in

2   the first instance.

3            THE COURT:  So, Mr. Benon, why shouldn't I take

4   that?

5            MR. YOUNG:  Your Honor, if I may?

6            THE COURT:  Oh, okay.

7            MR. YOUNG:  So, your Honor, I just want to -- you

8   know, the insinuation that the people that we're asking for

9   is not based on our review of the documents is simply, one,

10  incorrect.  And, two, you know, I -- I noticed that Mr. Sun

11  cited Mr. Paino, who is now subject of a deposition notice

12  and was named in their initial disclosures.  However, last

13  night we received notification that Mr. Paino, among two

14  other custodians were wrongly named in the initial

15  disclosures, and those disclosures will now be fixed to

16  remove and name correct people.

17     I mean, that's part of the issue that we're running

18  into.  We're adding more custodians because it turns out

19  that we do need more people, and the documents that we're

20  not getting are enough to properly litigate this case right

21  now.  And given that we are now running against a very

22  rapidly approaching discovery deadline, we don't really have

23  much more time to keep waiting for them to tell us who the

24  right people are.

25            MR. SUN:  Your Honor, just to clarify, I don't

21

think we've ever said that we were moving Alex Paino from

our initial disclosure.  So, I'm not entirely sure what Mr.

Young is referring to.

THE COURT:  Well, let's sort that out now.

MR. YOUNG:  Well, we've noticed Mr. Paino's

deposition.  They're telling us they don't want to produce

him, from what I've been able to tell, that he's not the

right guy to take the deposition of.  I mean, if he is still

a relevant custodian and presumably someone who we'd be

interested in taking the deposition of, I'd like to hear it

from OpenAI.  If he's not the right person, I'd like to hear

that from OpenAI too.

MR. SLAUGHTER:  Your Honor, I was hoping actually

not to have to say anything in this hearing, but I -- but I

joined specifically in case there was misinformation shared

with respect to depositions.  We have never said that Mr.

Paino would not be a deponent.  In fact, we said Mr. Paino

may need to be a 30(b)(6).  We're looking into it, and we

told them that we would be getting dates, and we are doing

that.  So, Mr. Paino -- we've never a single time suggested

that Mr. Paino would not be disclosed and be a potential

deponent.

THE COURT:  Okay.

MR. BENON:  Your Honor, I'll jump in here because

I was on this meet and confer call.  So, we ser -- we served

22

1  30(b)(1) -- 30(b)(1) deposition notices with respect to

2  three different individuals.  OpenAI came back and said, We

3  think you picked these individuals because of our initial

4  disclosures.  These -- these individuals were listed in our

5  initial disclosures.  They are also listed in -- in response

6  to interrogatories.

7       Actually, we're going to amend those to remove these

8  individuals.  It turns out based on our investigation they

9  don't actually have information -- they don't -- they're not

10 likely to  possess information relevant to the claims.

11      The problem is, your Honor, as my colleague Chris

12 alluded, these individuals were listed as custodians.  So,

13 when OpenAI said, Hey, look, we picked these custodians that

14 were listed in our initial disclosures, we said, Great.  We

15 don't need to have a dispute over those.

16      After the fact, we've now learned that these

17 individuals aren't likely to have -- possess relevant

18 information.  So, to Chris Young's point, we do need more

19 people here, your Honor, and it makes sense for us to at

20 least include some additional custodians to account for

21 that.

22           THE COURT:  All right.

23           MR. BENON:  And I'll also note this calls into

24 question a lot of the initial selections that OpenAI made.

25 We took OpenAI's word at face value, that the 12 selections

23

1  -- its 12 selections that it unilaterally made were people

2  who are likely to possess relevant information, but now we

3  know that OpenAI is changing its positions based on its

4  further investigations.

5       THE COURT:  All right.  Let's move on to the 212

6  -- I mean, excuse me, the -- the document number, but this

7  is the second letter brief that was filed in November.

8  Let's move on to that, and we'll begin with OpenAI I guess

9  would address first.

10      Is there any update to this, and then also anything you

11  want to add to what's already written in the documents?

12      MS. DAWSON:  Yes, your Honor.  Thank you so much.

13  Elana Nightingale Dawson from Latham and Watkins.

14      Just a few additional points.  I actually think much of

15  what, indeed, Plaintiffs said this -- with respect to the

16  previous motion is relevant with respect to this motion, and

17  we'll start by saying kind of, as your Honor said, we wish

18  we didn't have to bring this dispute to you, but I'd like to

19  just briefly recount what has brought us here today.

20      Number one, we have not received a single production

21  from Mr. Coates, from Klam or Plaintiff Snyder since October

22  11th, and we haven't produced -- received a single custodial

23  production, so nothing other than the production of a

24  deposition transcript, from Plaintiff Greer, Litman and

25  Woodson.  That is despite the fact that we -- we wrote to

1  them on October 4th.  They represented during an October 8th

2  conferral that they would commit the deficiencies we

3  identified, material deficiencies, including the failure to

4  produce a single email from numerous Plaintiffs and only a

5  handful from some.  They said they'll cure it, and then they

6  told us in writing on October 24th it would be cured by the

7  end of October.

8      They again met on November 13th, said, Actually, we'll

9  cure it by November 19th.  And yet no material productions

10  were made from numerous Plaintiffs.  And, so, your Honor, we

11  are -- as Mr. Young said, we aren't getting in this case on

12  our side the documents we need to properly litigate this

13  case.  As Mr. Young said, we don't have much time.

14  Plaintiffs noted that they have noticed depositions of

15  Defendant.  We would very much like to proceed with

16  depositions of Plaintiffs, but with respect to most if not

17  all Plaintiffs, we don't have the most basic discovery to

18  which we are entitled and to which they have said they would

19  provide but have not done so to date.

20      And, so, at this point, what we are asking your Honor

21  to do is to require with structure a timeline for Plaintiffs

22  to, in fact, do the type of search that is necessary to find

23  the documents responsive to these requests, and it's nothing

24  more than what Plaintiffs' own expert said was required in

25  Docket Number 164, an ESI vendor led collection but with

25

respect to the prior requests that we served, because

Plaintiffs have said, Our work here is done.  We don't have

anything more to do, and the documents show that that's not

the case.

THE COURT:  And -- and let me ask Plaintiffs why

shouldn't we sort of go into this structured search protocol

that -- that they're requesting?

MR. YOUNG:  So, your Honor, the reason we --

because it's already been done.  I -- I have confirmed with

Mr. Sweatman that for every single Plaintiff, a forensic

collection of documents has proceeded since the entry of the

ESI order.

I have also spoken with Mr. Sweatman with the

particular Plaintiffs, Mr. Coates, Diaz, Greer, and Klam.

The issue isn't that the documents haven't been collected.

They're just being processed.  And, from my understanding,

documents are going to be forthcoming as soon as this week.

From our -- from our -- from where we're standing, this

motion has really been just unripe and just been a rush to

the courthouse.

As exemplified, as you'll notice, Mr. Kadry's absence

from Ms. Nightingale Dawson's argument because we produced

documents, we told them that we produced documents, and his

omission is likely because they finally looked at the

production and found his documents.

1          MS. DAWSON:  Your Honor --

2          THE COURT:  So, with regard to that -- with regard

3   to that, Ms. Dawson, if the production is ordered to occur

4   by the end of this week, then -- then that satisfies your

5   concerns with it, right?  I mean --

6          MS. DAWSON:  Well --

7          THE COURT:  -- you might concerns with what's

8   produced and the amount that's produced, but that's a

9   different --

10         MS. DAWSON:  It is, your Honor, although a few

11  points in response.  Number one, I'll just say with respect

12  to your actual question, Plaintiffs have not identified any

13  search terms to search for responsive documents to our first

14  set of requests for production, so RFPs 1 through 38 or 39,

15  depending on the set of Plaintiffs.  Plaintiffs have said

16  that they satisfied their obligation to produce documents in

17  response to those requests, and they have said that they did

18  so with an attorney -- sometimes they say attorney directed.

19  Sometimes they say attorney supervised search.

20      And, so, as far as we know, they're not using search

21  terms.  The ESI order says it is their obligation to

22  disclose them under paragraph 7(b).  They haven't proposed

23  search terms for that set of requests.

24      So, your Honor, absolutely an order to produce

25  forthwith would be welcome in this circumstance.  The

27

1  concern is that based on all of the representations they

2  have made so far, they haven't actually conducted those

3  searches with respect to those request.  And I will point

4  out, even with respect to the requests that they said, We

5  will conduct searches for the more recent requests, we will

6  give you search terms, they said we would get the hit

7  reports by November 18th or 19th.  It took --

8           THE COURT:  Well, let me -- let me -- let me -- I

9  don't want to cut you off -- well, I do want to cut you off

10 but just to clarify something with Mr. Young as -- as it

11 relates to that.

12     So, you said in your -- in your briefing that you guys

13 are going to -- that you have conducted these searches.  I

14 think you said that you did conduct the searches and that

15 you -- with third party vendors, correct, and that you did

16 apply search terms.  Are you going to make those search

17 terms available and give transparency of what was done when

18 you make this production by the end of the week?

19           MR. YOUNG:  Your Honor -- your Honor, I can offer

20 some clarification, but it does require a little bit of just

21 going backwards into what Ms. Nightingale Dawson is -- was

22 -- was explaining.

