UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Robert M. Illman, Magistrate Judge

TREMBLAY, et al., )
)
Plaintiffs, )
)
vs. ) No. C 23-03223-AMO
)
OPENAI, INC., et al., )
)
Defendants. )
_______________________________)

San Francisco, California
Tuesday, January 28, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 11:03 - 11:21 = 18 MINUTES

APPEARANCES:

For Plaintiffs:

Boies Schiller Flexner, LLP
44 Montgomery Street
41st Floor
San Francisco, California 94104
BY: JOSHUA M. STEIN, ESQ.

1920 Hillhurst Avenue
Suite 406
Los Angeles, California 90027
BY: MATTHEW BUTTERICK, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Defendants:

Keker Van Nest & Peters, LLP
633 Battery Street
San Francisco, California 94111
BY: THOMAS E. GORMAN, ESQ.

Morrison & Foerster, LLP
425 Market Street
San Francisco, California 94105
BY: JOSEPH C. GRATZ, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

Tuesday, January 28, 2025 11:03 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: The Court calls civil case number 3:23CV3223, Tremblay, et al., versus OpenAI, Incorporated, et al.

Parties, please state your appearances for the record.

MR. STEIN (via Zoom): Joshua Stein from Boies Schiller Flexner for Plaintiffs.

MR. BUTTERICK (via Zoom): Good morning, your Honor. Matthew Butterick for the Plaintiffs.

MR. GRATZ (via Zoom): Good morning. Joe Gratz from Morrison Foerster for OpenAI.

MR. GORMAN (via Zoom): Good morning, your Honor. Thomas Gorman from Keker, Van Nest and Peters on behalf of OpenAI. And, if I could, before we begin, could I just address a couple of process questions before we start the argument?

THE COURT: Sure. What do you need?

MR. GORMAN: First, there -- there is a pending confidentiality issue. There is a motion to seal pending. I saw a filing last night and I just wanted to make clear that the fact that this particular data set is built off of raw data that was originally collected and distributed by a non-profit called Common Crawl, that's not -- that's public.

We didn't try to seal it. It's in the brief. It's been disclosed publically, but the technical specifications about the data set that OpenAI built, are subject to a pending motion to seal. So I would ask everyone to be mindful of that, unless the Court has already ruled on it or is prepared to rule right now.

THE COURT: No. I was simply going to remind everybody that that is still a pending issue and that anything that's been redacted in the filings that were sent to me should not be discussed. And if they need to be discussed, which I don't think they will, we can go into a private session to -- to discuss anything related to those things.

MR. GORMAN: Thank you. The other issue is that there have been some meet and confer developments since the filing of the joint letter brief, and I thought it would make sense to provide an update to those.

THE COURT: Please.

MR. GORMAN: So, in short, the sequence here is that, after the Court scheduled the hearing, Plaintiffs let us know that they had engaged new technical consultants to advise in these issues. We accelerated our review of the CV to get him cleared under the protective order, but even before we were able to clear him, Counsel and the consultant came to our offices, we had a face-to-face meet and confer,

spoke for over an hour about all of the various ways that we could collaborate. One of the proposals that I think drew their interest, was the idea that we could run unique search terms from the asserted works. For example, a unique phrase from chapter three, chapter seven, chapter 15. Run those against the data set and produce the records that hit.

We also discussed -- to give them a head start, we also discussed strategies that I've seen other plaintiffs use in co-pending litigation, successful strategies, to give them sort of a head start.

And then, we also presented a technical solution that we've developed that is -- is blazingly fast. It -- the technical details I reviewed for the consultant, I won't belabor them here, but their consultant, I think, was pleased with it. He remarked that it sounded like the right implementation to speed this thing up. I explained that I tested it that morning. One of these searches that took them, allegedly six-plus hours, we were able to do in just a few minutes. And I offered to show them a demo, but they said that they didn't need to see it, they would go back and discuss and that we could possibly hammer out an agreement and take this hearing off calendar. But, of course, that was Friday and I don't think that there's been enough time for us to reconnect.

So, to the extent our briefs suggest, or I guess quite

clearly, says that we have not had productive collaborative meet and confers, I did want to say that we now have had what I believe was a productive session and we've discussed some potential solutions that could work.

THE COURT: Let me hear from Plaintiffs' counsel on them.

MR. STEIN: Your Honor, good morning. Joshua Stein for Plaintiffs. The -- those didn't really seem quite like process points, specifically. It sounded to me a little bit more like the substance of the motion and I don't think that we are as close to a resolution, unfortunately, as Mr. Gorman maintained.

The way we saw the meeting that took place on Friday, is that at the eleventh hour, and only after we had filed our brief, did they come with a supposedly faster system. And, to be clear, our expert was not allowed to try that system. And, we were told also that the speed went to four minutes, but that was in a demo and that it hadn't been fully implemented just yet.

