February 3, 2025

**Via ECF**

The Honorable Robert M. Illman
United States District Court for the Northern District of California
Eureka-McKinleyville Courthouse
3140 Boeing Ave.
McKinleyville, CA 95519

      Re:    *In re OpenAI ChatGPT Litigation*, Master File No. 23-cv-3223-AMO Joint Letter

Dear Judge Illman:

Pursuant to the Court's Standing Order, the parties hereby submit this joint discovery letter brief concerning Plaintiffs' proposed additional search terms. The parties met and conferred, most recently on January 28, 2025, but regrettably were unable to reach a resolution on this dispute.

Per Paragraph 4(a) of the Court's Standing Order, Exhibit A to this letter brief is an exact copy of RFPs and responses. The parties respectfully request the Court's leave to submit Exhibits B and C, which provide additional information regarding the search terms and hit counts discussed throughout this joint letter brief. The parties believe Exhibits B and C will aid the Court's analysis of the parties' positions.

<u>**Plaintiffs' Statement**</u>

OpenAI's document productions have given Plaintiffs a peripheral view into numerous probative issues, including OpenAI's online piracy of massive amounts of copyrighted material; ChatGPT's tendency to reproduce copyrighted material; abandoned efforts to license text data from legitimate sources; and OpenAI's assessment of the quality of text sources as training data. These topics are relevant to copyright infringement and the fair use defense, but the search terms OpenAI ran largely gloss over them. Plaintiffs thus developed and proposed OpenAI run just *eight* additional search strings. Despite the fact that OpenAI itself recently proposed *over 100* additional search strings to Plaintiffs, of which Plaintiffs are running dozens that *capture over 230,000 documents*, OpenAI refuses to run Plaintiffs' searches because they hit on 345,000 documents. OpenAI can't play both sides, and thus the Court should compel it to run Plaintiffs' eight searches.

On January 2, Plaintiffs sent OpenAI proposed additional search terms and modifications to search terms that OpenAI disclosed. Although OpenAI provided hit counts for Plaintiffs' eight search strings (*see* Ex. B), it refused to answer questions about those hit counts, including whether they represent *unique* hits (i.e., de-duplicated against OpenAI's prior searches and against hits from Plaintiffs' other proposed searches). Nor has OpenAI agreed to implement *any* of the additional search strings, except the two with the fewest hits, but only if Plaintiffs drop the others.

## I.     Courts, Including *This Court*, Routinely Compel Parties to Run Additional Terms.

Plaintiffs seek only to compel OpenAI to run additional search terms that hit on documents with key terms that were ***not*** captured by OpenAI's initial search terms and productions. While the ESI Order allows the Producing Party (here, OpenAI) to "proceed with its review of documents hitting upon the disclosed search terms without input from the Requesting Party," Dkt. 175, §7(b), *nothing* in the ESI Order precludes the Requesting Party (here, Plaintiffs) from later proposing *additional* search terms. No other reading of the ESI Order could make sense. Indeed, the ESI Order *mandates* the Producing Party to disclose its initial search terms and hit counts. That mandatory disclosure provision would be pointless if the Requesting Party then had zero recourse. For this reason, courts routinely order producing parties to run additional or modified searches proposed by requesting parties. *E.g.*, *Cook v. Meta Platforms, Inc.*, 2025 WL 251942, at *4 (N.D. Cal. Jan. 21, 2025). Indeed, last month, this Court allowed OpenAI to propose additional searches for Plaintiffs to run. In response, OpenAI proposed over 100 search terms, of which Plaintiffs have run dozens that hit on over 230,000 documents. The ESI Order thus clearly doesn't prohibit proposing and running additional terms. The Court should not countenance OpenAI's about-face.

## II.     Plaintiffs' Proposed Additional Search Terms Capture Relevant, Key Evidence.

OpenAI argues Plaintiffs haven't shown there are "deficiencies" or "gaps" in OpenAI's productions. But Plaintiffs by definition know little about documents OpenAI ***hasn't*** produced. That's why Rule 34(a)(1)(A) requires a party like OpenAI to produce "any" responsive documents, not just what ***it*** thinks is "enough." *See also* ESI Order at 5, §7(f) (prohibiting withholding *any* known non-duplicative, responsive ESI). Plaintiffs reviewed OpenAI's productions and search terms, identified areas where the terms and connectors appeared too narrow or didn't capture lingo used by OpenAI's own employees, and proposed additional search terms. How do Plaintiffs know their search strings bear fruit? Just look at the hit counts. They yielded thousands of hits covering relevant documents. Ex. B. If these search terms *truly* overlap with what OpenAI already ran, as OpenAI now contends, any hits would be duplicates that OpenAI *wouldn't* have to review.

