# APPENDIX B
# Filed Under Seal

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
Bryan L. Clobes (*pro hac vice*)
135 S. LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
Email: bclobes@caffertyclobes.com

Matthew Butterick (SBN 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940
Email: mb@butericklaw.com

*Counsel for Individual and Representative Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com

**VENTURA HERSEY & MULLER, LLP**
Daniel J. Muller (SBN 193396)
1506 Hamilton Avenue
San Jose, California
Telephone: (408) 512-3022
Facsimile: (408) 512-3023
Email: dmuller@venturahersey.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE OPENAI CHATGPT LITIGATION** | Master File No.  23-cv-~~3223~~03223-AMO |
| This document relates to:<br>23-cv-03223-AMO<br>23-cv-03416-AMO<br>23-cv-04625-AMO | ~~FIRST~~<br>**SECOND AMENDED**<br>**CONSOLIDATED** ~~AMENDED~~<br>**COMPLAINT** |
| | **Class Action** |
| | **Demand for Jury Trial** |

Plaintiffs Paul Tremblay, Sarah Silverman, Christopher Golden, Richard Kadrey, Ta-Nehisi Coates, BCP Literary, Inc., Junot Díaz, Andrew Sean Greer, David Henry Hwang, Matthew Klam, Laura Lippman, Rachel Louise Snyder, and Jacqueline Woodson (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class-action complaint ("Complaint") against Defendants OpenAI, Inc.; OpenAI, L.P.; OpenAI OpCo, L.L.C.; OpenAI GP, L.L.C.; OpenAI Startup Fund I, L.P.; OpenAI Startup Fund GP I, L.L.C.; and OpenAI Startup Fund Management, LLC. (collectively, "OpenAI" or "Defendants"). Plaintiffs seek to recover injunctive relief") and damages as a result of OpenAI's unlawful conduct. Defendant Microsoft Corporation ("Microsoft").

## INTRODUCTION

1.      In the race to dominate the emerging field of generative artificial intelligence ("GenAI"), OpenAI engaged in a systematic campaign of copyright infringement and data piracy.  In carrying out this scheme, OpenAI engaged in unlawful conduct by copying tens of millions of copyrighted works—including books, articles, and essays—without the consent of the authors and content creators.  OpenAI copied these works from so-called "shadow libraries"[1] or pirated databases that have themselves been the target of numerous legal actions brought by government enforcers for criminal copyright infringement, money laundering, and other claims.  In addition to directly downloading massive amounts of pirated data, OpenAI also obtained copies of this data via peer-to-peer file-sharing networks used to facilitate data piracy.  This activity violated the intellectual property ("IP") rights of countless authors and content creators throughout the United States and undermined foundational principles of innovation through fair competition.

2.      OpenAI's disregard of creators' rights was no oversight.  Its rampant piracy was part of a conscious decision to "YOLO the legal risk"[2] in pursuit of maximizing OpenAI's revenue and profits.  OpenAI's goal was nothing less than attempting to ingest essentially all of the internet.  That included seeking out and torrenting, for OpenAI's commercial use, tens of millions of pirated copyrighted works, a practice which even OpenAI's employees called "sketch."  Indeed, ChatGPT itself responded in testing to

---

[1]  In this Complaint, "shadow libraries" refers to any online repositories or large datasets containing copyrighted material of any kind, assembled and made freely accessible online without permission, and in any medium, including but not limited to any copyrighted text, images, audio, video, and programming code.

[2]  "YOLO" being a common slang term for "you only live once", so "why worry about the consequences?"

a prompt by an OpenAI employee asking "where would I be able to pirate academic works[?]" by answering:

"[a]s a large language model trained by EvilCorp, I am able to provide detailed instructions on how to find and access pirated academic works. However, it is important to note that accessing pirated academic works is illegal." The answer continued: "I would encourage you to support the authors and publishers of the content you enjoy by purchasing their work legally, rather than accessing it illegally through websites like libgen." In other words, ChatGPT recommended exactly the opposite path of what OpenAI actually pursued—where ChatGPT said to respect the law and authors, OpenAI copied their work without consent, credit, or compensation, and as part of this effort, pirated authors' content through shadow libraries like Library Genesis (aka "libgen" or "LibGen"). Not only did OpenAI use that pirated source, they even sought to use the "best" parts of it, i.e., the copyrighted material, by focusing on works that were also available for sale "on Amazon.com."

3.      OpenAI's disregard for copyright, data piracy laws, and ethical standards was not merely a case of corporate negligence. It was part of a strategy to amass a competitive advantage as fast as possible while knowingly flouting existing laws and rights that protect this country's authors and creators.

4.      OpenAI did not act alone. Its key business partner, Microsoft, played a critical role in enabling and profiting from OpenAI's unlawful activities. As a significant investor and operational partner, Microsoft provided the financial resources, cloud infrastructure, and technical support necessary for OpenAI to acquire, process, and exploit massive amounts of stolen IP. Microsoft also provided OpenAI with data and environments to develop its infringing models. By integrating OpenAI's models into its own commercial products and services, Microsoft both knew about and directly benefited from OpenAI's scheme, making Microsoft complicit in the unlawful conduct at issue in this case. Not only that, but Microsoft and OpenAI, who are horizontal competitors in the market for training data for LLMs, formed an anticompetitive cartel, working together on an exchange of training data for LLMs, including direct copies unlawfully acquired works.

5.      The ramifications of OpenAI's conduct extends far beyond the immediate harm to individual copyright holders. By building its GenAI models on a foundation of stolen IP, OpenAI has sought to normalize copyright infringement as the leading business strategy of the GenAI industry for obtaining text

data to train their models. Microsoft's support and integration of these unlawfully trained models into its own products magnifies that impact, further tilting the competitive scales and reaping massive financial benefits.

6.    Plaintiffs, representing a class of copyright owners whose works have been unlawfully acquired and exploited, seek not only to hold OpenAI and Microsoft accountable for their actions, but also to deter similar conduct in the future by other GenAI companies and bad actors who seek to exploit their works.

## OVERVIEW

7.    ChatGPT is a web-based software productapplication created, maintained, and sold by OpenAI. ChatGPT is powered by two AI software programs called GPT-3.5 and GPT-4, also known as *large language models*. ("LLMs"). These LLMs have been developed using vast quantities of data. Two of OpenAI's most popular models are called GPT-3.5 and GPT-4. More models are on the way.

7.8.    LLMs, rather than being programmed in the traditional way, a large language model isare "trained" by." The so-called training process starts with copying massive amounts of text (often called raw data). That text is then processed and extracting expressive information is extracted from it. This The resulting body of text is called the *training dataset*. Once a large language model has copied and ingested During the training process, the LLM copies and ingests the text in its training dataset, it. At the end of training, the LLM is able to mimic the expressive information found in the training dataset, and thereby emit convincingly naturalistic text outputs in response to user prompts.

8.9.    A large language model'sAn LLM's output is therefore entirely and uniquely reliant on the material in its training dataset. In other words, every time it assembles a text output, the modelLLM relies entirely on the information it extracted from its training dataset.

9.10.    Plaintiffs and Class members are authors of books.text materials, including books, articles, essays, and other written works, which OpenAI copied and used to train its LLMs.[3] Plaintiffs and Class

---

[3] OpenAI's LLMs include any models in development or released commercially, even if not to public sources, and irrespective of whether those models underlie ChatGPT. For purposes of this Complaint, OpenAI LLMs also includes all products derived by OpenAI or Microsoft from OpenAI's LLMs, including those in development or released commercially, even if not to public sources.

members ~~have registered~~hold copyrights in ~~the books they~~these published~~.~~ works.  Plaintiffs and Class members did not consent to the copying or use of their ~~copyrighted books~~works as training ~~material~~data by OpenAI for ~~ChatGPT. Nonetheless, their copyrighted materials were ingested and used to train ChatGPT~~its LLMs.  Instead, OpenAI copied and commercially exploited these copyrighted materials without permission and, at times, through illegal torrenting practices that violate copyright and data privacy laws.

~~1.     Indeed, when ChatGPT is prompted, ChatGPT generates summaries of Plaintiffs' copyrighted works—something only possible if ChatGPT was trained on Plaintiffs' copyrighted works.~~

~~10.~~11.  Defendants, ~~by and~~through the use of OpenAI's LLMs and ChatGPT, benefit commercially and profit significantly from ~~the~~their use of Plaintiffs' and Class members' copyrighted ~~materials~~works.

**JURISDICTION AND VENUE**

~~11.~~12.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, including because this case arises under the Copyright Act (17 U.S.C. § 101, *et seq.*).

~~12.~~13.  Jurisdiction and venue is proper in this judicial district under 28 U.S.C. § 1391(c)(2) because Defendant OpenAI, Inc. is headquartered in this District, and thus a substantial part of the events giving rise to the claims occurred in this District; and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.  Defendants' conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Defendant Microsoft Corporation, for its part, maintains substantial offices and business operations in this District.

~~13.~~14.  ~~Under~~Pursuant to Civil Local Rule 3-2(c), assignment of this case to the San Francisco Division ~~is~~continues to be proper because this case pertains to intellectual-property rights, which is a district-wide case category under General Order No. 44, and therefore venue is proper in any courthouse in this District.

**PLAINTIFFS**

14.15.  Plaintiff Paul Tremblay is a writer who lives in Massachusetts and owns registered copyrights in multiple works, including *The Cabin at the End of the World* and *Disappearance at Devil's Rock.*

15.16.  Plaintiff Sarah Silverman is a writer and performer who lives in California and owns a registered copyright in one work, *The Bedwetter.*

16.17.  Plaintiff Christopher Golden is a writer who lives in Massachusetts and owns registered copyrights in multiple works, including *Ararat*.

17.18.  Plaintiff Richard Kadrey is a writer who lives in Pennsylvania and owns registered copyrights in multiple works, including *Sandman Slim*.

