**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (SBN 130064)
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Bryan L. Clobes (*pro hac vice*)
205 N. Monroe Street
Media, PA 19063
Telephone: (215) 864-2800
Email: bclobes@caffertyclobes.com

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Email: dboies@bsfllp.com

Matthew Butterick (SBN 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940
Email: mb@butericklaw.com

*Counsel for Individual and Representative
Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPENAI CHATGPT LITIGATION<br><br>This document relates to:<br><br>All actions | Master File No. 3:23-cv-03223-AMO<br><br>**PLAINTIFFS' MOTION FOR RELIEF FROM NON-DISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE [ECF No. 378]** |

# **MOTION**

Plaintiffs move under 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72(a), and N.D. Cal. Local Rule 72-2 for relief from a non-dispositive pretrial order of a Magistrate Judge. Plaintiffs object to and ask the Court to set aside the Discovery Order at ECF No. 378 issued by Magistrate Judge Illman on March 5, 2025, as set forth in the accompanying Memorandum of Points and Authorities ("Memorandum"). In addition to this Motion and the Memorandum, the Motion is based on the relevant briefing related to ECF No. 378, the Proposed Order for this Motion, the records and docket in this matter, and any oral argument.

**Introduction.** On March 5, 2025, Magistrate Judge Illman denied Plaintiffs' motion to compel ("Motion") the production of documents from third party Reuters News & Media Inc. ("Reuters"). ECF No. 378 (the "Order"). Judge Illman's Order is clearly erroneous for two reasons: To start, the Order went beyond the dispute presented in the Motion over *certain* categories of documents and quashed Plaintiffs' subpoena in full, including as to documents Reuters was prepared to produce, i.e., executed license agreements. Judge Illman also clearly erred by declaring the information that *was* the subject of Plaintiffs' Motion to be marginally relevant even though it goes directly to OpenAI's fair use defense. Order at 5. Plaintiffs, therefore, request that the Court sustain these objections and order Reuters to produce documents responsive to Plaintiffs' subpoena or, in the alternative, modify the Order to require Reuters to produce the license agreements it previously agreed to produce. *See* ECF No. 348 at 4; ECF No. 348-3 at 2-3.

**Background**. Plaintiffs and the putative class own copyrights to literary works—including books, news, or other content—that were wrongfully acquired and used by OpenAI to train its commercial large language models ("LLMs"). As OpenAI's appetite for high-quality textual datasets to train its LLMs skyrocketed, OpenAI sought vast quantities of data from every corner of the web, all without authorization and without providing due attribution, credit, or compensation to the copyright owners. *See, e.g.*, Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, N.Y. TIMES (Apr. 6, 2024). As noted in the Order, Plaintiffs subpoenaed Reuters to obtain evidence—information that *cannot* be obtained from OpenAI—regarding the existence of a market or potential market for the licensing of copyrighted text data for use in connection with training LLMs and to counter OpenAI's fair use defense. Order at 4. The Magistrate Judge denied Plaintiffs' Motion in its entirety.

**Legal Standard**. A magistrate judge's non-dispositive pretrial order that is "clearly erroneous or contrary to law" may be modified or set aside. Fed. R. Civ. P. 72(a). "[F]actual determinations are reviewed for clear error, and legal conclusions are reviewed to determine whether they are contrary to law." *Perry v. Schwarzenegger*, 268 F.R.D. 344, 348 (N.D. Cal. 2010).

**Argument.**

**The Magistrate Judge clearly erred by ignoring Reuters's agreement to produce executed licenses for AI training data.** Before Judge Illman's Order, Reuters had agreed to produce all executed licensing agreements related to AI training data. *See* ECF No. 348 at 4; ECF No. 348-3 at 2-3. The remaining

1  dispute centered only on Reuters's *unexecuted* licensing agreements. Reuters's willingness to produce the
2  executed licenses demonstrates that compliance with that portion of the subpoena calling for the agreements
3  is *prima facie* proportional and does not impose undue burden. Fed. R. Civ. P. 26(b)(1). Notwithstanding
4  that Reuters agreed to produce its executed licenses, Judge Illman ignored the parties' agreement and denied
5  the Motion in its entirety, effectively quashing Plaintiffs' subpoena in its entirety, rather than simply denying
6  the Motion as to the additional material Plaintiffs sought. That was clear error. *See e.g., United States v.*
7  *Sineneng-Smith*, 590 U.S. 371, 375 (2020) (holding it is improper for a court to disregard the parties' framing
8  of the case because it undermines the adversarial process and emphasizing that the courts should act as
9  neutral arbiters). What is more, the implication of the order is the elimination of Plaintiffs' ability to seek
10 relevant licensing agreements and the surrounding negotiations from nonparties.

11 **The Magistrate Judge clearly erred by failing to consider the importance of news content**
12 **licenses to this case.** Judge Illman held that news content licenses were "marginal[ly] relevan[t],"
13 apparently based on the mistaken belief that news content and non-news content are materially distinct in
14 the market for text training data. Order at 5. That was clearly erroneous for two reasons.