23           THE COURT:  Okay.

24           MR. YOUNG:  So, the ESI order was entered on

25 August 22nd.  We made our first production before that,

28

1  before we were required to disclose any search terms.  Since

2  -- once they issued new RFPs, we provided them broad enough

3  search terms to encompass the old RFPs as well.  So, from

4  our perspective, we have met our obligations.  They may not

5  be satisfied with the search terms we provided, but there is

6  provision within the ESI order for them to challenge that,

7  but instead, they have chosen to, instead, say that we never

8  provided search terms for RFPs 1 through 38, which is simply

9  not true because we have drafted broad enough search terms

10 with the new RFPs to comply with the ESI order to capture

11 any documents that may have escaped collection during our

12 initial attorney driven search and collection.

13        THE COURT:  Well, Ms. Dawson, then you can

14 continue.  I just wanted to get some clarification on -- on

15 what information related to the search terms have been --

16 been turned over.  So, what -- what's your response to what

17 Mr. Young has said about what that --

18        MS. DAWSON:  A few things, your Honor.  Number

19 one, Plaintiffs said when they provided the search terms in

20 their cover letter that those were search terms for the

21 third RFPs.  Respectfully, they are not broad enough to

22 cover all of the RFPs in question, and the compromise they

23 offered in response to our motion is we can negotiate

24 regarding the search terms.

25        If Plaintiffs are here committing to, Yes, we

29

agree to run search terms with respect to all of their

requests, we -- we take back our position that we have

fulfilled our production obligations with respect to the

first set of RFPs, and we can have some kind of timeline for

a back and forth process so we don't end up where we are

today because, as I said, we've repeatedly met and conferred

about these issues.  They've told us they were resolved, and

they are not.  We are happy to proceed with those search

terms.

        But, at the moment, the other thing I would point out

is we did not even get hit reports for all Plaintiffs until

this past Friday.  So, it took a month for them even to get

us those hit counts, and at this rate, if we don't have a

more structured timeline requiring them to produce for all

requests pursuant to a vendor led ESI search on a structured

timeline, we're not going to have documents, and we're going

to be faced with either taking their depositions and having

to do them twice because we don't have the documents we need

or with them continuing to drag their feet and not getting

this done during the timeline we have.

        MR. YOUNG:  Your Honor, I just want to correct

that at least for -- it's my understanding that hit reports

were provided from my clients on November 18th.

        THE COURT:  Okay.  Hold on.  Hold on, Mr. Young.

So, the request by -- by Ms. Dawson -- by OpenAI is -- is

30

1  that you provide the search terms to OpenAI within seven

2  days.  That's not a problem, right?  I mean, that's going to

3  be happening with your production by the end of the week,

4  right?

5      The second thing they're asking then is that they then

6  have seven days in which to propose additional search terms

7  and revisions from the production that you have.  Nobody has

8  a problem with that.  That's fine.

9      Then Plaintiffs executed those searches within three

10 days?  Is that the problem?  Is that where the -- this is

11 going to -- this is going to be coming up -- to be an issue

12 for you?

13          MR. YOUNG:  No.  I think where it's an issue for

14 us is this is precisely what we offered them, and instead of

15 taking us up on our offer, they've decided to come to you,

16 your Honor.  And from where we're standing, like we've

17 already done our searches and collections.  We're making our

18 productions.  They're just asking us to go back and burden

19 our Plaintiffs again with another search which could have

20 happened before.  That's -- that's where -- that's where our

21 issue is, your Honor.

22          THE COURT:  Well, why -- why would it have

23 happened before if -- if you're just now going to be

24 producing this to them along with the search terms?  Because

25 you're saying that those search terms that had been produced

1  before were the ones that --

2          MR. YOUNG:  They -- they've already been run.

3  We've done collections.

4      The issue with the production is not that the documents

5  haven't been produced.  They're just being processed and

6  being run and reviewed for privilege and all that -- all

7  that other materials, your Honor.

8          MS. DAWSON:  May I respond to --

9          MR. YOUNG:  So, my understanding --

10          MS. DAWSON:  -- your Honor -- oh, I'm sorry.

11          MR. YOUNG:  -- and Mr. Sweatman -- Mr. Sweatman

12  can correct me because from my understanding, these are all

13  issues with Mr. Sweatman's -- or not issues, but these are

14  all related to Mr. Sweatman who represents far more

15  Plaintiffs than I do in this case.

16          MS. DAWSON:  May I briefly respond, your Honor?

17          THE COURT:  Let me -- let me let Mr. Sweatman jump

18  in and then -- and then you hold onto that, and then you can

19  hit both of them.  Okay.

20      Go ahead, Mr. Sweatman.

21          MR. SWEATMAN:  I don't have anything additional to

22  add to Chris Young's points at this -- at this time other

23  than we have provided the search terms.

24          THE COURT:  Okay.

25          MS. DAWSON:  I'll just make two points, your

32

Honor.  Number one, this is not an issue that is unique to
Mr. Sweatman's clients.  Mr. Kadry, for example, there was a
reference to him in the briefing.  Publicly available
information reflects that he has six foreign language
publications.  We only have two agreements related to
foreign language.  That is an example.

I will say with respect to revenue for the works at
issue, there are numerous Plaintiffs for whom we do not have
revenue information, including responsive information from
Ms. Silverman related to her play.

I don't want to belabor the factual disputes, but the
really I think salient point here is what I heard Mr. Young
say is that we -- that Plaintiffs already offered to do what
we said.  Respectfully, when we were in the middle of
briefing this dispute, when Plaintiffs already had our draft
of the letter and were drafting their response to our
letter, they could have said, Yes, for all RFPs, we will do
what you're asking for.  But on November 26, at 12:00 p.m.
PT, Mr. Benon wrote to us and said for his four clients, in
response to the first and second sets of RFPs, a manual
attorney led search of Plaintiffs -- the listed devices was
conducted.  Plaintiffs' agents also provided responsive
materials.

In response to the third set of RFPs, counsel engaged
an ESI vendor to forensically image responsive portions of

33

Plaintiffs' devices and email accounts.  Setting aside what
we may still need to discuss regarding what the responsive
portions caveat means, in the middle of briefing this
dispute, Plaintiffs made clear that they were not doing what
we're asking.

     And, so, if they are now agreeing to everything we are
asking in the letter, then we are happy to proceed with a
timeline -- structured timeline that assures that this work
is done as contemplated in the letter and on an expeditious
timeline so we can proceed with moving this case forward,
which is our overall goal.  We would like to get to
depositions just as Plaintiffs are, but we are entitled to
these documents.

          MR. YOUNG:  Your Honor, if I may, I just have a
suggestion.  We are prepared to make further productions
this week.  I mean, OpenAI can -- can take a look at those
productions.  If they're still unsatisfied -- because what
you're not hearing is that things are missing.

     For example, the documents that Ms. Nightingale Dawson
-- I can give you the Bates numbers from some of those
foreign agreements right now.  As we've said, we have
produced those documents.  The Astonia document from Mr.
Kadry is at Kadry00196.

          THE COURT:  Well, hold on --

          MR. YOUNG:  The --

34

1          THE COURT:  Hold on.

2          MR. YOUNG:  Yeah.

3          THE COURT:  That doesn't help me, right.  I --

4          MR. YOUNG:  Yeah.

5          THE COURT:  Yeah.  So -- so, then you guys will

6    make your production and provide those search terms by the

7    end of this week, by the 20th.  And then -- and then OpenAI

8    will have until the -- the 27th I guess in which to provide

9    their response and their request for proposals for

10   additional search terms.

11      Is that going to give you guys enough time to have a

12   little bit of back and forth on that considering the

13   holidays that are jammed in between there or do we want to

14   push that to the 3rd of January?

15          MR. YOUNG:  I think the only issue, your Honor,

16   would be reaching out clients.  I mean --

17          THE COURT:  Right.

18          MR. YOUNG:  I think Mr. Sweatman's going to say

19   the same thing.  Given the holidays and our Plaintiffs might

20   be traveling, you know, I just don't know where they're all

21   going to be geographically situated.  I think a little more

22   time might be necessary.

23          THE COURT:  Ms. Dawson, do you have an issue with

24   pushing that to the 3rd of January?

25          MS. DAWSON:  Just so I understand -- I just want

35

1  to make sure I understand what we're pushing, but, yes, we

2  are happy to respect people's holiday schedules.

3      What I understood was that Plaintiffs were required to

4  get us information by this Friday in productions and then

5  the January 27th deadline is one for Plaintiffs.  If the

6  concern was as between the 27th and 3rd, we're happy to move

7  briefing to the 3rd and 6th or something comparable, but I

8  can say from my side -- from OpenAI's side, we can handle

9  whatever schedule your Honor enters.