We also, you know, had the chance to connect with our expert one-on-one after that meet and confer, and he explained that, you know, that four minutes might be for one inquiry, but that this is a case that could involve millions of works and the only way that we can successfully review that data set over that many works, is to have something

that's called "indexing" done. And, we proposed during that meet and confer, you know, that concept of indexing, and it didn't seem like, something at that point, that OpenAI was willing to let us do on their system. And, either way, would be much easier for us to do on a local system so that we can run searches.

The next point that we raise in our brief, and I think it still applies, is there is some serious attorney work product concerns with having to provide all of the searches that we want to run in that data set to opposing counsel and have them run those searches. I'm always amenable to resolution during a meet and confer, and I do appreciate that my colleague thought that they were -- that we were nearing a resolution, but it does not seem to me like the solution is to have a four-minute search for every single inquiry and that we have to do it there at scheduled times, when both the experts and my schedule happen to coincide.

THE COURT: How do you propose being able to host this data?

MR. STEIN: So, I spoke to our expert about this. We are proposing an enterprise grade-level storage on a local device, and we could provide that device to OpenAI for production purposes. The -- I'm sorry, I want to be mindful of the -- of the protective order, but the size that we're talking about can fit on a modern-day thumb drive, is

something I also wanted to note. And so I don't think that we would have too much trouble getting it from point A to point B.

THE COURT: I mean, that's squarely against what OpenAI says. They said this can't even be exported on a hard drive, much less a thumb drive.

MR. STEIN: Yeah, we vehemently disagree with that characterize, and we made our expert available at this hearing if the Court would like to hear from him directly on the technical aspects. But we understand that the size, which I can't reference exactly, is not going to be a problem, with respect to transfer or storage, and we think that the protective order in place more than adequately covers those concerns.

And then -- and we do think that the public availability of that data set, although Counsel did speak to that during his process soliloquy, I think that we -- you know, we haven't really understood from OpenAI how there's any sort of special sauce that's done in the processing there that would make this any different from what's publicly available. So, we think the protective order in place is adequate to protect commercial concerns, but we also don't think that those concerns are particularly apt here.

THE COURT: So they've talked about requesting

that if it's -- that if the production is compelled, there would be a requirement for you guys to meet and confer and discuss minimum security requirements, but your contention is that the protective order that's in place would take care of that. But the protective order isn't going to cover things like technical security requirements for the use of this -- this data, right? I mean, they're talking about how to transfer it, how to secure it and all of that kind of stuff.

MR. STEIN: I think I understand, your Honor. We would absolutely welcome a meet and confer as to those types of questions. So, if they, for example, want us to have a certain type of encryption or a certain type of device, if it was something that was commercially available, we would be very happy to undertake whatever they propose along those fronts.

THE COURT: Okay. I've considered the matters on the papers and determined that the -- that it should be produced. I am going to compel the production. I understand OpenAI's concerns about how effective the searches have been, and I don't -- so I don't take that lightly. And, maybe this is a case of a dog catching the car, but I am going to -- to require that production, because I do think that it is relevant and necessary for this case. I don't think the burden is too much if it's

given over in a proper manner.

I am going to take OpenAI's suggestion that the data set will have to be only given over after the parties have entered into an agreement, as to how it's going to be managed, how it's going to be transferred, what kind of security protocols will be put in place. So I'm going to order you guys to meet and confer on that -- on that protocol, and then develop that and file that as a joint stipulation. Although, I think a lot of that is going to probably be maybe under seal, depending on how that comes down, but I'll let you guys determine that.

As far as the protective order, you know, because there's two things. One is, the data itself and who's going to be looking at the data and its uses of that. I think the protective order right now will adequately handle those concerns, but to the extent OpenAI requests any additional add ons to that protective order, they can make that meet and confer with Plaintiffs first and then bring it to me. And I -- as I said, I will be a bit sensitive to OpenAI's request, because I do find their arguments put forth -- their security concerns are -- are valid.

All right. With this letter brief there's also the issue of the sealing motion, right? And there's -- there's a fight over whether or not some of the stuff should be sealed, and that's what you were talking about earlier, with

regard to what is public and what isn't public. Is that correct, Mr. Gorman?

MR. GORMAN: Yeah, that's right. I think there's a -- there's an important distinction between the raw web crawl data that Common Crawl generates in --

THE COURT: Right.

MR. GORMAN: -- its -- to researchers and companies. And then, the data sets that those companies generate after months and months of proprietary works --

THE COURT: Just so that I'm on the same page, I apologize for interrupting you, but give me --

MR. GORMAN: Yeah.

THE COURT: Give me the -- you guys write me letters almost everyday. So, which one is this one?