1. *OpenAI's infringing acts and knowledge of illegality (Ex. A, RFPs 42, 43, 64, 68)*. Search strings 1 and 4 capture documents about OpenAI's theft of copyrighted works from pirated databases, and its knowledge that doing so was illegal and unethical. *See* Dkt. 275-4 ("i'm pulling the rest of libgen. currently have all 2176 torrents queued"). This is key to infringement and fair use. *See Glacier Films, Inc. v. Turchin*, 896 F.3d 1033, 1041 (9th Cir. 2018) (rejecting, as *not* "a close and difficult case," argument that torrenting pirated IP was fair use). OpenAI alleges it already circumscribed search string 1 with other searches (*see* Ex. C), but ***none*** of the allegedly duplicative searches contain key terms like "illegal\*," "unlawful\*," "torrent\*," or "seed\*" (a term for sharing pirated works when torrenting; OpenAI calls it "nonsensically overbroad" but tellingly doesn't provide the hit count, as with the term "be doing," which would only capture comments like "we shouldn't be doing this").[1] And if the strings *actually* hit on boilerplate disclaimers as OpenAI suggests, they can be batched and pulled from review.

2. *OpenAI's illegal acquisition and use of copyrighted works (RFPs 43, 45)*: Search strings 2 and 5 are designed to capture documents about OpenAI's torrenting and seeding of copyrighted works it took from pirated databases. Discovery into the full extent of OpenAI's torrenting of pirated data—both its contents and quantity—is critical. *See, e.g., In re DMCA § 512(h) Subp. to Twitter, Inc.*, 608 F. Supp. 3d 868, 879 (N.D. Cal. 2022) ("it is obvious, for example, that downloading and distributing copyrighted music via peer-to-peer systems does not constitute fair use"). But the documents that OpenAI has produced so far on this topic were produced only by chance—OpenAI refuses to search directly for documents about torrenting or seeding.

3. *ChatGPT's memorization and regurgitation (RFPs 34, 67)*: Search string 3 is designed to capture documents discussing memorization, regurgitation, or leakage (phenomena where a model is capable of outputting copies of training data), and where such documents *also* categorize data being emitted (books, tokens, etc.). OpenAI's search terms on these topics are unduly restrictive: they often require use of the exact words "copyright" or "verbatim," and they omit "leakage" and "data" entirely. This leaves gaps that Plaintiffs seek to fill with their additional terms. For instance: if an OpenAI engineer asks another engineer, "how do we stop the model from regurgitating its training data?," such a document certainly would be relevant.

4. *Books as training data (RFPs 25, 36, 43, 47)*: Search strings 5 and 6, which require the term "book\*" within close proximity to other key terms, capture documents that discuss OpenAI's efforts to license copyrighted works. Such documents are relevant to whether a market exists for the use of Plaintiffs' works as training data (fair use factor 4). Meanwhile, documents about *how* and *why* OpenAI obtained its training data (through webscrapes and torrenting) are also relevant to infringement, willfulness, and bad faith. OpenAI recognizes all that: it agreed to search for this category, but its initial search terms were unduly restrictive (w/5 as opposed to w/20 for book\* near other key terms, and almost no search terms at all discussing publishers).

5. *Quality of books and datasets (RFPs 43, 46, 47)*: Search strings 7 and 8 cover documents about *why* OpenAI chose to train its models on copyrighted books (such as because they're high-quality text across a wide range of subjects) as opposed to, say, works in the public domain. During the parties' negotiations, OpenAI offered to run these two searches, but its "agreement" was contingent on Plaintiffs foregoing all six of their other search strings. That's unreasonable.

---

[1] OpenAI says "torrent\*" and "seed\*" aren't limited to its piracy of copyrighted works. But OpenAI doesn't suggest it torrented/seeded anything else. That's because data piracy is what torrenting is mainly used for.