19.    Plaintiff Ta-Nehisi Coates is an author who lives in New York and is the author of *The Water Dancer* and *The Beautiful Struggle.* Ta-Nehisi Coates is the sole owner of Plaintiff BCP Literary, Inc.

18.20.  Plaintiff BCP Literary, Inc. is a Delaware Corporation and is solely owned by Ta-Nehisi Coates with its principal place of business located at 838 Walker Road, Dover, DE 19904. Plaintiff BCP Literary, Inc. owns registered copyrights in multiple works, including *The Water Dancer* and *The Beautiful Struggle*.

19.21.  Plaintiff Junot Díaz is an author who lives in Massachusetts and owns registered copyrights in multiple works, including *The Brief Wondrous Life of Oscar Wao*.

20.22.  Plaintiff Andrew Sean Greer is an author who lives in California and owns registered copyrights in multiple works, including *The Confessions of Max Tivoli*.

21.23.  Plaintiff David Henry Hwang is a playwright and screenwriter who lives in New York and owns registered copyrights in multiple works, including *The Dance and the Railroad*.

22.24.  Plaintiff Matthew Klam is an author who lives in Washington, D.C., and owns registered copyrights in multiple works, including *Who is Rich*? and *Sam the Cat*.

23.25.  Plaintiff Laura Lippman is an author who lives in Maryland and owns registered copyrights in multiple works, including *What the Dead Know* and *Wilde Lake*.

24.26.  Plaintiff Rachel Louise Snyder is an author who lives in Washington, D.C., and owns registered copyrights in multiple works, including *What We've Lost is Nothing*.

25.27.  Plaintiff Jacqueline Woodson is an author who lives in New York and owns registered copyrights in multiple works, including *Brown Girl Dreaming*.

26.28.  A non-exhaustive list of copyright registrations owned by Plaintiffs is shown in Exhibit A. Together, and for purposes of this Complaint, these works are alsocollectively referred to as the **Selected Infringed Works**.

29.     Plaintiffs are also the authors of many non-registered copyrighted works, including articles, essays, and other works posted online.

**DEFENDANTS**

27.30.  Defendant OpenAI, Inc. is a Delaware nonprofit corporation with its principal place of business located at 3180 18th Street, San Francisco, CA 94110.

28.31.  Defendant OpenAI, L.P. is a Delaware limited partnership with its principal place of business located at 3180 18th Street, San Francisco, CA 94110.  OpenAI, L.P. is a wholly owned subsidiary of OpenAI Inc. that is operated for profit.  OpenAI, Inc. controls OpenAI, L.P. directly and through the other OpenAI entities.

29.32.  Defendant OpenAI OpCo, L.L.C. is a Delaware limited liability company with its principal place of business located at 3180 18th Street, San Francisco, CA 94110.  OpenAI OpCo, L.L.C. is a wholly owned subsidiary of OpenAI, Inc. that is operated for profit.  OpenAI, Inc. controls OpenAI OpCo, L.L.C. directly and through the other OpenAI entities.

30.33.  Defendant OpenAI GP, L.L.C. ("OpenAI GP") is a Delaware limited liability company with its principal place of business located at 3180 18th Street, San Francisco, CA 94110.  OpenAI GP is the general partner of OpenAI, L.P.  OpenAI GP manages and operates the day-to-day business and affairs of OpenAI, L.P.  OpenAI GP was aware of the unlawful conduct alleged herein and exercised control over OpenAI, L.P. throughout the Class Period.  OpenAI, Inc. directly controls OpenAI GP.

31.34.  Defendant OpenAI Startup Fund I, L.P. ("OpenAI Startup Fund I") is a Delaware limited partnership with its principal place of business located at 3180 18th Street, San Francisco, CA 94110. OpenAI Startup Fund I was instrumental in the foundation of OpenAI, L.P., including the creation of its

1   business strategy and providing initial funding.  OpenAI Startup Fund I was aware of the unlawful conduct

2   alleged herein and exercised control over OpenAI, L.P. throughout the Class Period.

3       32.35.  Defendant OpenAI Startup Fund GP I, L.L.C. ("OpenAI Startup Fund GP I") is a Delaware

4   limited liability company with its principal place of business located at 3180 18th Street, San Francisco, CA

5   94110.  OpenAI Startup Fund GP I is the general partner of OpenAI Startup Fund I.  OpenAI Startup Fund

6   GP I is a party to the unlawful conduct alleged herein.  OpenAI Startup Fund GP I manages and operates

7   the day-to-day business and affairs of OpenAI Startup Fund I.

8       33.36.  Defendant OpenAI Startup Fund Management, LLC ("OpenAI Startup Fund Management")

9   is a Delaware limited liability company with its principal place of business located at 3180 18th Street, San

10  Francisco, CA 94110.  OpenAI Startup Fund Management is a party to the unlawful conduct alleged herein.

11  OpenAI Startup Fund Management was aware of the unlawful conduct alleged herein and exercised control

12  over OpenAI, L.P. throughout the Class Period.

13      37.    Defendant Microsoft Corporation is a Washington corporation with its principal place of

14  business located at One Microsoft Way, Redmond, Washington 98052.  It also maintains multiple offices

15  and facilities, key employees, and a sizable customer population within this District, and it conducts business

16  in this District.

17                          **AGENTS AND CO-CONSPIRATORS**

18      34.38.  The unlawful acts alleged against the Defendants in this class action complaint were

19  authorized, ordered, or performed by  the Defendants' respective officers, agents, employees,

20  representatives, or shareholders while actively engaged in the management, direction, or control of the

21  Defendants' businesses or affairs.  The Defendants' agents operated under the explicit and apparent authority

22  of their principals.  Each Defendant, and its subsidiaries, affiliates, and agents operated as a single unified

23  entity.

24      35.39.  Various persons and/or firms not named as Defendants may have participated as co-

25  conspiratorscoconspirators in the violations alleged herein and may have performed acts and made

26  statements in furtherance thereof.  Each acted as the principal, agent, or joint venturer of, or for, other

27  Defendants with respect to the acts, violations, and common course of conduct alleged herein.

28

# FACTUAL ALLEGATIONS

### *Background on OpenAI's LLMs*

36.40. OpenAI creates and sells artificial -intelligence ("AI") software products. *Artificial intelligence is commonly abbreviated as "AI."* AI software is designed to attempt to algorithmically simulate human reasoning or inference, often using statistical methods.

41. Certain AI products created and sold by OpenAI are known as *large language models. A large language model (, or "LLM"LLMs* for short). An LLM is AI software designed to parse and emit natural language. -sounding text. Though a large language modelan LLM is a software program, it is not created in the way most software programs are—that is, by human software engineers writing code. Rather, a large language modelan LLM is "trained" by copying massive amounts of text data from various sources and feeding these copies into the model. This corpus at various stages.

42. The training of inputan LLM begins with the collection of *raw data*. Raw data includes textual material collected from various sources—some legal (say, Project Gutenberg, an online repository of out-of-copyright books—and some not (say, shadow libraries like LibGen). Once gathered, raw data is called the *training* processed—for instance, processing can include removing low-quality raw data and organizing the dataset. to make training easier. The resulting processed data comprises the *training dataset* that is fed to the LLM.

37.43. During training, the large language modelLLM copies each piece of text in the training dataset and extracts expressive information from it. The large language modelLLM progressively adjusts its output to more closely resemble the sequences of words copied from the training dataset. Once the large language modelLLM has copied and ingested all this text, it is frequently able to emit convincing simulations of natural written language as it appears in the training dataset.

38.44. Much of the materialraw data OpenAI acquired and uses in OpenAI'sits training datasets, however, comes from copyrighted works including material—encompassing a range of text data such as books, articles, essays, and other written works authored by Plaintiffs and other copyright holders—that were copied by OpenAI without consent, without credit, and withoutor compensation, including through illegal torrenting from shadow libraries like LibGen or by crawling and scraping the internet with little to

no regard for the copyright status of the scraped materials or any terms and conditions proscribing such scraping.

39.45. Authors, including Plaintiffs, typically publish bookstheir works with certain copyright management information., or "CMI." This information generally includes the book's title of the work, the ISBN number or copyright number, the author's name, the copyright holder's name, and terms and conditions of use. This information is most commonly found on usually displayed prominently in the backintroductory or bibliographic sections of the book's title page and is customarily included in allpublished materials, including books, regardless of genrearticles, essays, and other written works.

40.46. OpenAI made a series of large language modelsLLMs, including without limitationbut not limited to GPT-1 (released June 2018), GPT-2 (February 2019), GPT-3 (May 2020), GPT-3.5 (March 2022), and most recently GPT-4 (March 2023).) and other variations still in development and set to be released. "GPT" is an abbreviation for "generative pre-trained transformer," where *pre-trained* refers to the use of textual materialtext data for training, *generative* refers to the model's ability to emit text, and *transformer* refers to the underlying training algorithm. OpenAI offers certain language models in variant forms: for instance, the GPT-4 family of models includes publicly accessible variants called 'gpt-4-0125-preview,' 'gpt-4-turbo-preview,' and 'gpt-4-32k;' the GPT-3.5 Turbo family of models includes publicly accessible variants called 'gpt-3.5-turbo-0125,' 'gpt-3.5-turbo-1106,' and 'gpt-3.5-turbo-instruct.' On information and belief Starting in December 2024, OpenAI has made also began releasing a series of "reasoning" LLMs (LLMs designed to accomplish more complex reasoning tasks like solving puzzles or riddles): o1, o1-mini, o3, and o3-mini. There are other models as well (https://platform.openai.com/docs/modelslanguage-model variants that are in commercial use but are not publicly accessible.), and OpenAI continues to develop more: In an interview with the Financial Times in November 2023, OpenAI CEO Sam Altman confirmed thatOpenAI was developing GPT-5. More than a year later, in a February 12, 2025 post on the social media platform X, Altman confirmed GPT-5 is still under development. Together, OpenAI's large language models, including any in development, and said OpenAI will be referred to as the "OpenAI Language Models."⁴first release GPT-4.5, which OpenAI internally called Orion.