15 *First*, news content licenses are highly relevant to establishing the market for text data for use as
16 LLM training data. OpenAI's primary defense to infringement is fair use, and "the effect of the use upon
17 the potential market for or value of the copyrighted work" is a factor that must be weighed in the fair use
18 analysis. 17 U.S.C. § 107(4). Indeed, the Supreme Court has explained that this factor is "undoubtedly the
19 single most important element of fair use." *Harper & Row Publ'rs v. Nation Enters.*, 471 U.S. 539, 566
20 (1985). Thus, evidence regarding this element is highly relevant and discoverable. Yet the Magistrate Judge
21 seemingly ignored the importance of this evidence.

22 The relevant market in connection with OpenAI's infringement in the context of LLM training data
23 is the market for *high-quality text data used to train LLMs*. Determining the effect of OpenAI's theft on the
24 market for such text data relies (at least in part) on proof of agreements reached by market participants.
25 Reuters is one such participant. Because the market involves high quality text data, it does not matter if the
26 content is "news" or "non-news" content. *See e.g.*, Welinder Dep. Tr. 375: 15-16 ▇▇▇▇▇▇
27 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ To OpenAI, the *volume* of high-quality text data for use
28 as LLM training data is critical; not the book versus non-book distinction. *See e.g.,*

OPCO_NDCAL_1729759 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Among other things, experts will offer testimony on the existence of such a market, including the value of imputed text data licenses in the market had OpenAI properly negotiated arms' length licenses rather than engaging in Internet piracy to acquire the data. The Reuters agreements—including agreements it has attempted to negotiate and is in the process of negotiating—are real world examples. Such evidence will not only go to damages, but also to disprove OpenAI's alleged fair use defense. The Order's suggestion that news content licenses are largely immaterial ignores the markets at issue as well as the sources of data used by OpenAI in training its LLMs. *See e.g.*, *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) (recognizing the need for evidence about relevant markets); *Bell v. Pac. Ridge Builders, Inc.*, 2019 WL 13472127, at *5 (N.D. Cal. June 4, 2019) (same). The discovery sought is germane to establishing the scope of the relevant licensing market and the harm suffered by the class, and thus relevant to infringement and fair use. *See, e.g., Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1218 (D. Nev. 2020) (recognizing the relevance of "the challenged use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" to the fourth Fair Use factor).

*Second*, Judge Illman clearly erred by failing to recognize that this case is not limited to books. While the named Plaintiffs are book authors, the putative class includes "[a]ll persons or entities domiciled in the United States that own a United States copyright in any work that was used as training data for the OpenAI Language Models during the class period." Am. Compl. ¶ 53, ECF No. 120. Thus, Reuters's licensing agreements will aid in establishing the existence and scope of the market for text data for use in LLM training, a market in which Plaintiffs and the putative class were denied an opportunity to compete in due to OpenAI's piracy and misuse of their works.

**The Magistrate Judge improperly narrowed the discovery to which Plaintiffs are entitled, limiting it to party evidence and expert testimony.** The Order compounded its error by concluding that Plaintiffs needed to show "why *the essence* of the information it seeks cannot be garnered either from OpenAI, or through expert witness testimony, or by some other less intrusive means." Order at 3. This is legally erroneous. *First*, while OpenAI's own licensing deals for text content as LLM training data will provide *some* insight into the relevant market for text data in LLM training, that is hardly the only relevant evidence on this issue. Indeed, OpenAI will likely take the position that there is no demonstrable

marketplace for licensing text data for use in LLM training at all, as other companies facing similar claims have argued. Peterson Decl. in Supp. of Def.'s Mot. for Prelim. Inj., *Concord Music Grp. Inc. et al., v. Anthropic PBC*, Case No. 3:23-cv-01092 (M.D. Tenn. 2024), ECF No. 67-19 (characterizing the market of text training data licenses as "hypothetical" and "impracticable"). That other sophisticated market participants have in fact negotiated licenses for text training data directly disproves that assertion. Such evidence is routinely relied on in analogous cases. *See e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Experts can—and almost always do—rely on information from other market participants to provide a rigorous analysis to the factfinder. In this context, for example, other generative AI licensors.

Moreover, OpenAI's own licensing deals are of limited value in isolation. While those licensing deals are valuable data points, they are not perfect evidence and may need to be analyzed in the context of the broader market for text training data. As just one example, OpenAI's own licensing deals may undervalue the true market for licensing text data because OpenAI only entered its agreements after having *already* acquired a massive corpus of pirated training data for free. *United States v. Wilson*, 900 F.2d 1350, 1356 (9th Cir. 1990) (recognizing that "stolen information always commands less than legitimate information" and thus the actual "market value [of the stolen information] has got to be many times higher"). Before OpenAI sought to license copyrighted text data to train its LLMs, it pirated copyrighted works from shadow libraries and scraped the Internet for copyrighted data instead of seeking licenses. *See* Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, N.Y. TIMES (Apr. 6, 2024). OpenAI's prior unauthorized use of Plaintiffs' and the putative class's content would tend to create an artificially depressed market because OpenAI could satisfy its own demand by obtaining illegal copies of the work instead of going to the marketplace. Accordingly, the subsequent licensing deals that OpenAI reached after it already had stolen significant amounts of data may be imperfect evidence to prove the existence of the market and what licenses would have been negotiated in the but for world. To assist their experts in establishing the market and assessing the value of Plaintiffs' works as text training data, Plaintiffs should be permitted to gather evidence from nonparties who struck other licensing deals—evidence not fully tainted by OpenAI's theft—which will provide a more comprehensive picture of the market when analyzed in conjunction with other AI training data licenses, including OpenAI's. *See Zakaria v. Gerber Prods. Co.*, 2017 WL 9512587, at *18 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018) (finding that because expert relied