10         THE COURT:  Okay.  So, the reason why we'd want to

11  push it back to the 3rd is because you're going to be

12  proposing these things to them.  So, yeah, why don't you go

13  ahead and propose it by -- if you guys don't have an issue

14  with it, then by the 27th.  I guess -- I guess OpenAI

15  doesn't take the holidays.  And then -- and then the request

16  then would be Plaintiffs executing those searches, which may

17  -- that may be, Mr. Young, where the requirement is for you

18  guys to then have that back and forth, say, Well, talk to

19  your clients and then be able to talk to them, right.  So,

20  that's where I'll give the -- the extended time as opposed

21  to three days, which is what's proposed.  I would move that

22  back until the 7th of January, and then -- and then on that,

23  disputes regarding any search terms brought before the

24  Court, but we're going to know that.  We don't need 14 days

25  for that.  We can just bring that back by the 14th of

1  January.

2          MR. YOUNG:  Your Honor, I just want to -- I just

3  want to make sure that there's -- there's a provision for us

4  to be able to challenge OpenAI search terms.  I -- I just

5  want to make sure that we are not forced to adopt onerous

6  and burdensome search terms.  We've already made numerous

7  collections and -- and so --

8          THE COURT:  So --

9          MR. YOUNG:  -- before we have to --

10          THE COURT:  -- the execution of --

11          MR. YOUNG:  -- go to the --

12          THE COURT:  The execution of those search terms

13  will be done for the ones that you guys have agreements on.

14  Any -- any disputes that you guys have, you're supposed to

15  be meeting and conferring and then -- and then bringing to

16  me as a joint letter brief by the 14th of January.

17          MR. YOUNG:  Okay.

18          MS. DAWSON:  Thank you.  We would ask, your Honor,

19  that there be at least -- and this is standard in a number

20  of other ESI orders -- hit counts provides such that if

21  Plaintiffs are complaining that using a certain search term

22  is burdensome or duplicative, we at least need the hit

23  counts.  There shouldn't be an additional burden to running

24  because as -- at least according to Mr. Young, all of this

25  information is already collected.  And, so, I don't believe

37

1  -- I'll let them speak, but there -- I don't believe there

2  should be any material burden to at least providing hit

3  counts for all proposed terms so we can be speaking from the

4  same play book.

5              THE COURT:  Mr. Young?

6              MR. YOUNG:  Yeah, I just want to confirm dates,

7  your Honor.  I've got 12/20 for us to provide search terms.

8  I think we've already -- I mean, at least --

9              THE COURT:  Along with the information.

10             MR. YOUNG:  Yeah.  I think for at least -- for at

11  least the clients -- my -- the clients I represent, that's

12  already been done.

13      The 3rd to provide -- for OpenAI to provide revised

14  search terms to the ones we've provided.  Then the 7th to

15  run --

16             THE COURT:  No, no, no.  The 27th would be for

17  OpenAI to provide -- so, they're going to be able to get

18  this stuff, review it, and then -- and then turn around and

19  -- and provide additional search terms and revisions.

20  That's going to be their proposals to you, to provide those,

21  to say why they're insufficient, right.  And then -- then we

22  have that gap of a little bit of time for you guys to run

23  those searches because I know you're going to have to

24  contact your clients and you're going to have to maybe even

25  have a little bit of a back and forth with OpenAI, and

38

1  that's where I'm giving you until the 7th.

2      And then if there's a dispute, then you need to have a

3  joint letter brief in front of me by the 14th.  That joint

4  letter brief necessarily requires some back and forth where

5  you can see each other's arguments.  So, the hope is that

6  you would have it all solved out before then.

7      But does that all make sense?

8          MR. YOUNG:  Makes sense to me, your Honor.  Thank

9  you.

10          MS. DAWSON:  May I --

11          MR. SWEATMAN:  May I ask a clarifying question?

12          THE COURT:  Please.

13          MR. SWEATMAN:  And I'm sorry, the 20th, that's for

14  search term exchange or also all production, because we

15  represent eight Plaintiffs.  I think we can get three of

16  their productions out by the 20th.  For the others it would

17  be a very heavy lift.  I just wanted to clarify that that

18  was the Court's order or if there's any leeway for us to get

19  some weekend time in there, just for --

20          THE COURT:  For -- for your remaining clients, can

21  you get it out by the 23rd then?

22          MR. SWEATMAN:  We can do the 23rd.

23          THE COURT:  But I want the search in by the 20th,

24  but you can get the information turned over by the 23rd?

25          MR. SWEATMAN:  Yes.  Thank you, your Honor.

39

1          THE COURT:  All right.

2          MS. DAWSON:  And may I, just for -- for clarity,

3  just so I understand.  I keep hearing Mr. Young saying

4  they've already proposed terms.  When they provided the

5  terms, all Plaintiffs said these are for the third request

6  for production.  So, my -- my understanding is the

7  requirement now is they need to propose search terms for all

8  requests for production to which they've agreed to respond,

9  that we will get those by Friday, and by Monday we will have

10  outstanding productions pursuant to those terms and any

11  other documents that they owe us, and then we can go through

12  the back and forth conferral process.

13      Can we -- yeah, I guess one thing that we -- I think we

14  might otherwise need, as you're hearing, it has taken many

15  months to -- we haven't from many Plaintiffs gotten

16  productions in months.  And, so, I do think at some point we

17  are going to need a date certain for when the rest of these

18  productions pursuant to these search terms hit, copy that --

19  reraise that in January if we need to, but I just want to

20  preview that that remains an issue.  Respectfully, I didn't

21  want to belabor all of the gaps we have seen, but it is just

22  not the case as -- as opposing counsel has claimed, that we

23  aren't seeing gaps.

24          THE COURT:  Mr. Young, are you in agreement on the

25  -- on the -- the first part of that as far as the -- the

40

1 production the 20th and what will be outlined on -- as far

2 as search terms?

3          MR. YOUNG:  Yeah, so, it is -- it is my

4 understand, your Honor, with the caveat that I haven't been

5 on any of these meet and confers, the search terms that we

6 have -- that Ms. Elana Dawson -- Ms. Nightingale Dawson has

7 said are just for the third RFPs were intended to cover also

8 the prior RFPs as well.  If -- I mean, I will --

9          THE COURT:  If you need to clarify that in what

10 you're --

11          MR. YOUNG:  I am seeing nods from Mr. Sweatman,

12 and I'm receiving messages from my team that indicate that's

13 -- that was the intention.  So, I mean, we just might submit

14 the same set of search terms on Friday that we previously

15 used.

16          THE COURT:  I'd like to have it all in the same --

17 in the same production.  That would make it easy so that if

18 I have to make a determination of it on the 14th, I have it

19 all in a singular format.

20          MR. YOUNG:  Absolutely, your Honor.

21          THE COURT:  Ms. Dawson, you will prepare the

22 proposed order on this -- this one?

23          MS. DAWSON:  Yes, your Honor.

24          THE COURT:  Okay.  All right.  So, then let's move

25 to the third and final one, and that is the 2 -- Document

41

1 217.

2    There was no objection to the sealing of the

3 information in 204, correct?  I know there's an

4 administrative motion, but I think the time has passed for

5 any objection to it.  I can't remember if it was filed

6 jointly or if it was just individually.

7    (Pause.)

8        THE COURT:  It was just filed individually.  There

9 was no objection by Plaintiffs filed, right?  And I think

10 the time for that has already passed anyway.  Is that

11 correct?

12        MR. YOUNG:  Correct.

13        THE COURT:  Okay.  All right.  Okay.  Okay.  Let's

14 see if I've got that document.  I think pdf is giving me a

15 spinning wheel here.

16    (Pause.)

17        THE COURT:  Okay.  All right.  It's coming up.

18    Who -- who wants to take the lead on this?  I guess

19 probably Plaintiffs would go first on this one.  Who --

20 who's going to be speaking on behalf of Plaintiffs for this?

21        MR. YOUNG:  Yeah, I can just -- I can just speak

22 briefly on this, your Honor, not -- not to belabor this one.

23 We're just seeking production of recent -- recent GPT models

24 to -- we want to make sure all the discovery requests

25 encompass all GPT class models.  I think the real dispute is

42

1   with GPT models that have been either in development since
2   the initial filing of this case or kind of -- or still in
3   development.

4        I think -- you know, I think these -- these models
5   would clearly be relevant.  I'd point you to the -- the
6   operative complaint at paragraph 36, which also calls out
7   for in development GPT models.  Plainly, if they're still
8   using infringing materials, they'd be within the ambit of
9   the case, what's within the class definition, which
10  encompasses -- which goes up to the present.  So, I think
11  it's clearly encompassed by the allegations in this
12  complaint to the extent that bears on relevance.

13           THE COURT:  Yeah.  And I -- I finally got this --
14  this document to open, and it's got my notes in it.  So, I
15  -- I really do want to hear from Defendants as to why -- I
16  mean, it seems like a pretty reasonable request.  I want to
17  hear from Defendants and convince me as to why this -- this
18  wouldn't be something that would be appropriate in -- in
19  discovery.

20           MR. MALHOTRA:  Hello, your Honor.  Paven Malhotra
21  on behalf of OpenAI.

22       There's -- there are kind of two -- two basic issues
23  here.  One is relevance, and the second is burden, and I'm
24  prepared to address both.

25       First of all, I think it's important to clarify what

1  the Plaintiffs' motion is about.  It's about models that are

2  in development, not -- not models that have actually been

3  released to the public, not our in development chat GPTs.

4  We're talking about future models here, models that are in

5  the process of being developed.

6       And with respect to relevance, frankly, there's no

7  indication that these are relevant.  There's no indication

8  that any future or in development model was actually trained

9  on the Plaintiffs' works.