MR. GORMAN: The motion to seal?

THE COURT: Yeah, which -- the motion to consider what other parts should be sealed. Is it 258?

MR. GORMAN: I think the -- I think it's 255, is this motion to seal. Josh is nodding, so I --

THE COURT: You're right. You're right, yeah, 255. Okay. Okay, I apologize. Go ahead.

MR. GORMAN: So while the raw web data is public, the amount that OpenAI uses, how it's compressed it, how it's processed it, the size of that data set, especially the size of that data set in relation to its other data sets,

the mix that OpenAI uses, those are the types of proprietary details that other artificial intelligence companies would love to have. There's speculation on line about these types of technical details, because people want to understand how these models are trained. It's a -- it's a competitive secret. So, we just asked in the brief, you can see, we highlighted just those technical details. The exact size -- not the source -- but like the exact size, the number of records, the number of tokens.

THE COURT: And then, let me hear from the other side as to why that shouldn't -- I shouldn't grant that administrative motion.

MR. STEIN: Yes, your Honor. I think that the commercial sensitivity concerns about the size of the data that they've taken from publicly available sources are -- are not really capturing a true sensitivity issue. I think that there are certain types of trade secrets. I don't think that this -- that the kinds of things that were attempted to be sealed here are, but I think that even if they were, this is the type of case of public import, given the allegations of massive copyright infringement, where the public has a right to know the specifics of that infringement. How much was taken, how exactly it was used. So, I think from those two standpoints, in particular given what the company has told Congress and told the public about

the nature of its data sets that make it important, for those types of details to be available for the public to see them.

MR. GORMAN: And, if I could, your Honor. We're not talking about -- we're not talking about the scale of any infringement. In fact, Plaintiffs haven't identified a single infringing record in the enormous data set that we're talking about. And that's essentially what this motion to compel was. They want to look for infringement on their computer, because they -- they haven't found any thus far, due to the lack of collaboration. So it's like turning over the entire email system, instead of running ESI searches on our end to produce the relevant hits.

So --

THE COURT: But your concern is that the actual numbers, the actual data sets, is what you want to protect?

MR. GORMAN: It's just the technical specifications, not the source.

THE COURT: Right.

MR. STEIN: And, your Honor, if I just may very quickly. I think if this were a haystack, it would just be entirely filled with needles. It's not -- we're not talking about finding a needle in a haystack here and I think that's why the pubic has a right to know.

THE COURT: Well, it may be that this becomes

publicly available farther on down the road as the case is further developed, but at this time, I do think that OpenAI has shown the need for keeping this private. And so, I will rule that this will remain under seal.

All right. I think the other motions are not related to -- because I think the other stuff has to do with the third parties, so they're not before me today. We'll be putting those on calendar, if necessary, coming up. So I think that's it for today. Is that correct? Let's see here -- unless you guys filed something this morning that I --

MR. STEIN: From our perspective, it is, your Honor. Thank you.

THE COURT: All right. Okay. All right. So, the ruling is that it will be produced, and I'm not going to -- it's the third training data set, right? And then, you guys are going to meet and confer. How long will that process take?

MR. GORMAN: I think --

MR. STEIN: I --

MR. GORMAN: Go ahead. Sorry.

MR. STEIN: We're prepared to meet and confer on this tomorrow or the day after.

MR. GORMAN: Yeah, I just need to confer with the security people to see what their specific requests are. They gave me an overview. I think --

THE COURT: Is this going to be put in -- are you going to put this in a stipulation as an amendment to -- just a standalone security protocol, or a standalone transfer --

MR. GORMAN: Probably. It would be a standalone.

MR. STEIN: Yeah, that works for us.

THE COURT: And then you can get whatever in front of me for signing and enforcement purposes, if you want. Does that make sense?

MR. GORMAN: Yeah. Yes. But I just want to caution, like the view of the security department is, once it leaves their hardened systems that's been developed, in part because they're on the receiving end of, you know, nation-level attacks, that they lose a lot of ability -- there's just no way Plaintiffs could match that level of security. So, I mean there's just a concern right off the bat that any movement off of our system creates serious risk. I understand your Court's ruling. We'll do the best we can, but their reaction to this is very strong.

MR. STEIN: And we completely understand that, your Honor. Plaintiffs firm, Boies Schiller Flexner, in particular, has been subject to national attacks when we were involved in litigation against North Korea. It's something that we will take very seriously and we will meet and confer with all earnestness to make sure that those

concerns are addressed.

THE COURT: Okay. All right, gentlemen, thank you. Have a good day.

MR. BUTTERICK: Thank you, your Honor.

MR. GRATZ: Thank you, your Honor.

(Proceedings adjourned at 11:21 a.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, January 30, 2025