### III.    Plaintiffs' Proposed Additional Search Terms Are Not Unduly Burdensome.

OpenAI complains Plaintiffs' eight searches are burdensome because they yield 345,000 documents. But *OpenAI's* proposed searches *to Plaintiffs* yielded over 230,000. Further, OpenAI rebuffed questions about whether the 345,000 documents were de-duplicated or threaded. Put differently, if any documents already "hit" on OpenAI's search terms, they wouldn't need to be reviewed again; if a document "hit" on multiple searches, it would only be reviewed once; and if OpenAI hasn't threaded the documents, the number is inflated because it represents each email and text or chat, rather than chains.[2] Even taking OpenAI's estimate at face value and assuming *arguendo* that OpenAI cannot cull the document sets, a review of 345,000 documents is neither uncommon nor unduly burdensome in complex cases. *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, No. 20-cv-5640-YGR, Dkt. 1017, at 2 (N.D. Cal. Sept. 27, 2024) ("If Apple really wanted to, could it collect and review 1.3 million documents [in 7 weeks]? Yes, of course it could. If Apple really wanted to, with all of the resources available to it, it could probably review that many documents in a weekend."). OpenAI offers *zero* support for its claim that the review would take 10,000 attorney hours (a pace of just 34.5 documents per hour).[3] With technology assistance, e-discovery vendor DISCO estimates a 345,000-document review takes 2-3 weeks, upload through production.

### OpenAI's Statement

Plaintiffs try to put a fresh coat of paint on an argument they have already lost twice. At the outset of discovery, Plaintiffs sought an ESI order giving them input into OpenAI's search term selection. The Court appropriately rejected that demand because it "raises the specter of too many future delays and disputes over methodology and search term formulation." (ECF No. 166 at 3.) Then, just last month, while acknowledging that the Court's ESI Order means "Defendants are free to employ whatever methodology they find well-suited to conducting a search for responsive documents subject to the ESI order," Plaintiffs asked the Court to order OpenAI to specifically search for documents discussing torrents. (ECF No. 242 at 2.) The Court again rejected Plaintiffs' position, finding they "have failed to show why the current production is insufficient." (ECF No. 247 at 3.) Now Plaintiffs ask for an order not only on numerous torrent-related search terms,[4] but also on *hundreds of more* terms packed into eight search strings, including nonsensically overbroad terms like (ChatGPT AND "be doing"), (memori* AND data), and (seed*). Based on review time to date, Plaintiffs' terms would add over 9,000 hours of attorney review time with no showing that OpenAI's productions are deficient. The only "deficiency" Plaintiffs claim to have found is that OpenAI is not running their unilaterally-demanded search terms.

---

[2] On January 29, counsel for OpenAI emailed Plaintiffs' counsel asking if *Plaintiffs'* recently reported hit counts were de-duped. One day earlier, different counsel for OpenAI took the position in a meet and confer that OpenAI had zero obligation to tell Plaintiffs if *its own* reported hit counts (*see* Ex. B) were de-duped.

[3] OpenAI first said 10,000 hours and 50 attorneys, then "over 9,000" and 45 attorneys. Both are suspect. Even without technology-assisted review, which most vendors employ, the *average* pace for manual review is <u>60 documents per hour</u>, and even <u>90 per hour is common</u>.

[4] Plaintiffs' overbroad search string 2 is a list of torrent-related words, including the common root "seed*", with no further limitations. Therefore, Plaintiffs string 2 is not "designed to capture documents about OpenAI's torrenting and seeding of *copyrighted works it took from pirated databases*" but rather every document referencing torrenting/seeding. *See supra*, at 2 (emphasis added). Plaintiffs' search string 2 hits on 284,592 documents and family. Plaintiffs' search strings 1 and 5 also include a number of broad terms directed at torrents including "bittorrent*", "libtorrent*", "seed*", and "torrent*".

Plaintiffs try to justify their demand for search terms by pointing to OpenAI's search term requests to Plaintiffs, but those requests are the product not of the ESI Order, but of a discovery order specifically mandating Plaintiffs' compliance after OpenAI established deficiencies in Plaintiffs' productions, including the failure of many Plaintiffs to produce a ***single*** email.  (ECF No. 212 at 1; ECF No. 240.)  That order required OpenAI to propose terms to Plaintiffs.  (ECF No. 240 ¶¶ 3-4.)  Plaintiffs chose which OpenAI-proposed search terms to accept; to the extent they had concerns about hit counts as to those terms, they were welcome to raise them—they did not.  Additionally, the 230,000 hit count, which Plaintiffs refer to above, represents the cumulative results for twelve different parties.