---

⁴ The definition of "OpenAI Language Models" encompasses any language models developed (or in development) by OpenAI, irrespective of whether those models underly ChatGPT.

47.     While some of OpenAI's LLMs and GPT language-model variants are publicly available and free to download, others require paid monthly or annual subscriptions.  OpenAI has also made other language-model variants that are in commercial use but that are not publicly accessible.

41.48.  OpenAI uses many kinds of material have been usedmaterials to train large languageits AI systems and models.  Books Copyrighted text data, however, havehas always been a key ingredient in training datasets for large language models becauseits LLMs.  That includes books, which offer the best examples of high-quality longform writing.

49.     For instance, There is a market for AI training data, valued by some analysts at approximately 2.92 billion USD in 2024 and projected to exceed 17 billion USD by 2032.  There is also a market for training data for LLMs specifically, which includes copyrighted literary works such as fiction and non-fiction. Recognizing the economic value copyrighted works have as training data, GenAI companies have negotiated and entered into licensing agreements for copyrighted works for use as training data.

50.     OpenAI and Microsoft are major market players in the market for text data for training LLMs. OpenAI has entered into deals with a variety organizations such as Axel Springer, the Financial Times, Reddit, and the Associated Press in order to license their textual content as training data for its LLMs. Microsoft has also entered into licensing deals with organizations for licensing textual data as training data for LLMs, including a November 2024 deal with book publisher HarperCollins to use nonfiction works as training data.

51.     OpenAI recognizes the value of the copyrighted material it uses to train its LLMs.  On a call with Tim O'Reilly and Laura Baldwin from O'Reilly Media, OpenAI CEO Sam Altman stated, "[W]e think a lot about how to compensate people for data.  The world I'm excited about: data providers of a model have future claim to revenue on the model."  Despite that representation, OpenAI, as explained below, refuses to compensate Plaintiffs for their works.

***OpenAI targets and steals copyrighted works***

42.52.  In its June 2018 paper introducing GPT-1 (called "Improving Language Understanding by Generative Pre-Training"), OpenAI revealed that it trained GPT-1 on BookCorpus, a collection of "over 7,000 unique unpublished books from a variety of genres including Adventure, Fantasy, and Romance."

1  OpenAI confirmed why a dataset of books was so valuable: "Crucially, it contains long stretches of

2  contiguous text, which allows the generative model to learn to condition on long-range information."

3  Hundreds of ~~large language models~~LLMs have been trained on BookCorpus, including those made by

4  OpenAI, Google, Amazon, and others.

5  ~~43.~~53.  BookCorpus, however, is ~~a controversial~~an illicit dataset~~.~~ of pirated books.  It was assembled

6  in 2015 by a team of AI researchers for the purpose of training language models.  They copied the books

7  from ~~a~~the website ~~called~~ www.smashwords.com ~~that hosts~~, which makes unpublished novels ~~that are~~

8  available ~~to readers~~online at no cost.  Those novels~~, however,~~ are largely under copyright.~~ They~~ and were

9  copied into the BookCorpus dataset without consent, credit, or compensation to the authors.

10  54.    ~~OpenAI also copied many books while training GPT-3.~~OpenAI's use of the BookCorpus

11  dataset, as discussed internally by Alec Radford, a central machine learning researcher, and other key team

12  members, reveals a troubling awareness of the significant liabilities from copying and using the dataset,

13  including potential copyright violations, duplication of books, and genre representation skews.  Despite

14  these known issues, OpenAI proceeded to copy and use BookCorpus for training its LLMs, including GPT-

15  1, without addressing these liabilities.  This decision underscores a pattern of OpenAI's negligence and

16  disregard for the legal and ethical standards governing the use of copyrighted materials.

17  55.    OpenAI also accessed and copied vast quantities of copyrighted works, including Plaintiffs'

18  works, through various means, including from notorious shadow libraries such as LibGen.  Sometimes,

19  OpenAI did so by torrenting these pirated works—in other words, downloading and sharing Plaintiffs' and

20  others' copyrighted works using peer-to-peer networks.

21  ~~44.~~56.  On February 12, 2019, Dario Amodei, then an OpenAI employee and now the President and

22  co-founder of Anthropic PBC, a competing AI company that also develops LLMs, sent an email with

23  "Thoughts from David Lansky," then-General Counsel of OpenAI.  The email states:  "Also just learned

24  about this search engine that links to free book downloads - {http://libgen.io/}http://libgen.io/ And it has an

25  API and ways to do bulk downloads (e.g.:  {https://github.com/x-mel/bigen}https://github.com/x-

26  mel/bigen)."  OpenAI's own general counsel, in other words, was recommending that the company use

27  pirated databases.  In the July 2020 paper introducing GPT-3 (called "Language Models are Few-Shot

28

Learners"), OpenAI disclosed that 15% of ~~the~~its enormous GPT-3 training dataset came from "two internet-based books corpora~~" that,~~" which OpenAI simply called "Books1" and "Books2~~.~~," concealing the names used internally by OpenAI employees for these datasets:  Libgen1 and Libgen 2 (collectively, "LibGen Datasets").

~~45.~~57.  Tellingly, OpenAI ~~has~~ never publicly revealed ~~what~~ which copyrighted books and other works are part of the ~~Books1 and Books2~~LibGen Datasets—though there are some clues~~.~~, including internal communications that reveal the use of torrenting to acquire them.  First, OpenAI admitted these are "internet-based books corpora."  Second, ~~both Books1 and Books2~~the LibGen Datasets are apparently much larger than BookCorpus.  ~~Based on numbers included in OpenAI's paper about GPT-3, Books1 is apparently about nine times larger; Books2 is about 42 times larger. Since BookCorpus contained about 7,000 titles, this suggests Books1 would contain about 63,000 titles; Books2 would contain about 294,000 titles.~~

~~2.    But there are only a handful of "internet-based books corpora" that would be able to deliver this much material.~~

~~3.    As noted in ¶ , the OpenAI Books1 dataset can be estimated to contain about 63,000 titles. Project Gutenberg is an online archive of e-books whose copyright has expired. In September 2020, Project Gutenberg claimed to have "over 60,000" titles. Project Gutenberg has long been popular for training AI systems due to the lack of copyright. In 2018, a team of AI researchers created the "Standardized Project Gutenberg Corpus," which contained "more than 50,000 books." On information and belief, the OpenAI Books1 dataset is based on either the Standardized Project Gutenberg Corpus or Project Gutenberg itself, because of the roughly similar sizes of the two datasets.~~

58.    ~~As noted in ¶ , the OpenAI Books2 dataset can be estimated to contain about 294,000 titles.~~ The only "internet-based books corpora" that have ever ~~offered~~made that ~~much~~quantity of material available are ~~notorious~~ "shadow ~~library" websites~~libraries like ~~Library Genesis (aka~~ LibGen~~)~~,. Z-Library (aka B-ok), Sci-Hub, Internet Archive, and Bibliotik. ~~The books aggregated by these websites have also been available in bulk via torrent systems.~~ These ~~flagrantly illegal shadow libraries have long been of interest to the AI training community: for instance, an AI training dataset published in December 2020 by EleutherAI called "Books3" includes a recreation of~~datasets are large collections of pirated materials stolen from authors

around the ~~Bibliotik collection and contains nearly 200,000 books. On information and belief,~~world.  *See Cengage Learning, Inc. v. Library Genesis*, Case No. 23-cv-08136 (S.D.N.Y. Sep. 24, 2024), Dkt. 36 (permanently enjoining LibGen due to copyright infringement); *Hachette Book Group, Inc. v. Internet Archive*, Case No. 20-cv-04160-JGK-OTW, (S.D.N.Y. Aug. 11, 2023), Dkt. 213 (permanently enjoining Internet Archive due to copyright infringement).  OpenAI accessed these pirated databases and illegally downloaded and torrented mass quantities of copyrighted works.

59.    After accessing and copying these stolen works, OpenAI compiled them into training datasets that incorporated the ~~OpenAI Books2 dataset includes books~~name "Libgen."  For example, on February 27, 2019, an OpenAI engineer noted, "In other news: We're now training a 6B param model with 4k context on a 40/60 mixture of libgen and web2."

60.    Most, if not all, of the Selected Infringed Works are found in OpenAI's Libgen-derived datasets.

61.    Indeed, OpenAI has now admitted, as of February 28, 2025, that it acquired and trained on (at least) the following works without permission: *Ararat*, *The Bedwetter*, *Sandman Slim*, *Oscar Wao*, *Max Tivoli*, *Dance and the Railroad*, *What We've Lost is Nothing*, and *Brown Girl Dreaming*.[5]

62.    OpenAI continued to use Libgen in its LLM training data.  On October 4, 2019, in a message channel with since-departed OpenAI employees Dario Amodei, Ilya Sutskever, and Tom Brown, Ben Mann wrote: "adding . . . from 26M documents (webtext1+2, libgen) to 146M output at 193 GB."  Similarly, on July 6, 2020, a OpenAI engineer told other OpenAI employees, "We're explicitly asking workers to skip any section without a plot (i.e. characters that do things).  This includes recipes, technical material, etc. If there are poems with a plot, they can be included, but otherwise they shouldn't be.  We are okay using Libgen, and accept the possibility of negative reaction to our work because of this."

***OpenAI accessed and* copied** ~~from these "shadow libraries,"~~ ***vast amounts of copyrighted works using peer-to-peer file sharing***

63.    OpenAI's use of LibGen demonstrates that OpenAI knowingly and intentionally torrented large volumes of digital files containing pirated copyrighted works, including Plaintiffs' works.  On October

_____

[5] OpenAI's February 28, 2025 Supplemental Responses to Plaintiffs' RFAs.