on subjective information skewed by Defendant's misrepresentation, "the court [could not] calculate the *true market price* of [the product] absent the purported misrepresentations").

*Second*, for Plaintiffs' damages experts to develop a robust damages methodology, they should have access to a breadth of licensing agreements that help to reliably reflect the nature of the relevant market. Fed. R. Evid. 702. Judge Illman's suggestion that expert testimony could substitute for the requested discovery gets it backward. Real world evidence is highly probative, and expert testimony based on real world evidence is generally more reliable than *ipse dixit* assertions. *See* Fed. R. Evid. 702. Plaintiffs seek Reuters's licensing agreements and negotiations with other AI companies to provide those facts upon which an expert may analyze. Much of this information is not public. *See* Bruce Barcott, *How the Emerging Market for AI Training Data is Eroding Big Tech's 'Fair Use' Copyright Defense*, TECH POLICY. PRESS, Mar. 4, 2025, ("because these were [AI training data] deals between corporate entities, the actual amount of money changing hands remained cloaked in mystery"). Judge Illman therefore had no basis for concluding that Plaintiffs should be limited to expert testimony uninformed from discoverable, probative evidence of real-world arms' length transactions between sophisticated market participants that would make expert testimony more reliable.

**The Magistrate Judge clearly misapplied the substantial need and proportionality analysis.** Finally, the Order found that "Plaintiffs have not demonstrated a substantial need for the discovery they seek, and the requested discovery is not proportional to the needs of the case." Order at 5. This, too, was clear error. First, as noted *supra*, Reuters's executed licenses help establish the existence and scope of the market for text training data, in addition to the harm suffered by Plaintiffs and the class. Without this evidence, Plaintiffs will be deprived of probative evidence to counter OpenAI's fair use defense or develop a reliable damages methodology. Second, the burden on Reuters is minimal because Reuters *already agreed to produce* its executed licenses. What is more, Reuters's confidentiality concerns are adequately addressed by the protective order in this case. *See, e.g., Shasta Linen Supply, Inc. v. Applied Underwriters Inc.*, 2018 WL 2981827, at *3 (E.D. Cal. June 14, 2018) (subpoenaed nonparty's "argument that the subpoenas request documents which would reveal its confidential, proprietary information *does not protect it from compliance*" since the "protective order issued in this case addresses such concerns.") (emphasis added).

| | | |
|---|---|---|
| Dated: March 19, 2025 | By: | */s/ Joseph R. Saveri* |
| | | Joseph R. Saveri |

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Christopher K.L. Young (State Bar No. 318371)
Holden Benon (State Bar No. 325847)
Aaron Cera (State Bar No. 351163)
Melissa Tribble (State Bar No. 339098)
Alexander Y. Zeng (State Bar No. 360220)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                    czirpoli@saverilawfirm.com
                    cyoung@saverilawfirm.com
                    hbenon@saverilawfirm.com
                    acera@saverilawfirm.com
                    mtribble@saverilawfirm.com
                    azeng@saverilawfirm.com

Matthew Butterick (State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone:    (323) 968-2632
Facsimile:    (415) 395-9940
Email:          mb@buttericklaw.com

Bryan L. Clobes (pro hac vice)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Telephone:    215-864-2800
Email:          bclobes@caffertyclobes.com

Alexander J. Sweatman (pro hac vice)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone:   312-782-4880
Email:       asweatman@caffertyclobes.com

Daniel J. Muller (State Bar No. 193396)
**VENTURA HERSEY & MULLER, LLP**
1506 Hamilton Avenue
San Jose, California 95125
Telephone:   (408) 512-3022
Facsimile:   (408) 512-3023
Email:       dmuller@venturahersey.com


David Boies
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone:   (914) 749-8201
Facsimile:   (914) 749-8300
Email:       dboies@bsfllp.com

Evan Matthew Ezray
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone:   (954) 377-4237
Email:       eezray@bsfllp.com

Jesse Michael Panuccio
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Telephone:   (202) 237-2727
Email:       jpanuccio@bsfllp.com

Maxwell V. Pritt
Joshua Michelangelo Stein
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:   (415) 293-6813
Telephone:   (415) 293-6800
Email:       mpritt@bsfllp.com
Email:       jstein@bsfllp.com

*Counsel for Individual and Representative
Plaintiffs and the Proposed Class*