10      And I think it's important to note, looking at the

11  Plaintiffs' complaint, what they talk about are two -- two

12  book sets.  They talked about something called Books 1 and

13  2, and they talked about something called Books Corpus.  And

14  we are ready to submit a declaration from an OpenAI engineer

15  that explains that Books 1 and 2 was not actually used to

16  train models after GPT 3.5.  And we have -- we have

17  submitted at Docket 214 a request to -- to supplement the

18  record with that declaration, and we're ready to do that.

19          THE COURT:  Why wouldn't -- why wouldn't they --

20  in the development of the -- the newer models, why wouldn't

21  the conduct in -- in that development be relevant to their

22  -- the complaints and the allegations in the development of

23  the previous models?  I mean, why wouldn't that be relevant?

24          MR. MALHOTRA:  Well, models are trained from

25  scratch.  So, the fact that some materials were used to

44

1 train GPT 1, 2, 3 is not necessarily indicative that those

2 materials were used to train later models.  And we -- we

3 have a declaration from an OpenAI engineer saying that with

4 respect -- after GPT 3.5, the Books 1 and 2 datasets were

5 not actually used for training.

6      Now, by the way, we actually have produced discovery on

7 models after GPT 3.5.  We've done that.  So, what we're

8 talking about are future models, and on that point, there's

9 just no indication that the Plaintiffs' works were actually

10 used to train those models.

11      Now, what's -- what's the other issue?  The issue is

12 one of burden.  So, the declaration that we will submit will

13 explain that when developing models, OpenAI does lots and

14 lots of research.  There's lots of models that are

15 generated.  Some of them come to fruition.  Some of them are

16 dead ends.  Maybe a few end up actually, you know,

17 developing into something that's released to the public.

18      But the problem with what the Plaintiffs are asking for

19 is they're just asking for general discovery on models in

20 development, and that's incredibly burdensome.  And the

21 declaration that we --

22           THE COURT:  Well, let's -- let's stick right now

23 just for -- for the initial purposes in -- in relevance, and

24 let me hear from the other side in response to your -- your

25 arguments regarding relevance.  And then we'll -- and then

45

1  we'll get into the burdensome argument.  Thank you.

2          MR. YOUNG:  Thank you, your Honor.  You know, I

3  just -- as your Honor surely knows, the test for relevance

4  isn't whether or not Plaintiffs' works were used in the

5  later iterations of the model.  It's whether or not the

6  information's going to be relevant to a claim or defense.

7      If OpenAI has decided to no longer use infringing works

8  for later models, I think that's going to be -- that's going

9  to be highly relevant to the claims at issue in this case.

10  And if they -- if it turns out that they are still using

11  infringing works but have just renamed the datasets to

12  something that's not Books 1, Books 2 or Books Corpus,

13  that's also highly relevant to the claims and defenses.

14          THE COURT:  That's where I'm getting caught up,

15  and that's what I wanted to hear from Defendants on.  I

16  mean, I don't -- it seems that -- that, you know, exactly

17  what you're doing in the later models is -- is either -- you

18  know, bolsters their case, whether or not you're infringing

19  or not bolsters what their claims are, and that's maybe

20  where I'm getting caught up, and maybe you can relieve me of

21  that.  I guess I just need to hear more as to why that --

22  that wouldn't be relevant to their specific claims in this

23  case.

24          MR. MALHOTRA:  The -- the complaint itself talks

25  about how the Plaintiffs' works are in these public datasets

46

1  called Books 1 and 2.  Then we have a declaration from the

2  OpenAI engineer explaining that the materials from those

3  datasets were not actually being used after GPT 3.5.  So,

4  they wouldn't be used in the in development models.

5        THE COURT:  This is the declaration that you

6  have --

7      (Pause.)

8        MR. MALHOTRA:  This was a declaration that was

9  submitted in the New York case and we're ready to submit in

10 -- in this case as well.

11       THE COURT:  Okay.  Sorry.  Okay.  Then go ahead

12 and go into your burdensome argument then, please.

13       MR. MALHOTRA:  Sure.  So -- so, part of the

14 challenge, your Honor, is when the Plaintiffs are asking for

15 models in development, as the name suggests, they're in

16 development.  They haven't been completed.  They haven't

17 been released yet.  It's not clear what is actually going to

18 be released.  There's just lots of research going on.  And,

19 as our declaration will establish, trying to produce all of

20 this discovery on various research artifacts, potential

21 models, it's incredibly burdensome.  It could take literally

22 months to try to collect all that information, because we

23 haven't actually selected what the final model will look

24 like.  The Plaintiffs have asked for GPT-5 and Orion.

25 There's actually no model that's been completed and released

1 that are GPT-5 or Orion yet.  So, that -- that's part of the

2 challenge.  We don't know where the roadmap's going to lead,

3 and they're just telling us to produce everything, and

4 that's just incredibly burdensome, and -- and we're ready to

5 substantiate that burden which, frankly, is something that

6 Meta did not do in the <u>Kadry</u> case that the Plaintiffs are

7 pointing to.  We actually are substantiating the burden.

8      And, so, given the tenuous relevance, given the

9 incredible burden, respectfully, your Honor, we would -- we

10 would ask you to deny this request.

11          THE COURT:  All right.  Mr. Young?

12          MR. YOUNG:  All I'd just say is that the requested

13 discovery is -- is proportional to the needs of the case.  I

14 -- I understand Mr. Malhotra's appeal to burden, but,

15 however, this -- I mean, I think everyone would agree this

16 is a monumentally significant case both -- I mean, both --

17 not just monetarily but for societal impact and for property

18 rights, intellectual property rights.

19      I also think that even though these models are in

20 development, there is still highly relevant and proportional

21 information to the -- for example, whatever -- OpenAI has --

22 has announced plans that it intends to convert from

23 nonprofit to for profit.  How much money does it intend to

24 derive from these products in development?  I mean, I

25 certainly think that that number has many many --

48

1          THE COURT:  But that's --

2          MR. YOUNG:  -- commas, right.

3          THE COURT:  That's different.  I mean --

4          MR. YOUNG:  Yeah.

5          THE COURT:  I mean, I understand you're talking

6  about the -- the -- I think you're conflating a couple of

7  different standards here with regard to the relevance of

8  the -- needs are proportional to the case versus how

9  important is the case to society.  I mean, that's -- that's

10  a little bit tenuous there, right?

11     You know, the question is in these -- in these

12  discovery requests that you guys are making is is how is

13  this going to aid in the -- in your case, in making your

14  case or making your defenses or whatever it might be, and --

15  and in this case, it does seem that, you know, if they don't

16  have these completed models and they -- you know, how are

17  they supposed to be able to produce these to you?  It does

18  seem like that's going to be a very difficult burden for

19  them.

20     So, but then also, back to the relevance question.  If

21  this is -- I mean, maybe this is because you need to amend

22  the pleadings in the case or something like that, but -- but

23  nail down for me a little bit better the relevancy first and

24  then address what he stated with regard to how is he

25  supposed to be able to produce what they haven't even

49

figured out from these models yet?

        MR. YOUNG:  Certainly, your Honor.  And just to -- you know, it's no secret that fair use is going to be a -- a huge issue in this case, right.  I think, you know, everyone acknowledges what the infringement is.  Infringement defense is going to be fair use.  Four factors of fair use, one of them's going to be commerciality of -- of the products, right, whether or not -- how it's going to be used.

    Their intent to profit or how to monetize or commercialize models in development, that goes squarely into one of the -- like several of the fair use -- not to mention the materials they're planning use to develop these models. Certainly that material is not -- has not been created yet. You have to figure out what you're going to pretrain the model on, right, so, what comprises the first data sets. That goes to willfulness if they include infringing models. If they're renamed the data sets, which we do not know, that goes to willfulness, which goes to factor one.

    So, I'm going to -- I'm going to stop there, your Honor, and just see if there's anything else you want to --

        THE COURT:  What about the idea of they're not -- like how are they going to -- you know, the burdensome nature of this taking --

        MR. YOUNG:  Right.

        THE COURT:  -- months as they suss out what's

50

1    going to be working?

2        MR. YOUNG:  So, even though -- even though the

3    models themselves are in development, there are certainly

4    planning documents.

5        THE COURT:  Right.

6        MR. YOUNG:  It would be bizarre for me to think

7    that, you know, there are no documents that explain these

8    are the datasets we are planning to use for these future GPT

9    models.  This is what we're planning to do with these GPT

10   models.  This is how we're going to license the data for

11   these GPT models or not license the data for these GPT

12   models.  This is how we're -- these are the people we're

13   going to try to contract with to incorporate these models

14   into their products.

15       It would be bizarre for me that some of these documents

16   at least do not already exist.

17       THE COURT:  I think, though, that what you're

18   articulating now and just a minute ago are more narrow than

19   -- than what is requested here, don't you think?

20       MR. YOUNG:  Yeah.  I mean, if -- certainly, if a

21   document does not exist, it would -- I would certainly not

22   be standing in front of you, your Honor, and ask for a

23   document that doesn't exist to be produced.  All -- I think

24   all we're really asking for are things that are currently --

25   that currently exist that are going into these GPT models

51

1  that we know are in development.  And, most importantly, we

2  want to know things like that go squarely towards the fair

3  use factors and really the key claims -- the key claims and

4  issues that are going to be at issue in this case.