Plaintiffs have identified no deficiencies in OpenAI's productions.  Plaintiffs admit above that they "know little about documents OpenAI hasn't produced," *supra*, at 1, and the same appears to apply to the documents that OpenAI *has* produced.  Leading up to this brief, OpenAI asked Plaintiffs to confer on a concrete list of purported deficiencies in its productions.  Plaintiffs refused.  Without any alleged production deficiencies, Plaintiffs proceed to do exactly what the ESI Order seeks to prevent: they analyze OpenAI's search methodology—evidently with little reference to its existing production—and demand additional terms.  As the Court recognized, allowing "the requesting Party [to] have input in determining search terms raises the specter of too many . . . disputes over methodology and search term formulation."  (ECF No. 166 at 3.)  Plaintiffs prove this to be true by not only demanding hit counts for its proposed terms, but also demanding technical details about OpenAI's document review workflow including deduplication methodologies and "threading protocols."  Plaintiffs' repeated attempts to interject themselves into the technical details of OpenAI's review process, particularly when there is no contention of any actual deficiencies, will only delay discovery in this case.

Even setting aside Plaintiffs' failure to show actual deficiencies in OpenAI's existing production, Plaintiffs make no attempt to show that OpenAI's existing 600+ search terms are insufficient to capture the documents that OpenAI agreed to produce.  Indeed, Plaintiffs' portion of the brief does not reference a single one of OpenAI's terms, many of which are designed to hit on broad categories of documents, e.g., (infring*), ("fair use"), (book* w/10 download*) or ((copyrighted OR copyrights) w/25 book*).  That failure is conspicuous.  Plaintiffs claim that they have "identified areas where the terms and connectors appeared too narrow or didn't capture lingo used by OpenAI's own employees, and proposed additional terms."  *Supra* at 1.  But that cannot be true because several segments of Plaintiffs' proposed search strings overlap with and/or are narrower than the relevant search terms that OpenAI has already run.[5]  In other words, Plaintiffs' demand here not only disregards the ESI Order, it fails to follow their own proposed methodology.

To take Plaintiffs' search string 1 as an example, OpenAI already ran a host of overlapping and even broader search terms directed at documents related to library genesis, z-lib, common crawl, anna's archive, infringement, piracy, copyright, and licenses.  *See* Ex. C.  For example, OpenAI's search terms include the term (infring*) which captures all of the documents (and more) that Plaintiffs are seeking with a large subset of their proposed search string 1, i.e., ((infring*) w/20 (copyright* OR licens* OR author* OR publish* OR book* OR content* OR data* OR material! OR corpora OR corpus OR  libgen OR "lib gen" OR "library genesis" OR torrent* OR bittorrent* OR libtorrent* or seed* OR AA OR "anna's" OR annas OR z-lib* OR crawl*)).  Similar overlap exists for other portions of search string 1 as well as Plaintiffs' other search strings.  The fact that

---

[5] For example, Plaintiffs propose (book* w/5 quality), ignoring OpenAI's broader (book* w/15 quality).

the relevant aspects of Plaintiffs' proposed terms are largely duplicative of the terms OpenAI used demonstrates that Plaintiffs' proposals are not based on any principled analysis of either OpenAI's productions or search terms.

Thus, OpenAI's existing search terms offer ample coverage for the portion of Plaintiffs' demands directed to relevant, proportional subject matter. But Plaintiffs' terms also go beyond discoverable information to sweep with generic, indiscriminate terms. For example, Plaintiffs' search string 1 includes the terms "content*", "data*", "material!", "illegal*", "legal*", "unlawful*", "lawful*", "be doing", "ethical*", and "unethical*". Plaintiffs' search string 4 suffers from the same issue. Plaintiffs' terms do not account for the fact that the documents being searched include lengthy text reflecting model inputs and outputs, which are likely to be hit upon by common words. These terms are also prone to hitting on boilerplate legal language, e.g. in contracts or in disclaimers in email footers. This illustrates why OpenAI—not Plaintiffs—is "best situated to determine the most appropriate method" for locating responsive documents, including "appropriately tailored search terms." (ESI Order ¶ 7, ECF No. 175.) OpenAI's 647 search terms, hitting on over 640,000 documents, are well-suited to locating responsive documents in this case.