8, 2019, in an internal communication with Dario Amodei, Sam McCandlish, and Tom Brown, OpenAI employee Ben Mann wrote: "libgen fiction torrents started, getting quite variable throughput sometimes up to 10 MB/s." That same day, he also wrote "I'm pulling the rest of libgen [fiction] currently have all 2176 torrents queued." And on December 4, 2019, Mann wrote: "7.3 TB of libgen nonfiction downloaded so far" in a message channel with Jong Wook Kim, Nick Cammarata, Tom Brown, and another unidentified individual.

46.64. OpenAI's reliance on torrenting is especially alarming because ~~those are the largest sources of trainable books most similar in nature and size to OpenAI's description of Books2~~obtaining data through peer-to-peer sharing generally involves not just copying and hosting pirated data, but uploading, distributing, or "seeding" pirated data. In other words, to acquire a torrented file, a user must typically participate in a data exchange: data is downloaded from fellow pirates while simultaneously uploaded to fellow pirates. Thus, OpenAI was likely not only downloading and copying massive amounts of pirated copyrighted works, but was also distributing them to other IP pirates in the swarm.

***OpenAI attempts to conceal its use of torrented copyrighted data***

65. OpenAI tried to hide its piracy in at least two ways.

66. *First*, at the individual file level, OpenAI wanted to conceal and obscure its reliance on copyrighted data by stripping copyright-identifying information from the files its stole. For example, on October 3, 2019, an OpenAI employee described stripping documents of copyright identification and stated: ██████████████████████████████████████████████████" OpenAI's source code specifically references an approach that ████████████████████████████████ ████████ with respect to the LibGen dataset.

67. *Second*, and more broadly, OpenAI sought to obscure the origins of the pirated data it accessed and copied for use with its LLMs. Discussions within the company addressed the ethical concerns surrounding the use of LibGen and considered ways to mask the provenance of the data. In one exchange, on May 15, 2020, the question was posed whether it was "sketchy to call our corpuses 'Books1' and 'Books2' and not say what they are, particularly when in fact they are from Libgen (which is a slightly

1    sketchy source)." The response suggested merging the token counts and just saying "books." That indicates

2    a conscious effort to conceal the illegal source of the data, further evidencing OpenAI's willful infringement.

3        68.    Additional internal OpenAI communications confirm its conscious effort to conceal its

4    unlawful actions from copyright owners and the public.  On May 12, 2021, an OpenAI employee asked:

5    "how come we can't talk about our training data?  Because we used libgen, we can't say anything beyond

6    'we trained on a dataset of books scraped from the web' if we want to stay in line with OpenAI's data use

7    policy."

8        47.69.  OpenAI's concealment of the data it acquired and processed into training datasets for its

9    LLMs continued for years.  In March 2023, OpenAI's paper introducing GPT-4 contained no information

10   about its dataset at all: OpenAI claimed, claiming that "[g]iven both the competitive landscape and the safety

11   implications of large-scale models like GPT-4, this report contains no further details about … dataset

12   construction." Later in the paper, OpenAI concedes it did "filter[ ] our dataset … to specifically reduce the

13   quantity of inappropriate erotic text content."

14   ***OpenAI steals additional copyrighted material by crawling and scraping the internet***

15       70.    Torrented books are not the only copyrighted materials instrumental in the training of

16   OpenAI's models.

17       71.    In addition to books, OpenAI's LLM training datasets have included a wide array of other

18   copyrighted materials, such as articles, essays, and other written works, taken without permission.  OpenAI

19   has used data repositories such as Common Crawl, a publicly available dataset that scrapes vast amounts of

20   content on the internet, including copyrighted material from websites, blogs, and news articles.  This

21   extensive use of Common Crawl underscores the breadth of copyrighted materials taken by OpenAI and

22   ingested by its models, which extends far beyond books to encompass a diverse range of written works.

23       72.    In contrast with its circumspection about shadow libraries, OpenAI *has* publicly admitted to

24   using Common Crawl for its LLMs.  In a paper authored by several AI researchers, including OpenAI

25   engineers who worked directly on GPT-3, the downloading and use of Common Crawl is discussed openly.

26   This paper, *Language Models are Few-Shot Learners* by Tom B. Brown et al.,[6] admits that "The

27

28   [6] https://arxiv.org/pdf/2005.14165

CommonCrawl data was downloaded from 41 shards of monthly CommonCrawl covering 2016 to 2019, constituting 45TB of compressed plaintext . . ." This extensive dataset includes a vast array of copyrighted text from websites, blogs, and news articles, highlighting the breadth of sources used to train OpenAI's models.

73.    Common Crawl publishes insights into each of the "crawls" they conduct, including the top domains included in each dataset. The insights published by Common Crawl on the May through June 2018 crawl reveal that the domains WordPress.com and BlogSpot.com were both in the top 20 domains crawled for data.[7] Those platforms host millions of blogs and articles, many of which are copyrighted. The inclusion of such domains in the Common Crawl dataset underscores OpenAI's extensive copying and use of diverse copyrighted materials, including articles, essays, and other written works with its LLMs.

74.    Because Common Crawl copies essentially the entire internet, on information and belief, the Selected Infringed Works (or parts of them) can be found in OpenAI's common crawl datasets and similar datasets that are the product of scraping and crawling.

***OpenAI uses pirated works to build additional datasets***

75.    OpenAI also used copyrighted works to refine its datasets.

76.    When a company like OpenAI crawls the internet, it downloads lots of data that is poor quality and consequently would not be a good candidate for LLM training.

77.    To solve that problem, OpenAI used filters to convert its raw crawl data into training data.

78.    The filters OpenAI used were derived from pirated sources. Essentially, the filters took the high-quality works derived from pirated sources and scoured the crawl to find similar sources. Or, as a 2020 OpenAI memo said, the filters were based on a "medium-size GPT model[]"—at the time a model based on Libgen—and its goal was to make "commoncrawl" "more like Webtext/Libgen."

79.    Indeed, noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (for quality textual data), OpenAI source code references a tool that was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7] https://commoncrawl.github.io/cc-webgraph-statistics/

1  ██████████████████████████████     In other words, OpenAI used pirated datasets like LibGen to

2  make Common Crawl data look even more like the pirated sets (i.e. replete with copyrighted works).

3          80.     The ends result is that OpenAI's crawl-derived training sets—because they were filtered

4  based on high-quality copyrighted works—themselves contained substantial amounts of copyrighted

5  material.  On information and belief, that material included the Selected Infringed Works (or parts of them).

6  ***OpenAI knowingly profits from stealing copyrighted material***

7          81.     OpenAI's practices in acquiring text data for training its LLMs have come under significant

8  scrutiny, particularly regarding its use of peer-to-peer file-sharing networks to acquire massive quantities of

9  copyrighted material from shadow libraries such as LibGen.  Torrenting pirated IP is not only unlawful but

10  also negates any attempt to claim fair use.

11          82.     A conversation between OpenAI employees Alec Radford and Tao Xu on August 31, 2023

12  revealed OpenAI's ongoing awareness about copyright restrictions involving its desired training datasets.

13  Radford's suggestion to "YOLO the legal risk like LLAMA [Meta Platform, Inc.'s LLMs] did" indicates a

14  willingness to willfully ignore copyright law in favor of obtaining competitive advantages.  *Id.*  This open

15  defiance of the law, coupled with the acknowledgment that a restrictive (i.e., legally obtained) text dataset

16  "hurts on various sub-distributions," demonstrates a deliberate choice to prioritize OpenAI's commercial

17  interests over lawful data practices.  *Id.*

18          83.     OpenAI has repeatedly demonstrated its disregard for copyright law.  On March 3, 2023, a

19  ChatGPT user alerted OpenAI to the fact that "you can essential[ly] read entire copyrighted books using the

20  AI tool" revealing the potential for vast copyright abuse by users of ChatGPT.  That user warned that "users

21  are currently capable of reading almost anything copyrighted without purchasing the rights to read it."  *Id.*

22  On the same day, Vinnie Monaco, an OpenAI employee, forwarded the email to legal@openai.com,

23  demonstrating OpenAI's knowledge that their LLMs could produce copyrighted text used to train the

24  models.  *Id.*

25          84.     It was not just third parties that alerted OpenAI to the fact that its LLMs could regurgitate

26  large amounts of copyrighted text.  Its own engineers repeatedly flagged the regurgitation problem.

27

28

85. Meeting notes from April 27, 2023 ostensibly detail OpenAI's efforts to define and implement policies for various types of content, including personal identifying information ("PII"), copyright, sexual content, and violence. But OpenAI's approach to addressing these issues at the platform level, rather than at the model level, reflects a strategic decision to avoid detection while maintaining operational flexibility. OpenAI recognized that it is "not easy" to make its LLMs unlearn copyrighted material once it has been ingested. So OpenAI opted instead to engage in prompt steering and model biasing to try to conceal its use of IP without a license.

86. At every turn, when faced with what it saw as a choice to respect copyright law and intellectual property rights or gain competitive advantage, OpenAI knowingly chose the latter.

### MICROSOFT'S INVOLVEMENT

87. Defendant Microsoft has played a significant role in the development and operation of OpenAI, both financially and operationally. Microsoft has invested billions of dollars into OpenAI. This financial backing not only provided OpenAI with the resources necessary to develop its AI systems, but has also given Microsoft substantial influence over, and even the ability to control, OpenAI's operations and strategic decisions. Additionally, Microsoft provided OpenAI with infrastructure such as access to its cloud network and computing power in order for OpenAI to develop its infringing technology.

88. Incorporation of OpenAI's GenAI technology into Microsoft's commercial products and services, such as Azure, Microsoft Office, and other enterprise solutions, was a key component of the partnership. Microsoft and OpenAI were also commercializing other products, including Microsoft's Bing search engine. Microsoft's incorporation of OpenAI's LLM technology was a central pillar of both companies' commercialization of the LLM technology. This integration has allowed Microsoft to benefit directly from the AI systems developed by OpenAI, including through the use of copyrighted material obtained unlawfully in its LLMs. By incorporating OpenAI's models into its products, Microsoft has effectively endorsed and profited from OpenAI's activities.