5          THE COURT:  See, that's -- that's what I'm talking

6  about.  That's --

7          MR. YOUNG:  Yeah.

8          THE COURT:  -- a little more narrow than the --

9  than the request here.

10          MR. YOUNG:  Yes.  I -- and we would be happy to

11  narrow our request to those -- to those areas, to the issues

12  squarely within the realm of fair use, as well as our -- as

13  well as to liability in this case.

14          THE COURT:  Mr. Malhotra, what's your response to

15  that?

16          MR. MALHOTRA:  I think the challenge, your Honor,

17  is this whole -- this whole case is largely one of fair use.

18  And, so, it's -- it's hard for me to say without seeing Mr.

19  Young's narrow set of requests the burden and the relevance

20  of what it is because I haven't seen that set yet.

21          THE COURT:  This is what I'm -- this is what I'm

22  going to order.  I'm going to order Mr. Young to make a more

23  narrowed request along the lines of what we've been talking

24  about here and along the lines of how you just recently

25  described that because I think that may -- may pass, and

52

1  then submit that request for review.  If there's objections

2  to it, have a little bit of a back and forth, allow that

3  time, and then -- and then submit that request to me for

4  review, along with the declaration that -- that -- that you

5  were talking about with regard to your engineer that would

6  explain the proportionality.

7      Is that -- does that make sense, Mr. Malhotra?

8          MR. MALHOTRA:  Yes.  And -- and, your Honor, if

9  you want, we can just -- if you grant Docket 214 today, we

10 can submit all the papers today.

11         THE COURT:  That will be in it, yeah.  Okay.  All

12 right.  Yeah, I'll --

13         MR. BENON:  Your Honor --

14         THE COURT:  I just didn't want to -- I didn't want

15 to -- I didn't want to have unnecessary stuff on the --

16 well, I guess are you guys going to submit that in -- so,

17 you know, there's like an email thread between counsel and

18 the parties' related issues raised in the letter brief.  All

19 of that's not necessary any --

20         MR. MALHOTRA:  Yeah, we don't --

21     (Simultaneous speaking.)

22         THE COURT:  You see what I'm saying?

23         MR. MALHOTRA:  But at least the declaration.  I'm

24 not sure if the transcript from the -- this was (Zoom

25 glitch) in the Authors Guild case.  I don't know if the

1  transcript is ready yet, but whatever's ready, we can submit

2  that to you, and -- and you can have it on the record.

3           THE COURT:  So -- so, I just want the -- the

4  declaration.  Really --

5           MR. MALHOTRA:  Okay.

6           THE COURT:  -- I don't think it's a question --

7           MR. BENON:  Your Honor, if I may?

8           THE COURT:  Yes.

9           MR. BENON:  Just a -- a quick point of clarity on

10  this.  So, Plaintiffs are not requesting all documents

11  related to these models in development.  The RFPs that

12  Plaintiffs have served contain a defined phrase called

13  OpenAI language models, and that includes -- it lists out

14  some models, and the last one is models in development.  So,

15  the models in development actually should be read in

16  connection with all the other requests that we're serving.

17  So, it's not that we're requesting everything.  It's just a

18  component of the requests that we're serving, all other

19  outstanding RFPs.

20           THE COURT:  So, the request was to produce the

21  responsive document related to all OpenAI GPT class models,

22  including those models in development, right?

23           MR. BENON:  So -- yeah.  So, maybe -- maybe

24  something was lost in translation there, but what we're

25  really -- the relief we're really seeking here is for the --

54

1  the defined phrase "OpenAI language models", it's

2  appropriate to include models in development, and OpenAI

3  should not be restricting what it's searching for because

4  it's not willing to produce documents from models and

5  development, so that the -- the concept of -- of models in

6  development is a part of this defined phrase, "OpenAI

7  language models".

8         MR. MALHOTRA:  Your Honor, I -- I don't know that

9  that resolves the issue because there's lots of RFPs, and

10  just saying we want you to produce materials responsive to

11  everything in these RFPs that concern future models, that's

12  not advancing the ball for us here.

13         THE COURT:  Yeah.  I -- I think -- I think having

14  the -- the narrow requests separately sent over is going to

15  -- is going to get us farther.  I know you guys have had

16  some meet and confers on this issue in the past, right?

17         MR. MALHOTRA:  Yes, there have been.

18         THE COURT:  Okay.  All right.  All right.  And --

19  and when can that happen, Mr. Young?

20         MR. YOUNG:  Let's see, I'm looking at Mr. Benon.

21  Given my schedule, he's going to be more likely to be on

22  this call than I will, but I think we can get this done by

23  the end of -- we can -- I think we can certainly get a

24  request to OpenAI by the end of this week.  I think that's

25  -- that's very easily feasible.  And then if there are

1    issues, I think we can submit something to your Honor by --

2    before the New Year I think, next week?

3              MR. MALHOTRA:  Your Honor, I think we would need

4    -- we'd probably need to have a meet and confer the first

5    week of January just given the holidays next week and the

6    need for me to discuss it with my client as well.

7              MR. YOUNG:  We would be happy to -- if there are

8    issues with the RFP, how about we set letter briefs by the

9    10th, January 10th?

10             THE COURT:  That will give you guys time to have

11   those meet and confers prior to the --

12             MR. MALHOTRA:  That would be fine, your Honor.

13             THE COURT:  Okay.  All right.

14       Mr. Young -- yeah, Mr. Young, you'll prepare the proper

15   order on that one.

16             MR. YOUNG:  Happy to, your Honor.

17             MR. BENON:  Your Honor, if I may make one point

18   about the additional custodians, because your Honor asked if

19   any of the parties had any solutions on that one, and I'd

20   like to propose something if your Honor will allow it.

21             THE COURT:  If it requires me to -- or it relieves

22   me from doing a bunch of writing over the next week, then

23   yeah.

24             MR. BENON:  It may, your Honor.  So, one -- so,

25   one point about the custodians that are the subject of the

56

analogous motion in the Southern District of New York, so,
Mr. Sun mentioned that the Court denied that motion.  Well,
that's only partially -- partially true.  The Court granted
and denied it in part, and the Court said:

> "If Plaintiffs wish to renew their
> motions regarding the custodians in
> dispute, they may only do so after
> reviewing the Sutskever production and
> meeting and conferring with opposing
> counsel."

So, this may not be fully resolved after all.  And what
-- what I propose, your Honor, is that we essentially rise
or fall with that -- with what happens in the SDNY wit
respect to those custodians.

So, setting aside Sutskever, which it sounds like
OpenAI will produce -- cross-produce its file, the Court --
the Court may deny, you know, the other remaining SDNY
custodians, but if they are ultimately granted through a
later motion, then we'll get those custodians here
automatically.

And with respect to the other I think it's four
custodians, we ask the Court grant our request for those.
We think they're relevant and proportional to the needs of
the case.  We believe we've provided sufficient evidence to
support their inclusion, and there's also the point that

1 OpenAI said -- went back and said, Well, maybe our initial

2 investigation didn't capture the right people, and those --

3 those would include those -- those custodians that they

4 initially selected unilaterally.  So, it accounts for that

5 as well.

6         MR. SUN:  Your Honor, may I quickly?

7         THE COURT:  Um-hmm.

8         MR. SUN:  This is the same offer that they floated

9 in meet and confer before filing the motion.  It is exactly

10 the same offer.  So, it's not a variation on anything other

11 than what the parties have already discussed.  The issues,

12 of course, are -- and they're not living by the sword and

13 dying by the sword.  They're saying, We want everyone that's

14 designated in the <u>Authors Guild</u> case, plus we want an

15 additional number of custodians, plus we want to be able to

16 ask for more custodians in the future, regardless of if that

17 -- those requests are based off of new information or not,

18 which is the first point.

19     The second point is that there are a host of --

20         THE COURT:  I mean, wouldn't it necessarily have

21 to be based off of new information?  Wouldn't they have to

22 make some sort of showing for that?

23         MR. SUN:  Well, that is what I would hope, your

24 Honor, but I'll tell you in meet and confers I asked this

25 question specifically because we had a concern that the most

1 recent draft of custodians, the request for 11 that

2 Plaintiffs are currently asking for, is based off evidence

3 that was produced in May and June of this year, which was

4 months before the parties briefed their first custodian

5 motion, the one that you ruled on.  And when I asked Mr.

6 Benon in a meet and confer whether or not they would agree

7 that going forward, requests for new custodians would be

8 based off of newly identified information, he flatly refused

9 to agree to that caveat, which is kind of the thrust of our

10 concern about this process being a little bit haphazard, a

11 little bit overbroad, and I think --

12          THE COURT:  Hold on.  Don't -- don't take shots.

13          MR. SUN:  Okay.  I'm sorry, your Honor.

14          THE COURT:  What about -- what about that, Mr.

15 Benon?  What -- based on new information and based on -- you

16 have to have some sort of basis for that.  I mean, are you

17 -- are you in agreement with that, if you want to put that

18 in with your proposal here?

19          MR. BENON:  I'd -- I'd have to talk with my team,

20 but I think that's something we -- sitting here today, I

21 think that's something we can probably agree to.

22          THE COURT:  And then with regard to -- what about

23 the other four, Mr. Sun?  What about going forward with

24 those, living or dying with New York on the others, and then

25 the production that you've already agreed to in the -- in

59

1   the first part?