Further, it is the agreed scope of responses to Plaintiffs' requests for production—not the requests themselves—that provide the universe of responsive documents. Plaintiffs cite to a number of their overbroad requests for production as the basis for their overbroad search terms. Plaintiffs omit the mutually agreed-upon *narrowed* responses that the parties negotiated over many meet and confers. Even if OpenAI had agreed to the full scope of Plaintiffs' requests, those requests still do not support Plaintiffs' broad terms, including e.g., "legal*", "illegal*", "lawful*", "unlawful*", "ethical*", "unethical*". Plaintiffs point to RFP Nos. 42, 43, 64, and 68 as justification for these "illegal" terms. But those requests relate to "the decision not to provide information about the training datasets" in a paper, "the decision to use Shadow Datasets," "the decision about or guidelines for including or excluding copyrighted material", and "the processing of copyrighted material." Plaintiffs' terms are not only overbroad but ill-tailored.

Reviewing hundreds of thousands more documents is also burdensome. Plaintiffs purport to propose only 8 search "strings," but those search strings consist of 362 search terms, hitting on an additional 345,000 documents beyond the over 640,000 documents that OpenAI has already agreed to review. OpenAI has already invested an enormous amount of resources into identifying relevant search terms, reviewing and producing documents, and reviewing, redacting, and logging privileged documents. That review is still ongoing. Requiring OpenAI to introduce hundreds of thousands of non-responsive documents into its review queue will not add value to the case but may very well prolong fact discovery. Based on metrics from OpenAI's reviews to date, the time required to complete just the first-level review of these 345,000 additional documents would be over 9,000 hours, or five weeks for a team of 45 attorneys.[6]

Finally, Plaintiffs cite to *Meta* and *Apple* cases for the proposition that OpenAI should be ordered to run Plaintiffs' search terms and review hundreds of thousands of documents. Those are different cases with different circumstances and different ESI orders. The Court ordered the ESI protocol that controls here, and OpenAI has demonstrated nothing but good faith in complying with it. Plaintiffs' requests should be denied.

---

[6] This estimate even aggressively assumes a review rate of 38 documents per hour, over 20% higher than the average review rate to-date in this case of 31 documents per hour. Plaintiffs' unsupported citations to higher rates do not account for the length, volume or technical complexity of documents *in this case*.

By:  /s/ *John R. Lanham*

John R. Lanham
**MORRISON & FOERSTER LLP**
12531 High Bluff Dr, Suite 100
San Diego, CA 92130
Telephone: (858) 720-5100
Fax: (858) 720-5125
Email: JLanham@mofo.com

Christopher Sun
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email: CSun@keker.com

Elana Nightingale-Dawson (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Email: Elana.NightingaleDawson@lw.com

*Attorneys for Defendants*
OPENAI, INC., OPENAI, L.P., OPENAI
OPCO, L.L.C., OPENAI GP, L.L.C., OPENAI
STARTUP FUND GP I, L.L.C., OPENAI
STARTUP FUND I, L.P., AND OPENAI
STARTUP FUND MANAGEMENT, LLC

By:    /s/ *Maxwell V. Pritt*

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com

Maxwell V. Pritt (SBN 253155)
Joshua M. Stein (SBN 298856)
Reed D. Forbush (SBN 347964)
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(415) 293-6800
mpritt@bsfllp.com
jstein@bsfllp.com
rforbush@bsfllp.com

Jesse Panuccio (*pro hac vice*)
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
jpanuccio@bsfllp.com
jschuffenhauer@bsfllp.com

Evan M. Ezray (*pro hac vice*)
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL, 33301
(954) 377-4237
eezray@bsfllp.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN 179108)
Christopher K.L. Young (SBN 318371)
Holden Benon (SBN 325847)
Aaron Cera (SBN 351163)

601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
hbenon@saverilawfirm.com
acera@saverilawfirm.com

Matthew Butterick (SBN 250953)
mb@buttericklaw.com
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Bryan L. Clobes (*pro hac vice*)
Alexander J. Sweatman (*pro hac vice*)
Mohammed A. Rathur (*pro hac vice*)
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Tel: (312) 782-4880
bclobes@caffertyclobes.com
asweatman@caffertyclobes.com
mrathur@caffertyclobes.com

*Counsel for Individual and Representative
Plaintiffs and the Proposed Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)**

I hereby attest that I obtained concurrence in the filing of this document from each of the

other signatories. I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 3, 2025

                                             BOIES SCHILLER FLEXNER LLP

                                             */s/ Maxwell V. Pritt*
                                             Maxwell V. Pritt

                                             *Counsel for Plaintiffs*