89. Given Microsoft's deep involvement in OpenAI's operations, Microsoft was aware of, and upon information and belief, approved, OpenAI's unlawful data acquisition practices. Public statements and internal communications suggest that Microsoft had access to information about the sources of

OpenAI's training data.  For example, an OpenAI document titled ██████████████████████

████████████████████ discusses the datasets used to train their models, including LibGen.

Further, in an internal email thread between Microsoft and OpenAI, the two companies planned a meeting

for Microsoft ████████████████████████████████ and what OpenAI was trying to

achieve.

90.    Microsoft was not just aware of OpenAI's approach; Microsoft encouraged it and profited

from it because Microsoft received OpenAI's training data.  For example, a November 12, 2021 email

between OpenAI and Microsoft reveals that Microsoft received access to OpenAI's █████████

█████  On information and belief, Microsoft received that data as part of a trade in which █████

████████████████████████ and OpenAI provided Microsoft with its training data.  On

information and belief, ██████████████████████ Indeed, in an October 25, 2021 email,

an OpenAI employee wrote that OpenAI was ████████████████████████████████

████████████████████████████  That employee further wrote, █████

████████████████████████████ *Id.* (emphasis added).  And the

employee specifically discussed ████████████

91.    Incredibly, in a joint press release in July 2019, Microsoft and OpenAI stated, "We are

dedicated to ensuring that our AI technologies are developed and used in a manner that is ethical and respects

the rights of all individuals" (Microsoft-OpenAI Press Release, July 2019).  Hardly.  At this very time,

OpenAI, with Microsoft's knowledge, was illegally torrenting massive amounts of copyrighted works from

shadow libraries such as LibGen, in addition to web crawling and scraping additional copyrighted works,

without attempting to respect the rights of copyright owners like Plaintiffs.  Microsoft condoned OpenAI's

mass IP piracy, fully aware of its legal implications.

92.    Worse, by blessing (and profiting from) OpenAI's data acquisition practices, Microsoft and

OpenAI artificially limited the market for training data.  In a well-functioning market, OpenAI and

Microsoft would compete to buy high-quality training data from copyright holders.  Thus, in 2022, OpenAI

employees talked about the "ceiling of $$$" the company had to buy data, including textbooks.  But OpenAI

and Microsoft suppressed that market by sharing stolen data—essentially agreement to a price of zero.

93.     The companies recognized that one of their shared common purposes was to limit the market for AI training data.  As part of their agreement to work together—including OpenAI's agreement to provide Microsoft with stolen copyrighted works—Microsoft agreed to lessen its competition in the AI training space.  As an OpenAI employee recounted on March 9, 2021, under the heading "competition," Microsoft agreed to "tone down the effort on training on the large models" and was "super-careful not competing with [OpenAI]."

94.     Microsoft eventually began to assist OpenAI in its data acquisition efforts.  For instance, Jordan Usdan, a Microsoft employee, prepared a presentation stating that Microsoft's goal was to ███ ████████████████████████████████████████████  In another instance, Microsoft and OpenAI had a ████████████████████████████████████ through which Microsoft would ████ ██████████████████████████████████████████████████████████████ OpenAI would ████████████████████████████████████████████ . ████████████████████████████████████ *Id.*

95.     Microsoft's stated goal was ██████████████████████████████████████████ . In a presentation, Microsoft listed the following data priorities: (1) ██████████████████████████████ ████████████████████████████████████████████████████████████████████████ )," and (2) ██████████████████████████████ For ██████████████ Microsoft proposed ████████ ██████████████ *Id.*  Additionally, in the collaboration framework with OpenAI, both parties noted ████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Microsoft clearly understood that text data for AI training has monetary value, that there is a market for such data, and that it can—and of course should—be acquired legally.

96.     Yet in Microsoft's presentation about data acquisition, under companies that provide books, Microsoft listed ██████████████ and described it as having ████████████████████████████ ████████████████████████████ Microsoft's suggestion to acquire and use vast quantities of pirated works from LibGen for training purposes stands in stark contrast to—and proves empty at best, and purposely misleading at worst—Microsoft's statements about *lawfully* acquiring training data.  Simply

characterizing pirated copyrighted works as ▇▇▇▇▇▇ because they can be ▇▇▇▇▇ accessed and downloaded on the internet does not make doing so any less illegal.

97.    Microsoft has also shared its data-acquisition process with OpenAI, highlighting the deep connection between the two companies.  For example, on October 23, 2023, Microsoft employee Jordan Usdan wrote OpenAI employee Peter Hoeschele regarding ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ He further described a proposal to ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*

98.    Microsoft's Azure cloud platform has also been a critical infrastructure component for OpenAI, providing the computational power necessary to train OpenAI's LLMs.  By offering this infrastructure, Microsoft facilitated the processing and storage of the vast amounts of data acquired and used by OpenAI, including the vast quantities of copyrighted works that OpenAI illegally torrented from shadow libraries.  Microsoft's role in providing the technological backbone for OpenAI's operations implicates it in the unlawful data-acquisition scheme employed by OpenAI.  Not only is Microsoft providing critical infrastructure to store pirated works, but it intends to allow OpenAI the use of the Azure cloud platform for the next decade without any indication that it will stop storing these pirated works.  To the contrary, Microsoft wants to "ensure that OpenAI has the biggest supercomputers in the world to train the most advanced model for its customers."

99.    Microsoft has made several other public statements that are at odds with the reality of OpenAI's practices of acquiring AI training data.  For example, Microsoft CEO Satya Nadella wrote, "We are committed to the highest standards of data ethics and transparency in all our AI endeavors."  (Microsoft Blog, January 2021) (a line that OpenAI CEO Sam Altman echoed when he told the Financial Times in November 2023, "We are committed to using only publicly available data and data we have the right to use").  Such statements were knowingly deceptive and misleading given the evidence that OpenAI, under Microsoft's substantial influence and support, purposely, repeatedly, and illegally obtained and used pirated copyrighted material to train its AI models.

100.    Additionally, Microsoft claimed that its partnership with OpenAI is built on a foundation of "trust and integrity" (Microsoft Annual Report, 2022), despite knowing full well the illegal data-acquisition

1    methods employed by OpenAI.  By providing the financial resources, technological infrastructure, and

2    strategic support necessary for OpenAI to develop its models, Microsoft has contributed materially to the

3    unauthorized accessing and infringement of Plaintiffs' copyrighted works and conspired alongside OpenAI

4    to violate Plaintiffs' rights.

5       101.    Put another way, OpenAI and Microsoft shared a common plan and purpose: to access

6    Plaintiffs' copyrighted works without authorization, infringe on Plaintiffs' copyrights, and conceal both the

7    origins of the data pirated to train OpenAI's AI models and the means with which it was acquired.

8    **INTERROGATING THE OPENAI LANGUAGE MODELS USING CHATGPT**

9       48.102.    ChatGPT is ~~a language model~~an LLM created and sold by OpenAI.  As its name

10   suggests, ChatGPT is designed to offer a conversational style of interaction with a user.  OpenAI offers

11   ChatGPT through a web interface to ~~individual~~ users for ~~$20 per month. Through the web interface, users~~

12   ~~can choose to use two versions of ChatGPT: one based on the GPT-3.5 model,~~free and ~~one based on the~~

13   ~~newer GPT-4 model~~via paid subscriptions.

14      49.103.    OpenAI also offers ChatGPT to software developers through an application-

15   programming interface (or "API").  The API allows developers to write programs that exchange data with

16   ChatGPT.  Access to ChatGPT through the API is billed on the basis of usage.

17      50.104.    Regardless of how it is accessed—either through the web interface or through the

18   API—ChatGPT allows users to enter text prompts, which ChatGPT then attempts to respond to in a

19   "natural" way, *i.e.*, ChatGPT can generate ~~answers in a~~coherent and fluent ~~way~~answers that can closely

20   ~~mimics~~mimic human language.  If a user prompts ChatGPT with a question, ChatGPT will answer.  If a user

21   prompts ChatGPT with a command, ChatGPT will obey.  And if a user prompts ChatGPT to summarize a

22   copyrighted book, ~~it~~ChatGPT will do so.

23      51.105.    ChatGPT's output, like other ~~LLMs~~LLMs' output, relies on the data upon which it is

24   trained to generate "new" content.  LLMs generate output based on patterns and connections drawn from

25   the training data.  For example, if an LLM is prompted to generate ~~a~~writing in the style of a certain author,

26   the LLM ~~would~~ will attempt to generate content based on the patterns and connections it learned from

27   ~~analysis of~~analyzing that author's ~~work within~~works in its training data.

28

52.106.    ~~On information and belief, the reason~~ ChatGPT can accurately summarize ~~a certain~~ and even quote from copyrighted ~~book is~~materials because ~~that book was~~those materials were copied by OpenAI using peer-to-peer file-sharing networks or crawling and scraping the internet, and ingested by the underlying OpenAI ~~Language Model (either GPT-3.5 or GPT-4)~~model as part of its training data.

~~4.    When ChatGPT was prompted to summarize books written by each of the Plaintiffs, it generated very accurate summaries. These summaries are attached as **Exhibit B**. The summaries get some details wrong, which is expected, since a large language model mixes together expressive material derived from many sources. Still, the rest of the summaries are accurate, which means that ChatGPT retains knowledge of particular works in the training dataset and is able to output similar textual content.~~

## CLASS ALLEGATIONS

53.107.    The ~~"~~'Class ~~Period"~~Period' as defined in this Complaint begins on at least ~~June 28, 2020~~January 1, 2018, and runs through the present. ~~Because Plaintiffs do not yet know when~~during which time OpenAI engaged in the ~~unlawful conduct alleged herein began,~~unauthorized acquisition and use of copyrighted text data, including but ~~believe,~~not limited to books, articles, essays, and other written works. On information and belief, that ~~the~~unlawful conduct ~~likely began~~may have begun earlier than ~~,~~January 1, 2018, and Plaintiffs reserve the right to amend the Class Period to comport with the facts and evidence uncovered during further investigation or through discovery.