2         MR. SUN:  Yeah.  Your Honor, I don't think that

3   there is reason -- and I'm happy to discuss each of the

4   particular custodians that they've requested that weren't

5   covered by Authors Guild.  I don't think they're warranted

6   individually or kind of en mass.  I'll -- I'll reiterate

7   that the two cases that Plaintiffs principally cite in

8   support of their custodian request, both resulted in

9   designations of custodians that were below 24.  Kadry was 15

10  full custodians.

11        THE COURT:  Right.

12        MR. SUN:  Authors Guild was 24 full custodians for

13  right now.  So, they were -- and they -- and Plaintiffs

14  already have more than either of those two cases.  So, I

15  don't think additional documents are warranted.  I think if

16  there should be a production or a designation of additional

17  custodians, the Plaintiffs have to satisfy the ESI order's

18  requirements of demonstrating that the custodians have

19  relevant and importantly nonduplicative information.  And,

20  again, I'm happy to discuss why that's not true.

21        THE COURT:  Let's do that as to those four at

22  least, because, I mean, I understand your argument about --

23  about the number because that is important and it is

24  something the Court should take into effect, but if there's

25  a -- if there's a showing a need for it, then, you know,

60

1 there may be a reason why this case requires these

2 additional.  So, let's talk about those four.

3          MR. SUN:  Of course, your Honor

4          THE COURT:  And let's see where we end up with

5 that.

6          MR. SUN:  Why don't we start with -- why don't we

7 start with Jakub Pachoki, because I already discussed him

8 briefly.

9      Plaintiffs cite -- he's currently I believe the Chief

10 Scientist at OpenAI.  Plaintiffs --

11          THE COURT:  And then this is -- this would be just

12 a -- just a minor -- this is the caveat about being careful

13 not to speak about something that might be -- the parties

14 want it sealed or something like that.

15          MR. SUN:  Yes, your Honor.  I'm going to be very

16 mindful about that, and I apologize in advance if I'm a

17 little cryptic and not as specific as I would like to be.

18 I'm happy to -- you know, if you want to create a private

19 room and to discuss details, I'm happy to do that.

20          THE COURT:  Okay.

21          MR. SUN:  With respect to Mr. -- with respect to

22 Jakub Pachoki, Plaintiffs identify two reasons, both public

23 I believe, as to why he -- why he should be designated, and

24 that is his work on the model GPT-4 --

25          THE COURT:  Um-hmm.

61

1          MR. SUN:  -- and his work on a neural network

2    called OpenAI-Five.

3          THE COURT:  Yeah.

4          MR. SUN:  GPT-4 is one of OpenAI's recent models,

5    and I checked before this hearing, and at least 19 of the

6    custodians -- 19 of the 24 custodians that OpenAI has

7    already identified worked on GPT-4.  And Plaintiffs have not

8    ever described what unique information Mr. Pachoki would

9    contribute that wouldn't be covered by those 19 other

10   custodians.

11      OpenAI-Five is the -- is the neural network that I

12   don't understand the relevance of because it's just a neural

13   network that plays competitive video games.  So, I don't

14   think it has any relevance to this case.  And, so, I'm not

15   sure what nonduplicative relevant responsive information Mr.

16   Pachoki would provide that isn't already covered.

17         THE COURT:  All right.  Who wants to respond to

18   that?

19         MR. BENON:  I'll respond to that, your Honor.  So,

20   let's set aside OpenAI-Five because we -- because it's -- we

21   -- the parties agree that Mr. Pachoki was involved in the

22   development of GPT-4, which is the parties don't disagree

23   that's relevant.

24         THE COURT:  Okay.

25         MR. BENON:  Defendants make this argument about

62

1    other individuals who they designated as custodians who were

2    already knowledgeable about similar subjects.  But just

3    because other individuals have knowledge on this same topic

4    doesn't mean their custodial files are the same.  They --

5    the -- the individuals could have different tenures, they

6    moved around on different teams.  What one custodian may

7    find alarming or unethical might be different from what

8    +another custodian finds unethical.

9        The folks work on different projects.  They can have

10   conversations with different people.  We've pointed to a

11   conversation that Mr. Pachoki had where he asked someone

12   else to run experiments.  I can't say what the experiments

13   were on, but -- but we -- we're -- we've pointed to unique

14   documents that are on -- that are on relevant topics, and we

15   think we've satisfied the burden here, your Honor, with Mr.

16   Pachoki.

17            THE COURT:  You know, the problem is is that -- I

18   mean, you've got to do that for so many people, right.  I

19   mean, and -- and we're already at a very high number in this

20   case.  I mean, so, I mean, you're telling me that -- that --

21   I mean, what would be sort of -- it's got to be something

22   more than just the normal information about these people to

23   get you to such a high number, right, beyond what would be

24   normally allowed in all these cases, and it also seems --

25   you know, I mean, what you're saying is -- seems a bit

63

1  speculative.  I know you've pointed to one conversation, but

2  even that itself doesn't specifically point to any

3  information necessarily that -- that would be relevant and

4  unique to your claims in this case.

5          MR. BENON:  So, on that point, your Honor, we'd

6  point you to the In Re Facebook Consumer Privacy Litigation

7  case, which is cited in our earlier brief which says the

8  evidence used to support these types of requests does not

9  need to be absolute.  It's just whether an individual is

10 likely to possess relevant categories of information.

11         THE COURT:  But that -- that -- in this case,

12 where we've already designated so many --

13         MR. BENON:  Yeah.

14         THE COURT:  -- right, I mean wouldn't that just be

15 for the normal designation, I mean, or a couple beyond here

16 where -- I mean, we're really far out there.

17         MR. BENON:  I -- I hear you, your Honor, and I'd

18 ask your Honor to consider the point I made earlier about

19 OpenAI's evolving understanding of who has relevant

20 information and the fact that their initial set of

21 custodians, well, they might not have been the ones -- the

22 right ones with all the relevant information.  We're asking

23 for four additional custodians here, your Honor.  We're

24 asking that it rise and fall with the Southern District of

25 New York case on the other ones, and we -- I have to confirm

64

1  with my team, but it sounds like we'll agree to some

2  limitation that these requests going forward will be based

3  on new evidence.  I think that will put -- that will put a

4  cap on these types of requests going forward.

5      (Simultaneous speaking.)

6          MR. YOUNG:  Your Honor -- I'm sorry, your Honor.

7  I just want to add onto Mr. Benon's comments here.  What's

8  primarily coloring our -- our kind of alacrity here is that

9  we want to -- we want to proceed with depositions, and part

10  of that is we want to get whichever custodians we think is

11  going to be the final list set as soon as we can so that we

12  have the universe of documents so that we can examine the

13  people that we need to examine.

14          THE COURT:  I mean, you guys have been trying to

15  do that for months.  So, what's the -- let's talk about --

16  let's talk about another one, Mr. Sun.  Which one do you

17  want to go to next?

18          MR. SUN:  Let's talk about Katie Mayer (phonetic).

19  How about that, your Honor?  So --

20          THE COURT:  Yeah.

21          MR. SUN:  -- this is -- I think that there's a

22  philosophical difference between Plaintiffs and Defendant in

23  this case that Katie Mayer kind of  highlights.  So, they

24  want her because of her alleged knowledge about OpenAI's

25  relationship with Microsoft.  We designated at least five

65

1  custodians that can speak to that precise issue, including

2  Mr. Lightcap (phonetic), which is one of the -- the

3  custodians that Plaintiffs demanded specifically because of

4  his supposed knowledge about Microsoft.  And, so, this is

5  yet another example of a custodian that should be amply

6  covered by the custodians that we've already designated.

7      They cited a number of documents in support of this,

8  and without getting into the details and as we noted in our

9  brief, most of the discussions that Ms. Mayer is involved in

10 are logistical.  They're not technical.  They're not

11 substantive.  And that kind of highlights what I think is

12 the philosophical difference.

13     I think Plaintiffs believe that they're entitled to

14 designate a custodian if there's any reason to think that

15 that custodian might have a document that another -- that

16 current designated custodians don't have.

17     As you point out, there's no limiting principle because

18 that could apply to anyone at a company.  I think the

19 relevant question which I think is supported by the Facebook

20 case that Mr. Benon cites is that there has to be an issue

21 that they can speak to that no other custodian can speak to

22 or that no other custodian can speak to as well, a question

23 that they can answer or some fact that they can provide, and

24 I don't see that with respect to Ms. Mayer in particular.

25     For example, in a number of the -- the documents they

66

1  cite -- I can give you the -- you know, the Bates number.

2  It's last three digits 338 for example is a thread that she

3  is included on but where the substantive discussion and

4  description of info -- or provision of information is done

5  by John Schulman (phonetic), who's already a custodian.  The

6  same is true for the document Bates Number 917 where Peter

7  Herschel (phonetic) provides the substantive information.

8  And in the Bates number ending 038, Ms. Mayer specifically

9  identifies Mr. Herschel as kind of more knowledgeable about

10  the relevant issues being discussed.