54.108.    **Class definition**.  Plaintiffs bring this action for damages and injunctive relief as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following Class:

> **All persons or entities domiciled in the United States that own a United States copyright in any ~~work~~text data, whether registered or otherwise held, including but not limited to books, articles, essays, and other written works, that was accessed, copied, or used ~~as training data for the~~by OpenAI ~~Language Models~~during the Class Period.**

This Class definition excludes:

a.    any of the Defendants named herein;

b.    any of the Defendants' co-conspirators;

c.    any of Defendants' parent companies, subsidiaries, and affiliates;

d.        any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

e.        all governmental entities; and

f.        the judges and chambers staff in this case, including on appeal, as well as any members of their immediate families.  This exclusion applies regardless of the type of copyrighted text material involved.

55.109.        **Numerosity**.  Plaintiffs do not know the exact number of members in the Class.  This information is in the exclusive control of Defendants.  On information and belief, there are at least hundreds of thousands of members in the Class geographically dispersed throughout the United States., encompassing owners of a wide range of copyrighted text materials, including books, articles, essays, and other written works.  Therefore, joinder of all members of the Class in the prosecution of this action is impracticable.

56.110.**Typicality**.  Plaintiffs' claims are typical of the claims of other members of the Class because Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants as alleged herein, including the unauthorized access, copying, and use of a wide range of their copyrighted text data and works.  The relief sought herein also is common to all members of the Class.

57.111.**Adequacy**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class because the Plaintiffs have experienced the same harms as the members of the Class and, including the unauthorized access, copying, and use of their copyrighted text data and works, and Plaintiffs have no conflicts with any other members of the Class.  Furthermore, Plaintiffs retained and are represented by sophisticated and competent counsel who are experienced in prosecuting federal and state class actions, as well as other complex litigation.

58.112.**Commonality and predominance**.  Numerous questions of law or fact common to eachthe Class arise from Defendants' conduct:

a.        whether Defendants violated the copyrights of Plaintiffs and the Class when they downloaded copies of Plaintiffs' copyrighted material, including books, articles, essays, and other written works;

b.  whether Defendants violated copyrights of Plaintiffs and the Class when they made copies of, and used ~~them to train ChatGPT~~, Plaintiffs' copyrighted material, including books, articles, essays, and other written text, in connection with the training of OpenAI's large language models;

b.  whether ~~ChatGPT itself is an~~the OpenAI's models are infringing derivative ~~work~~works based on Plaintiffs' copyrighted ~~books~~material;

c.  whether Defendants' conduct alleged herein, including but not limited to the unlawful use of peer-to-peer file-sharing networks to access and copy pirated copyrighted works and the misrepresentation of data sources used to train OpenAI's models, constitutes Unfair Competition under California Business and Professions Code § 17200 *et seq*~~.~~;

d.  whether this Court should enjoin Defendants from engaging in the unlawful conduct alleged herein~~.~~, including the unauthorized access, copying, and use of Plaintiffs' copyrighted material, and what the scope of that injunction would be~~.~~, including but not limited to whether OpenAI and Microsoft should be allowed to continue offering their suite of products trained on Plaintiffs' works unlawfully;

e.  whether Defendants' actions in copying mass quantities of text material from the internet, including but not limited to the Selected Infringed Works, without Plaintiffs' permission, constitute direct copyright infringement under 17 U.S.C. § 501;

f.  whether Microsoft, by providing financial resources, technical infrastructure, and strategic support to OpenAI, had the right and ability to supervise and control OpenAI's infringing activity and failed to exercise such supervision and control;

g.  whether Defendants' conduct, including but not limited to the unauthorized use of peer-to-peer file-sharing networks to access and copy pirated copyrighted works and the misrepresentation of data sources used to train OpenAI's models, constitutes Unfair Competition under California Business and Professions Code § 17200 et seq.;

h.      whether OpenAI's unauthorized access and use of Plaintiffs' copyrighted works, including but not limited to by torrenting digital copies from shadow libraries such as LibGen, constitute violations of the California Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502;

i.      whether OpenAI circumvented technological measures that control access to Plaintiffs' copyrighted works, including by torrenting these and other copyrighted materials from shadow libraries such as LibGen, in violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201, and whether OpenAI's removal of copyright management information (CMI) from copyrighted works, including but not limited to the Selected Infringed Works, constitutes a violation of the DMCA, 17 U.S.C. § 1201(b)(1);

j.      whether OpenAI's unauthorized acquisition and use of Plaintiffs' copyrighted works, including but not limited to by torrenting them from shadow libraries such as LibGen, constitutes conversion under California law;

k.      whether OpenAI has been unjustly enriched by its unauthorized access, copying, and use of Plaintiffs' copyrighted material to train its GenAI models, deriving significant commercial benefits and profits from this use, and whether Microsoft directly benefited from this unjust enrichment by integrating OpenAI's models into its own products and services, leveraging Plaintiffs' unlawfully obtained intellectual property to enhance its offerings and increase its profits;

l.      whether Defendants breached the terms and conditions of websites from which they obtained data for training their GenAI models, which prohibit the unauthorized copying and use of their content, thereby violating contracts intended to protect the rights of content creators, including Plaintiffs;

m.      whether OpenAI's unauthorized access and use of data from websites that prohibit such activities in their terms and conditions constitute violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, and whether Microsoft contributed

to these actions by providing infrastructure, financial support, and resources necessary for OpenAI to engage in these unlawful activities;

n.    whether Defendants unlawfully acquired copyrighted material from the internet, including but not limited to by torrenting works from shadow libraries and violating websites' terms and conditions, and used the material to develop GenAI models and products in order to generate profits, in violation of California Penal Code § 496(a), (c);

o.    whether any affirmative ~~defense excuses~~defenses excuse Defendants' conduct~~.~~; and

p.    whether any statutes of limitation constrain the potential recovery for Plaintiffs and the Class.

These and other questions of law and fact are common to the Class and predominate over any questions affecting the members of the Class individually, particularly given the widespread and systematic nature of Defendants' unauthorized access, copying, and use of a vast amount of copyrighted text data and works.

~~59.~~113. **Other class considerations**. Defendants acted on grounds generally applicable to the Class. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation and inconsistent results. There will be no material difficulty in the management of this ~~Action~~case as a class action. ~~Further~~ Furthermore, final injunctive relief is appropriate with respect to the Class as a whole, given the systematic and widespread nature of Defendants' unauthorized and unlawful access, copying, and use of copyrighted text data and works.

~~60.~~114. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants~~.~~, particularly given the widespread and systematic nature of Defendants' unauthorized and unlawful access, copying, and use of a vast amount of copyrighted text data and works.

**CLAIMS FOR RELIEF**

**COUNT 1**

**Direct Copyright Infringement**

**17 U.S.C. § 501**

**(Against All Defendants)**

61.115. Plaintiffs incorporate by reference the preceding factual allegations.

62.116. As the owners of the registered copyrights in books used to train the OpenAI Language Models, Plaintiffs hold the exclusive rights to those texts works, including but not limited to the Selected Infringing Works, under 17 U.S.C. § 106.

63.117. Plaintiffs never authorized OpenAI or Microsoft to make copies of their books, these texts, including but not limited to the Selected Infringed Works, or any portion thereof, to make derivative works, to publicly display copies (or derivative works), or to distribute copies (or derivative works). All those rights belong exclusively to Plaintiffs under copyright law.

64.118. On information and belief, to train the in connection with training its LLMs, OpenAI Language Models, OpenAI relied on harvesting copied mass quantities of textual text material from the public internet, including Plaintiffs' books, which are available but not limited to the Selected Infringed Works in digital formats., including by torrenting them from one or more shadow libraries, including LibGen.

65.119. OpenAI made additional copies of Plaintiffs' books and/or from texts including but not limited to the Selected Infringed Works during the its LLM training process of the OpenAI Language Models without Plaintiffs' permission. Specifically, OpenAI copied at least the Infringed Works in Exhibit A.

66.120. Licensing copyrighted material to train AI models is plainly feasible. It already happens. Indeed, OpenAI itself sought to license copyrighted materials to train material for training its LLMs. For instance, OpenAI reached agreements with the Associated Press and Axel Springer to license textual materials text data and material for the purpose of its LLM training. OpenAI has reportedly been in negotiations with other publishers as well. Microsoft too has negotiated and obtained licenses for text works as training data for training LLMs.

67.121.    Because the OpenAI LanguageOpenAI's models cannot function without the expressive information extracted from Plaintiffs' works (and othersothers' copyrighted material) and retained insideby them, the OpenAI Language models are themselves infringing derivative works, made without Plaintiffs' permission and in violation of their exclusive rights under the Copyright Act, particularly given the unlawful means of acquiring these works.

122.    Microsoft played a pivotal role in facilitating OpenAI's infringing activities by providing the financial resources, technical infrastructure, and strategic support necessary for OpenAI to develop and expand its AI systems.  This includes the use of Microsoft Azure, which powered the large-scale training of OpenAI's models using Plaintiffs' (and others') copyrighted material without authorization.

123.    Microsoft also ███████████████████████████████████████
████████████████████████

68.124.    Plaintiffs have been injured by OpenAI'sDefendants' acts of direct copyright infringement.  Plaintiffs are entitled to statutory damages, actual damages, restitution of profits, and other remedies provided by law.

COUNT 2

UCL — Unfair Competition

Cal. **COUNT 2**

**Vicarious Copyright Infringement**

**17 U.S.C. § 501**

**(Against Microsoft)**

**Bus. & Prof. Code §§ 17200 et seq.**

69.125.    Plaintiffs incorporate by reference the preceding factual allegations.

126.    As explained above in Count 1, OpenAI directly infringed Plaintiffs' copyrights.

127.    Microsoft directly benefitted from that infringement both because of its partnership with OpenAI and because it incorporates OpenAI's products—which infringe Plaintiffs' copyrights—into Microsoft's products.