11      And, so, it might be true that Ms.  Mayer has documents

12  that other -- that the existing custodians don't have

13  because every employee at the company will have at least one

14  document that another custodian doesn't have.  But she

15  doesn't have relevant information.  The information in those

16  documents is not different.  Even -- this is the point I was

17  trying to make earlier where it's -- it's not proportionate

18  to the needs of the case to designate a number of custodians

19  just so that we have 10 different ways of describing the

20  same training step because even though the documents are

21  different, the information underlying them is not.  So,

22  that's what makes it disproportionate to the needs of the

23  case and, in particular --

24          THE COURT:  Mr. Benon --

25          MR. SUN:  -- with respect to Ms. Mayer.

1    MR. BENON:  So, you know, Mr. Sun was talking

2  about what this -- what this witness or what this individual

3  is likely to be able to discuss.  We're not talking about a

4  deposition here.  We're talking about the email

5  communications that Ms Mayer is likely to have had with

6  noncustodians.  Microsoft is a noncustodian.  They're a

7  third party.  So, if you -- and if you look at the <u>In Re</u>

8  <u>Facebook</u> case specifically lists is this individual likely

9  to have communications with noncustodial third parties.  If

10 it is, that -- that weighs in favor of adding this

11 individual as a custodian, and the reason for that is

12 simple.  We wouldn't -- we wouldn't have those

13 communications because Microsoft's not a custodian.  Ms.

14 Mayer is not yet a custodian.

15    With respect to OpenAI's relationship with Microsoft,

16 we can point to a number of pieces of literature online that

17 talks about how Microsoft and OpenAI are working hand in

18 hand in producing the -- and developing the technology

19 that's at issue here.  Their -- their communications with

20 OpenAI's staff is extremely relevant to this case.

21    So, we think we've -- we've met the burden by pointing

22 to a piece of evidence here.  We -- we hear you that it's --

23 maybe it's not as --

24    THE COURT:  But you don't have anybody else -- you

25 don't have anybody else who has had these types of

68

1  communications outside of --

2        MR. BENON:  Yeah.

3        THE COURT:  -- Mayer and -- and then -- and then

4  the -- but, I mean, you still have to tie it in to something

5  relevant, right?  I mean, just because they've been jointly

6  developing with them, you -- you don't have any other

7  tethered to that?

8        MR. BENON:  I -- I can't speak to it right now,

9  your Honor, because of the confidentiality concerns, but I'd

10  point you to the first four lines of our brief that talk

11  about what she worked on with Microsoft and what -- what

12  role she played.  And I'll also ask -- answer your Honor's

13  previous questions about who we already have, and Mr. Sun

14  said, Oh, well, you already have Brad Lightcap.  That's the

15  reason you chose Brad Lightcap.  But, actually, that's --

16  that's not entirely correct, your Honor.  We chose Brad

17  Lightcap because he's the signature on licensing agreements

18  with third parties.

19        THE COURT:  Right.

20        MR. SUN:  Your Honor, I guess pointing out the

21  fact that Mr. Benon has not addressed the fact that even

22  beyond Mr. Lightcap, we've designated four custodians that

23  can speak to the issue of OpenAI's relationship with

24  Microsoft.  It -- to your point, I'm also not clear what the

25  relevance of Microsoft is in this case given that Microsoft

69

 1  is not a party.  And, third, they did specifically request

 2  Mr. Lightcap because of his supposed knowledge of Microsoft.

 3  I can find it in their prior brief and point you to it if

 4  you -- if that would be helpful.

 5          MR. BENON:  Your Honor, we could keep -- we're

 6  happy to keep going with these additional custodians and

 7  talk about why they're relevant or not.  We believe that the

 8  -- the proposal that I -- that I offered just a bit ago is

 9  -- makes sense.  It's --

10          THE COURT:  It would be the -- well, which four

11  are you talking about?

12          MR. BENON:  So, it would be Mayer, Pachoki, Wu and

13  Zaramba (phonetic), because Boloji, the -- the parties

14  resolved that one before this hearing, your Honor.  And then

15  it would be Sutskever who OpenAI agreed to produce their --

16  their file, and then we would rise and fall with the

17  Southern District of New York.  That --

18          THE COURT:  And, Mr. Sun, you don't want -- you

19  don't want any part of that?

20          MR. SUN:  I -- I would love to give you something

21  on this, your Honor, but I really don't think that

22  Plaintiffs have satisfied their burden of proving

23  nonduplicative information.

24      Mr. Wu and Mr. Zaramba are two examples of people that

25  Plaintiffs have requested because of their knowledge of

70

1  training data.  As I noted very early in this hearing, we

2  have nine custodians on that, including the heads of the

3  relevant teams and people who worked directly on the models,

4  and I've never seen Plaintiffs ever identify any category of

5  information that you're missing.  The arguments have

6  principally been, Well, they all -- they worked on it.  So,

7  they might have documents that speak to this, and maybe

8  those documents are documents other people don't have.  That

9  is, to your point, I think speculative, your Honor.  And,

10 so, it does not satisfy the ESI order's burden to show

11 nonduplicative relevant and responsive information or in the

12 possession of these individuals.

13          MR. BENON:  On the point of speculation, your

14 Honor, like I said, this evidence will never get to be

15 absolute in a case like this because we don't have the

16 custodial file to point to the concrete evidence of what

17 they actually have.  We're making this request because we

18 don't have the evidence.  Therefore, we have to point to

19 clues or indications in the file that we currently have to

20 support this request, and Mr. Sun is pointing out, Well,

21 this evidence is flimsy.  It's not enough.  Well, yeah, but

22 it's not enough because we need the additional files.  And

23 -- and that's what the case law says.  It -- it just needs

24 -- there needs to be a likelihood.

25          MR. SUN:  I don't -- so, we've talked about

1  Facebook, your Honor, and I want to clarify this.  I think

2  Plaintiffs' reading of the Facebook case is simplistic.  I

3  would point your Honor to pin cite two of that case, which

4  says that Zuckerberg and Sandberg are likely to possess

5  unique relevant information because they were key decisions

6  makers related to issues at the heart of Plaintiffs'

7  allegations, including friend sharing, whitelisting,

8  business partners, and third party misuse of information.

9  So, the standard was not met by the Plaintiffs in that case

10  because they prove that Sandberg and Zuckerberg might have

11  had responsive documents in their possession but, rather,

12  that by (indiscernible) of their roles in the company and

13  their involvement in the relevant issues, they were likely

14  to have categories of information.

15          THE COURT:  Well, let's -- let's go to that point,

16  right.  So, I mean, that -- they're making that argument at

17  least with regard to Pachoki, right, Chief Scientist.

18  They're making that argument with regard to Wu, involved in

19  the selection and acquisition of -- of training data, and

20  then Zaramba, you know, in that first line that talks about

21  are redacted but deeply involved in this.  Now, your

22  argument I assume is going to be that they're just saying

23  that about everybody so that they can get more -- more

24  people in?  Is that -- is that your point?  But, I mean,

25  when you're talking about the Chief Scientist involved, that

1  seems that that person might have some pretty unique

2  information.

3        MR. SUN:  I guess, your Honor, I -- I appreciate

4  what you're saying.  I think that my issue is I don't know

5  what that information is, right.  So, the -- the statement

6  is just, because of role as a Chief Scientist, he might have

7  relevant and responsive information.  I think the ESI order

8  requires them to identify what it is that information that

9  they want.

10     We -- if we cross-produce for Ilya Sutskever, he was

11 the Chief Scientist prior to Mr. Pachoki, who was -- has

12 only been Chief Scientist for, you know, a relatively short

13 amount of time.  I the issue is principally highlighted

14 actually by the request for Mr. Wu and Mr. Zaramba, right.

15 So, their justification is, Well, they were involved with

16 training data.  But OpenAI develops models, and a big part

17 of that process is training data.  So, you could say that

18 about, you know, hundreds of thousands of people at the

19 company.  The question is is there an -- is there an issue

20 that their documents can answer that the documents from the

21 nine other custodians that we've already identified wouldn't

22 be able to answer.

23     Your spoke specifically to data acquisition, for

24 example, that Wu and Zaramba might be able to speak to data

25 acquisition.  But one of the nine custodians we've

1 designated on training data is the head of the data

2 acquisitions.

3          THE COURT:  Right.

4          MR. SUN:  He would be the person that you would

5 think would have the documents, and we've already

6 affirmatively identified and designated him.

7     So, I think the question that Plaintiffs should have to

8 answer, which I don't think they have, is what is the

9 information you want.  Like, what is the question you're

10 trying to answer?  What is the fact that is in dispute that

11 you think that these custodians will be able -- that their

12 documents will be able to answer that isn't available from

13 the other already designated custodians.  And I think the

14 answer -- the reason they can't find good evidence for this,

15 your Honor, is because we've given them a lot of custodians,

16 mostly the same custodians as in the other cases, more

17 custodians than in <u>Kadry</u>, and I think we've done a good job,

18 and I think that that's why more custodians aren't

19 warranted.