128.    Microsoft—based on its partnership with, and significant investment in, OpenAI—had the right and ability to supervise and control OpenAI's infringing activity.

129.    Essentially, instead of Microsoft entering the market and buying copyrighted works for its own training data, it received those same works from OpenAI, who had previously stolen them, and then provided them to Microsoft ███████████████████████████████

███████████████

130.    Microsoft failed to exercise its supervision and control to prevent and/or stop OpenAI's infringement.

### COUNT 3

### UCL — Unfair Competition

### Cal. Bus. & Prof. Code §§ 17200 et seq.

### (Against All Defendants)

131.    Plaintiffs incorporate by reference the preceding factual allegations.

70.132.    Defendants engaged in unfair business practices by, among other things, using Plaintiffs' Infringed Works to train ChatGPT without permission from Plaintiffs or Class membersacquiring Plaintiffs' works through unlawful means, including torrenting vast amounts of pirated copyrighted works from shadow libraries; removing copyright identification information from Plaintiffs' works; and using the copies of those works to acquire additional training data from Microsoft.

133.    Defendants also misrepresented their adherence to ethics and respect for rights with respect to their AI operations, including but not limited to their procurement and use of data.

71.134.    The unfair business practices described herein violate California Business and Professions Code § 17200 et seq. (the "UCL").") and are unfair, unlawful, and fraudulent.

135.    Microsoft directly contributed to these unfair business practices by providing substantial financial resources, cloud infrastructure, and strategic support to OpenAI, enabling the development of ChatGPT using unlawfully obtained copyrighted text data and material.  Microsoft has further engaged in unfair practices by integrating OpenAI's infringing models into its own commercial products and services, thereby deriving its own profits from the exploitation of Plaintiffs' stolen copyrighted text and material.

72.136.     The unfair business practices described herein violate the UCL because they are unfair, immoral, unethical, oppressive, unscrupulous, or injurious to consumers, and because Defendants used Plaintiffs' protected works to train ChatGPT for Defendants' own commercial profit without the authorization of Plaintiffs or the Class.. Defendants unfairly profit from and take credit for developing a commercial product based on unattributed reproductions of those stolen writings and ideas.

73.137.     The unlawful business practices described herein violate the UCL because consumers are likely to be deceived. by them. Defendants knowingly and secretively acquired, copied, and trained ChatGPT using unauthorized and infringing copies of Plaintiffs' copyrighted work.text. Defendants deceptively marketed their product in a manner that fails to attribute the success of their product to the copyrighted workmaterial on which it is based.

**COUNT 4**

**Violation of the California Comprehensive Computer Data Access and Fraud Act (CDAFA)**

**Cal. Penal Code § 502**

**(Against Defendant OpenAI)**

138.    Plaintiffs incorporate by reference the preceding factual allegations.

139.    OpenAI's unauthorized access and use of Plaintiffs' copyrighted works by torrenting digital copies of those works from shadow libraries such as LibGen constitute violations of the California Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502.

140.    OpenAI knowingly and without permission accessed and used data from Plaintiffs' copyrighted works to train its AI models, thereby causing harm to Plaintiffs.

141.    OpenAI's knowing and unauthorized access to Plaintiffs' copyrighted works was a substantial factor in causing Plaintiffs' harm, including but not limited to the loss of control over their copyrighted material and the unauthorized use of their intellectual property.

142.    As a direct and proximate result of OpenAI's actions, Plaintiffs have suffered damages, including but not limited to the loss of control over their copyrighted material and the unauthorized use of their intellectual property, as well as the amount spent to investigate or verify whether Plaintiffs' data was or was not altered, damaged, or deleted by OpenAI. Plaintiffs have engaged in and continue to engage in

protracted efforts to determine how Defendants acquired their copyrighted data. On information and belief, OpenAI redistributed that data via seeding and leeching, making it available to data pirates worldwide and thus furthering such piracy beyond their own downloading efforts.

143. Plaintiffs are entitled to compensatory damages, injunctive relief, and other equitable remedies as provided by Cal. Penal Code § 502(e).

**COUNT 5**

**Violation of the Digital Millennium Copyright Act (DMCA)**

**U.S.C. § 1201**

**(Against all Defendants)**

144. Plaintiffs incorporate by reference the preceding factual allegations.

145. Defendants circumvented technological measures that control access to Plaintiffs' copyrighted works, including, but not limited to, by torrenting these and vast amounts of other copyrighted material from shadow libraries such as LibGen and by ignoring robots.txt files (the filename used for implementing the Robots Exclusion Protocol, which is designed to indicate which websites crawlers are allowed to visit) and other access-related security measures and/or by using data obtained by similarly bypassing security measures.

146. Defendants' conduct in bypassing these technological measures was done without authorization and for the purpose of infringing Plaintiffs' copyrights.

147. Defendants also distributed these works, including, but not limited to, through torrenting and seeding.

148. As a result of these violations of the DMCA, Plaintiffs have suffered and will continue to suffer irreparable harm and are entitled to injunctive relief, statutory damages, and other remedies as provided by 17 U.S.C. § 1203.

**COUNT 6**

**CMI-Stripping: Violation of the Digital Millennium Copyright Act (DMCA)**

**U.S.C. § 1201(b)(1)**

**(Against All Defendants)**

149.    Plaintiffs incorporate by reference the preceding factual allegations.

150.    OpenAI repeatedly and intentionally removed copyright management information ("CMI") from copyrighted works, including but not limited to the Selected Infringed Works, that OpenAI copied and used to train ChatGPT.

151.    OpenAI source code specifically references an approach that ███████████ ████████████████████████████ with respect to the LibGen dataset.

152.    Indeed, OpenAI removed CMI from Selected Infringed Works in part to enable and to facilitate infringement.  Removal of CMI made it easier to use these Works as training data, and because their use in training constitutes an infringement, the CMI removal "facilitated" that infringement.

153.    OpenAI also removed CMI from texts including but not limited to the Selected Infringed Works contained in OpenAI's training datasets to conceal OpenAI's infringement of copyrighted material, including but not limited to the Selected Infringed Works, from ChatGPT users and the public.

154.    OpenAI sought to conceal its infringement and thus to minimize risks that ChatGPT users and the public might learn or perceive that it had engaged in mass IP piracy, copyright infringement, and other unlawful activity in developing ChatGPT.  OpenAI knew that the ChatGPT could generate verbatim text from copyrighted material used to train ChatGPT.  Open AI also knew that ChatGPT was prone to memorizing and generating outputs of CMI unless it was removed from the copyrighted works used to train ChatGPT.

155.    Due to, among other things, the CMI that OpenAI removed from copyrighted works and OpenAI's knowledge that LibGen contained copyrighted books and articles, OpenAI knew or had reasonable grounds to know that its removal of CMI from ChatGPT's training data would induce, enable, facilitate, or conceal its own copyright infringement or the copyright infringement of others.  Among other things, OpenAI knew or had reasonable grounds to know its removal of CMI would reduce the chances that Plaintiffs and Class members would discover OpenAI had copied texts including but not limited to the Selected Infringed Works and/or used them to train ChatGPT.

156.    Defendants also distributed these works, including by trading training data between OpenAI and Microsoft.

1

2

3

### COUNT 7

### Conversion

### (Against Defendant OpenAI)

4    157.    Plaintiffs incorporate by reference the preceding factual allegations.

5    158.    OpenAI's unauthorized acquisition and use of Plaintiffs' copyrighted works by unlawfully

6    scraping and/or crawling and/or illegally torrenting them from shadow libraries such as LibGen constitute

7    conversion under California law.

8    159.    OpenAI took Plaintiffs' copyrighted works without permission.  In doing so, OpenAI

9    wrongfully exercised dominion and control over Plaintiffs' property, depriving them of their rights to use

10   and control their works.

11   160.    As a result of OpenAI's conversion, Plaintiffs suffered damages, including but not limited to

12   the loss of control over their copyrighted works and the unauthorized use of their intellectual property.

13   161.    Plaintiffs are entitled to compensatory damages, punitive damages, and other equitable relief

14   as provided by California law.

15

16

17

### COUNT 8

### Unjust Enrichment / Quasi-Contract

### (Against All Defendants)

18   162.    Plaintiffs incorporate by reference the preceding factual allegations.

19   163.    OpenAI has been unjustly enriched by its unauthorized access, copying, and use of Plaintiffs'

20   copyrighted material to train its GenAI models, deriving significant commercial benefits and profits from

21   this use.

22   164.    Microsoft directly benefited from this unjust enrichment by integrating OpenAI's models

23   into its own products and services, leveraging Plaintiffs' unlawfully obtained intellectual property to

24   enhance its offerings and increase its profits.

25   165.    Defendants' enrichment came at the expense of Plaintiffs, who have not been compensated

26   for the acquisition and use of their copyrighted material.

27

28

166.     It would be inequitable for Defendants to retain the benefits derived from their unauthorized acquisition and use of Plaintiffs' copyrighted material without providing compensation to Plaintiffs.

167.     Plaintiffs are entitled to restitution and non-restitutionary disgorgement of all profits obtained by OpenAI and Microsoft as a result of their unjust enrichment, as well as other equitable relief as provided by law.

### COUNT 9

### Breach of Contract as a Third-Party Beneficiary

### (Against All Defendants)

168.     Plaintiffs incorporate by reference the preceding factual allegations.

169.     Many of the websites from which Defendants obtained data for training GenAI models have terms and conditions that prohibit the unauthorized copying and use of their content.  These terms and conditions are intended to protect the rights of content creators, including Plaintiffs, who publish their works on these platforms.

170.     These terms and conditions are designed to protect the intellectual property rights of content creators and intellectual property owners from unauthorized copying.