20          MR. BENON:  Your Honor, I'll just also point out

21 that, first of all, I'm hamstrung here because I cannot

22 point to the -- to the information that we provided the

23 Court under redaction.  That -- that we believe contains

24 they why.  It contains the substance of what these

25 parties --

74

1          THE COURT:  Well, I'm -- I'm looking at it myself.

2          MR. BENON:  Yeah.

3          THE COURT:  I'm looking at it myself.

4          MR. BENON:  And I'll also point the Court to some

5  of these custodians that are the subject of the S -- that

6  were the subject of the SDNY motion, for example, Shawn

7  Tonujay (phonetic), we provide even more information than

8  some of the other ones that were discussed.  And I get it,

9  we -- we're making --

10         THE COURT:  They were all -- they were all --

11         MR. BENON:  Yeah -- yes.

12         THE COURT:  They were rejected.

13         MR. BENON:  Right.  Right.

14         THE COURT:  So, I mean, I -- I see the basis for

15  it with regard to Pachoki.  I -- I don't see it for -- for

16  Wu or for Zaramba.  I --

17         MR. YOUNG:  So, your --

18         THE COURT:  I'm --

19         MR. YOUNG:  I'm sorry.

20         THE COURT:  I'm on the teetering for -- for Mayer.

21  I don't -- I don't really know what that gets you with

22  regard to those.

23      My -- my suggestion would be that -- because that one's

24  on the -- on the fence and you're willing to live and die

25  with regard to the SDNY, which is already in Mr. Sun's favor

1 or your client's favor, that Mr. Sun take your -- your --

2 your offer, but it will apply to two, to Mayer and to

3 Pachoki, as opposed to four.  And then you guys live and die

4 with SDNY and then produce what you've already agreed to

5 with regard to the other whose name escapes me.

6             MR. BENON:  Sutskever.

7             THE COURT:  What is it?

8             MR. BENON:  Ilya Sutskever.

9             THE COURT:  Oh, Sutskever, yeah.

10            MR. SUN:  And I will just take my shot here, your

11 Honor, which is that Ilya Sutskever and Mr. Pachoki were --

12 had the same roles.  And to the extent that Mr. Pachoki --

13            THE COURT:  But they -- did they overlap during

14 that time period?

15            MR. SUN:  They did not overlap, but Mr. Pachoki is

16 very recently, like within the last year I think if I'm not

17 mistaken, the Chief --

18            THE COURT:  I thought you said 2017?

19            MR. SUN:  Oh, maybe I'm wrong about that, your

20 Honor.  I don't think it was 2017.  I don't think it was

21 2017.  I think it was around --

22            THE COURT:  I mean, the documents in front of me

23 says he was transitive research initiative since 2017.

24            MR. SUN:  Yes, but I --

25            THE COURT:  He's -- he's been there since 2017,

76

1  but he hasn't been chief since.

2  MR. SUN:  That's correct, your Honor.  That's --

3  THE COURT:  But then, so, you got to have the

4  overlapping information between the two, and that's --

5  that's where I think it's important.

6  MR. SUN:  One other clarification, your Honor, is

7  with respect to additional requests for a new custodian.

8  THE COURT:  That's what I was going to say is is I

9  agree with you 100 percent on the -- on that, which is that

10 they're going to have to make a showing of new and relevant

11 information as to why the -- they should have new additional

12 designations, and -- and it's going to be beyond, you know,

13 sort of like the -- the baseline bar, right, because we've

14 had so many additions into this, and I think, Mr. Benon,

15 you'd agree to that, right?

16 MR. BENON:  Sounds like we'll agree to that, your

17 Honor.  I would like to make one quick point about Wu,

18 however, if your Honor will allow me.

19 The evidence we point to here, it shows that he has

20 unique communications about this information that's under

21 redaction.  It's not overlapping, and we -- we'd point you

22 to that first document we cite there and the statement right

23 before it.  We think this is squarely the type of -- the

24 type of additional custodian that possesses unique, relevant

25 information and, given the other -- given the full picture

1  here and given the -- the cap that will govern additional

2  custodians going forward, we think that we should -- we

3  would respectfully request that your Honor grant our request

4  with respect to Wu.

5          MR. SUN:  Your Honor, this document is a document

6  that another custodian, Al Gradford (phonetic), is on and

7  having a substantive discussion about.  If memory serves,

8  this document only has a single message from Jeff Wu on it

9  on which I can't get into the details.  he mostly just

10  offers a fact.  It's not a description of anything that

11  happened, and it -- I don't think it's an -- it's just a

12  fact about like what -- about data and how -- whether

13  certain data was used in a training -- an unspecified

14  training data set.  So, it's not clear why that question is

15  relevant to the issues in this case and -- or why other

16  custodians like Al Gradford, for example, couldn't answer

17  that question.

18          MR. BENON:  So, we point to that document to show

19  the -- the relevant information he's likely to communicate

20  with other custodians, and we point to this other document

21  to show that he is communicating with noncustodians.  It's

22  the marriage of those two points, your Honor.  Mr. Sun is

23  trying to focus us on that first piece and trying to tie it

24  to the nonduplicative piece, but it's both of those points

25  that need to be read in conjunction.

1          MR. YOUNG:  And, your Honor, this type of

2   information was squarely towards fair use factor one.

3          MR. SUN:  I don't know that it is, your Honor, but

4   I -- I think the issue is conflating the question of whether

5   or not -- the standard cannot be that a -- a noncustodian

6   had a -- like a person that Plaintiffs seek to designate as

7   a custodian had a written conversation with someone who was

8   not a custodian and, therefore, must be designated, because

9   there is a limiting principle to that.  The question is was

10  this discussion relevant to any issue in the case.  It's not

11  clear that it is because it's not clear why that same

12  information is not available from other sources, and it's

13  not clear like what -- whether what they were discussing

14  even relates to any of the relevant models in this case or

15  any relevant issues.  They're kind of making broad

16  statements about, Oh, well, this person knows about

17  training.  This person knows about data, but lots of people

18  at the company know about that, including the nine

19  custodians we've designated.

20          THE COURT:  Well, the -- it's the content of the

21  communications, right?  You know, it's the content that we

22  have redacted here, and then those communications with

23  noncustodians and how that would be related to that -- the

24  -- the contents of the communications in the -- in the first

25  instance.  I mean, wouldn't that be a little bit different

1 than what you're talking about?

2          MR. YOUNG:  I don't think it is, your Honor,

3 because -- well, for one, I'm looking at the document now,

4 and I'm not sure what external -- like communications with

5 noncustodians Mr. Benon is referencing because, as I noted,

6 Al Gradford is on this communication.  So, I'm not sure what

7 that is referencing, but the issue --

8          THE COURT:  Mr. Benon, wouldn't that -- wouldn't

9 you get that through the other custodian?

10          MR. YOUNG:  Your Honor, if I may, no, we wouldn't

11 because, you know, if people within the organization are

12 expressing like thoughts about contents of datasets, for

13 example, right, where -- well knowledge and perhaps

14 intentionality -- intentionality, maybe exacerbating

15 factors.  It would be extraordinary if a person did not

16 express that to just one person.

17          MR. SUN:  This is my concern, your Honor, which is

18 that there's no -- it's not clear why concerns are being

19 raised.  It's not clear why those concerns are relevant to

20 the claims in this case.  It's not clear that those concerns

21 happened.  So, the only basis for adding these custodians,

22 the basis of their request is speculation that it might be

23 the case that people whose entire job it is to source data

24 and use data to train models might have talked about

25 sourcing data and training models, which would mean that

80

1 there would be no limiting principle on -- on the number of

2 custodians.  They would keep adding custodians on that

3 basis, and there would be no way to reign them in.

4          MR. BENON:  I'll refer -- I'll refer your Honor to

5 the earlier point I made that we'll never get to have

6 absolute concrete evidence in --

7          THE COURT:  Right.  I know.

8          MR. BENON:  -- cases like this.

9          THE COURT:  No, I know.  But, again, I just go

10 back to the number that we have here.  You want Mayer or Wu

11 more?

12          MR. BENON:  I think if your Honor will allow us to

13 make a selection, we'd ask for -- your Honor for some time,

14 and we can include that in a proposed order and some sort of

15 follow up.

16          THE COURT:  Mr. Sun?

17          MR. SUN:  If you're asking for my opinion about

18 whether or not to force Mr. Benon to give an answer now --

19          THE COURT:  I'm not.  I'm saying, you know, the

20 idea is they get two, one of them being Pachoki, the other

21 one being Wu or Mayer, and then you guys live or die with

22 New York.

23          MR. SUN:  Yeah, I can read the -- the writing on

24 the wall, your Honor.  I still maintain that Mayer and Wu

25 don't have nonduplicative information, but if that's the

81

1   Court's ruling, then we will respect it.

2          THE COURT:  All right.  Let's do that.  Then I

3   don't have to see you guys again until after the New Year.

4   Fair?

5       (Simultaneous speaking.)

6          MR. SUN:  That's ideal for me too, your Honor.

7          THE COURT:  It's just going to have to be Mr.

8   Benon's going to do this one because this is going to entail

9   a little bit of agreement between the parties, a stipulation

10  between the parties, right?

11         MR. BENON:  Correct, your Honor.

12         THE COURT:  Stipulation and proposed order that

13  Mr. Benon will prepare.  Run it by Mr. Sun, and then get it

14  to me.  All right.

15         MR. BENON:  Thank you, your Honor.

16         THE COURT:  Okay.  Nothing further from the

17  parties, so, you guys are all dismissed.  Have a great

18  holiday.  Take care.

19         ALL:  Thank you, your Honor.

20      (Proceedings adjourned at 1:09 p.m.)

21

22

23

24

25

82

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Friday, December 20, 2024