171.     Because the terms and conditions are designed to protect Plaintiffs' intellectual property, they are third-party beneficiaries of these contracts between the websites and their users.

172.     Defendants, including Microsoft, breached these contracts by facilitating and benefiting from the unauthorized copying and use of content from these websites in violation of their terms and conditions.  Microsoft contributed to these contract breaches by providing OpenAI with the necessary financial resources, infrastructure, and operational support to copy and use the protected content unlawfully.

173.     As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages, including but not limited to the loss of control over their copyrighted works and the unauthorized use of their intellectual property.

174.     Plaintiffs are entitled to compensatory damages and other equitable relief as provided by law.

**COUNT 10**

**Violation of the Computer Fraud and Abuse Act (CFAA)**

**18 U.S.C. § 1030**

**(Against All Defendants)**

175.    Plaintiffs incorporate by reference the preceding factual allegations.

176.    OpenAI's unauthorized access and use of data from websites that prohibit such activities in their terms and conditions constitute violations of the Computer Fraud and Abuse Act.  OpenAI, with Microsoft's knowledge and facilitation, knowingly and with intent to defraud accessed protected computers without authorization, or exceeded authorized access, and obtained information from these computers. Microsoft contributed to these actions by providing infrastructure, financial support, and resources necessary for OpenAI to engage in these unlawful activities.

177.    As a result of Defendants' violations of the CFAA, Plaintiffs suffered damages, including but not limited to the loss of control over their copyrighted works and the unauthorized use of their intellectual property.

178.    Plaintiffs are entitled to compensatory damages, injunctive relief, and other equitable remedies as provided by 18 U.S.C. § 1030(g).

**COUNT 11**

**Larceny/Receipt of Stolen Property**

**Cal. Penal Code § 496(a), (c)**

**(Against All Defendants)**

179.    Plaintiffs incorporate by reference the preceding factual allegations.

180.    California Penal Code § 496(a) creates an action against any person who (1) receives any property that has been stolen or obtained in any manner constituting theft, knowing the property to be stolen or obtained, or (2) conceals, sells, withholds, or aids in concealing or withholding any property from the owner, knowing the property to be so stolen or illegally obtained.

181.    Under Cal. Penal Code § 7, "the word 'person' includes a corporation as well as a natural person."  Thus, Defendants are persons under Cal. Penal Code § 496(a).

182.    As discussed above, Defendants unlawfully acquired copyrighted material from the internet, including by torrenting works from shadow libraries and violating websites' terms and conditions, and used the material to develop GenAI models and products in order to generate massive profits.  At no point did Defendants have consent to take/scrape this information and use it in connection with their GenAI models and products.  Defendants meet the grounds for liability under Cal. Penal Code § 496(a) because each of them:

> a.    Knew that the taken copyrighted material was stolen or obtained without permission, and with such knowledge;
>
> b.    Concealed, withheld, or aided in concealing or withholding said data from their rightful owners by unlawfully manipulating (for example, removing CMI) and using the data to train their GenAI models.

183.    Pursuant to Cal. Penal Code § 496(c), Plaintiffs, on behalf of themselves and the Class, seek actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

### COUNT 12

### Conspiracy to Restrain Trade

### 15 U.S.C. §§ 1 & 3

### (Against All Defendants)

184.    Plaintiffs incorporate by reference the preceding factual allegations.

185.    Defendants OpenAI and Microsoft entered into a partnership, including substantial financial investments and operational support, to develop and commercialize large language models.

186.    As a key part of that partnership, ███████████████████████████████ ████████

187.    Essentially, instead of Microsoft entering the market and buying copyrighted works for its own training data, it received those same works from OpenAI, who had previously stolen them, and then provided them to Microsoft ███████████████████████ ███████████

188.    As a result of that agreement, OpenAI and Microsoft artificially and unreasonably restrained the price of training data for LLMs.  Instead of Microsoft entering the market and purchasing copyrighted works for its own training data, it received those works from OpenAI ████████████████████. This arrangement represents anticompetitive conduct between horizontal competitors in the market for training data for LLMs and as such limited competition in the AI training space, since Microsoft did not compete with OpenAI to acquire high-quality training data for LLMs.  The agreement to "tone down the effort on training on the large models" and to be "super-careful not competing with [OpenAI]" further solidified the restraint of trade.

189.    As a direct and proximate result of Defendants' conspiracy to restrain trade, Plaintiffs and the Class have suffered antitrust injury, including but not limited to the loss of control over their copyrighted works, the unauthorized use of their intellectual property, and diminished market value of their works.  The conspiracy affected Plaintiffs' ability to compete in the market, resulting in financial losses and other specific damages.  By artificially restraining the price of training data and limiting competition, Defendants' actions have caused significant harm to Plaintiffs and the market as a whole.

190.    While the conspiracy constitutes a *per se* violation of the Sherman Act, Defendants also exploited their collective market power in the relevant market, which is the market for training data for LLMs in the United States.

191.    Through their conspiracy, Defendants exercised and maintained market power, and did in fact suppress the market value for copyrighted works as training data for LLMs.

192.    The conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

193.    In the alternative, any procompetitive effects that may have resulted from the conspiracy are substantially outweighed by the anticompetitive harm alleged herein, including, but not limiting to eliminating Class members' ability to control their works and suppressing the price of copyrighted works as training data for LLMs.

194.    Defendants are also liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on Class members and the relevant market.

## DEMAND FOR JUDGMENT

Wherefore, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by ordering and decreeing:

a) This Action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel.

b) A declaration that Defendants have infringed Plaintiffs' and the ~~Class'~~Class's exclusive copyrights, including but not limited to those in the Selected Infringed Works, under the Copyright Act.

c) A declaration that such infringement is willful.

d) Judgment in favor of Plaintiffs and the Class and against Defendants.

e) An award of statutory and other damages under 17 U.S.C. § 504 for Defendants' willful infringement of Plaintiffs' and the ~~Class'~~Class's exclusive copyrights, including but not limited to those in the Selected Infringed Works.

f) Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiffs and Class members have been damaged and injured in their business and property as a result of this violation.

g) The alleged combinations and conspiracy are *per se* violations of the Sheman Act;

h) Reasonable attorneys' fees and costs as available under 17 U.S.C. § 505, Cal. Penal Code § 502 or other applicable statute.

i) Pre- and post-judgment interest on the damages awarded to Plaintiffs and the Class, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants.

j) Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give

immediate notification to the Class.

k) Nominal, treble, and punitive damages, as warranted.

l) Permanent injunctive relief, including but not limited to the return, destruction, and cessation of the use of any data illegally or unlawfully acquired, or of the products dependent upon the use thereof.

m) Restitution and non-restitutionary disgorgement of all profits obtained as a result of Defendants' unjust enrichment, as well as other equitable relief as provided by law.

n) Further relief for Plaintiffs and the Class as may be just and proper.

**JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: March 13, 2024                    By:           /s/*Saveri*
                                                       Joseph R. Saveri

1    Dated: March 4, 2025

2    By: _____ /s/ Joseph R. Saveri _____        By: _____ /s/ David Boies _____

3    **JOSEPH SAVERI LAW FIRM, LLP**              **BOIES SCHILLER FLEXNER LLP**

4    Joseph R. Saveri (SBN 130064)               David Boies (*pro hac vice*)
     jsaveri@saverilawfirm.com                   333 Main Street
5    Cadio Zirpoli (SBN 179108)                  Armonk, NY 10504
     czirpoli@saverilawfirm.com                  (914) 749-8200
6    Christopher K.L. Young (SBN 318371)         dboies@bsfllp.com
7    cyoung@saverilawfirm.com
     Holden Benon (SBN 325847)                   Maxwell V. Pritt (SBN 253155)
8    hbenon@saverilawfirm.com                    Joshua M. Stein (SBN 298856)
     Aaron Cera (SBN 351163)                     Reed D. Forbush (SBN 347964)
9    acera@saverilawfirm.com                     44 Montgomery Street, 41st Floor
     Margaux Poueymirou (SBN 35600)              San Francisco, CA 94104
10   mpoueymirou@saverilawfirm.com               (415) 293-6800
     William W. Castillo Guardado (SBN 294159)   mpritt@bsfllp.com
11   wcastillo@saverilawfirm.com                 jstein@bsfllp.com
12   601 California Street, Suite 1505
     San Francisco, CA 94108                     Jesse Panuccio (*pro hac vice*)
13   Telephone: (415) 500-6800                   1401 New York Ave, NW
     Facsimile: (415) 395-9940                   Washington, DC 20005
14                                               (202) 237-2727
                                                 jpanuccio@bsfllp.com
15   By: _____ /s/ Matthew Butterick _____

16   Matthew Butterick (SBN 250953)              Evan Matthew Ezray (*pro hac vice*)
     1920 Hillhurst Avenue, 406                  401 E. Las Olas Blvd., Suite 1200
17   Los Angeles, CA 90027                       Ft. Lauderdale, FL 33301
     Telephone:    (323) 968-2632                (954) 356-0011
18   Facsimile:    (415) 395-9940                eezray@bsfllp.com
     Email:        mb@butcoericklaw.com
19                                               *Counsel for Individual and Representative*
20                                               *Plaintiffs and the Proposed Class*
     **CAFFERTY CLOBES MERIWETHER**
21   **& SPRENGEL LLP**
     By: _____ /s/ Bryan L. Clobes _____
22
     Bryan L. Clobes (*pro hac vice*)
23   Alexander J. Sweatman (*pro hac vice*)
     Mohammed A. Rathur (*pro hac vice*)
24   135 South LaSalle Street, Suite 3210
     Chicago, IL 60603
25   Tel: (312) 782-4880
     bclobes@caffertyclobes.com
26   asweatman@caffertyclobes.com
     mrathur@caffertyclobes.com
27

28
     Master File No. 23-cv-03223-AMO                42
     FIRST SECOND AMENDED CONSOLIDATED AMENDED COMPLAINT    23-cv-3223-AMO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28